Joseph S. Farzam, SBN 210817
**JOSEPH FARZAM LAW FIRM**
A Professional Law Corporation
11766 Wilshire Blvd., Suite 280
Los Angeles, California 90025
Telephone: (310) 226-6890
Fax: (310) 226-6891

Nicole Lahmani, Esq. SBN 278182
**LAHMANI LAW, APC**
1539 E. Fourth Street
Santa Ana, CA 92701
Telephone: (949) 202-1111
Fax: (855) 700-0529

Attorneys for Nicholas Robinson

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| NICHOLAS ROBINSON )<br><br>Plaintiff, )<br><br>vs. )<br><br>CITY OF SAN JOSE, RYAN DOTE, )<br>JAMIE MARIE KULIK, NICHOLAS )<br>PETTERSON, and DOES 1 through 20 )<br>inclusive, )<br><br>Defendants. )<br>)<br>)<br>_____ ) | Case No.: 5:19-cv-06768NC<br><br>**DECLARATION OF JOSEPH S. FARZAM IN SUPPORT OF PLAINTIFF'S OPPOSITION TO THE MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>DATE:    September 22, 2021<br>TIME:    1:00 p.m.<br>COURTROOM:    5, 4th Floor<br>JUDGE:  Hon. Nathanael Cousins<br><br>Trial:    November 22, 2021 |

I, JOESPH FARZAM, am an attorney admitted to practice law in the courts of California and in the U.S. District Court for the Northern District of California, hereby affirms and declares the truth of the following under penalty of perjury to 28 U.S.C. § 1746.

1.    I am co-counsel for Plaintiff Nicholas Robinson.

2.    I submit this declaration in support of Mr. Robinson's opposition to

1

defendant's motion for partial summary judgment.

3.     I am familiar with the facts of this case and have reviewed the attached exhibits to my declaration.

4.     Attached as Exhibit A is a true and correct copy of San Jose Police Department's Chief of Police's, Edgardo Garcia, response letter dated on October 20, 2020, to Nicole Lahmani's Public Records Request that included a link to footage of the incident recorded by the Department's Body Worn Camera Unit. The link is listed as 18-333-0904 BWC Redacted.

5.     Attached as Exhibit B is a true and correct copy of excerpts of the transcript of Nicholas A. Robinson's deposition taken on April 2, 2021.

6.     Attached as Exhibit C is a true and correct copy of excerpts of the transcript of Officer Nicholas Petterson's deposition taken on April 14, 2021.

7.     Attached as Exhibit D is a true and correct copy of excerpts of the transcript of Officer Ryan Dote's deposition taken on April 13, 2021.

8.     Attached as Exhibit E is a true and correct copy of excerpt of the City of San Jose Police Department's Internal Affairs Unit's letter dated December 4, 2018, regarding its enclosed investigation report, I A Case No. I2018-0293. Letter signed by Chief of Police, Edgardo Garcia.

9.     Attached as Exhibit F is a true and correct copy of Roger Clark's Declaration and attached report marked as Exhibit A to his declaration.

10.     Attached as Exhibit G is a true and correct copy of San Jose Police Department's Police Report No. GO#SJ 2018-183330904 OPEN that was attached as Exhibit 2 to the transcript of Officer Ryan Dote's deposition taken on April 13, 2021.

11.     Attached as Exhibit H is a true and correct copy of excerpts of the transcript of Jaime Kulik's deposition taken on April 20, 2021.

12.     Attached as Exhibit I is a true and correct copy of Bob Scales', Police Strategies, Police Force Analysis System Summary Repo dated on January 2018.

13.    Attached as Exhibit J is a true and correct copy of Bob Scales', Police Strategies, Police Force Analysis System Summary Repo dated on March 2020.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct, and that this declaration was executed on August 20, 2021 in Los Angeles, California.

Joseph Farzam

**https://www.dropbox.com/sh/w06tkf9wxiqftx7/AADz2YBPY
0KkZWkaKKskkpsaa?dl=0**

**Exhibit "A"**




*San José Police Department*

October 20, 2020

Nicole Lahmani
nicole@lahmanilaw.com

**Re: Public Records Request – Update**

Dear Ms. Lahmani:

On September 21, 2020, the Department notified you that additional records responsive to your request were being processed and an update would be provided by October 21, 2020.

Please refer to the following report concerning event number 18-333-0904, which occurred on November 29, 2018 and involved subject Nicholas Robinson.

This record was downloaded via Axon Evidence.com and provided by the Department's Body Worn Camera (BWC) Unit. The BWC video file included in this update has been trimmed to capture the event's precipitous moments and does not represent the full-length video. Please advise if this record satisfies your request.

Body Worn Camera Video – Link: <u>18-333-0904 BWC_Redacted</u>

The following exemptions have been applied to this record:

- Officer images have been redacted pursuant to Penal Code section 832.7(b)(5)(D), there is reason to believe that disclosure of the record would pose a significant danger to the physical safety of the peace officer; Penal Code section 832.7(b)(6), the public's interest in nondisclosure clearly outweighs the public's interest in disclosure.

For questions regarding this response, please contact Jennifer Quezada, Office of the Chief Executive Officer, Research and Development Unit at (408) 277-5200 or jennifer.quezada@sanjoseca.gov. Should you desire to appeal this response, please submit your appeal to:

Open Government Manager              Or    City of San José, Office of the City Clerk
City of San José, Office of the City Manager    200 East Santa Clara Street
200 East Santa Clara Street                San José, CA  95113
San José, CA  95113                        cityclerk@sanjoseca.gov
PublicRecordsRequest@sanjoseca.gov



Nicole Lahmani
**RE: Public Records Request - Update**
October 20, 2020
Page 2

Sincerely,

Edgardo Garcia
Chief of Police

By: Jennifer Quezada
Research and Development Unit

EG:JQ



Exhibit "B"

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION


NICHOLAS ROBINSON,                    )     CASE NO.
                                      )     5:19-CV-06768-NC
                Plaintiff,            )
                                      )
vs.                                   )
                                      )
CITY OF SAN JOSE, et al.,             )
                                      )
                Defendants.           )
                                      )


DEPOSITION OF NICHOLAS A. ROBINSON

PAGES 1 - 152


DATE:          Friday, April 2, 2021

TIME:          10:46 a.m.

LOCATION:      Office of the City Attorney

               200 East Santa Clara Street, 16th Floor

               San Jose, California

REPORTED BY:   SHELLEY M. SAILOR

               CSR No. 10254

1

1    explain?

2        Q.   Sure.  Once you got off the exit, you didn't go

3    all the way home.  Right?

4        A.   No.

5        Q.   You stopped before you got home?

6        A.   That's right.  Because I saw the officers.

7        Q.   So why did seeing the police officers make you

8    stop your car?

9        A.   I questioned why they were -- after observing

10   them on the freeway emergency shoulder lane off on the

11   freeway entrance, emergency shoulder of the freeway

12   entrance, I was curious as to why they were there

13   without CHP present with them because that, to me, that

14   was a judicial issue.

15       Q.   Okay.  Can you describe the area where you saw

16   the police officers?

17       A.   It was the -- it was a well-known homeless

18   encampment that runs along the freeway entrance of the

19   101 southbound off of Story Road.

20       Q.   And this was at nighttime?

21       A.   Yes.

22       Q.   Was it dark in that area?

23       A.   Yes.

24       Q.   Were there any businesses around?

25       A.   There was businesses the opposite side of the

                                                              66

1      A.   And also raise the question or question why

2   they were present on state property without state

3   officials or state law enforcement being present.

4      Q.   Why did you want to observe and document what

5   they were doing?

6      A.   I believe that the homeless -- I believe

7   San Jose and Santa Clara County in general do not do

8   anything for the homeless.  They could care less about

9   the homeless.  And I do believe that the homeless

10  population here in Santa Clara County and in San Jose

11  are both vulnerable populations to when it comes to

12  police harassment.

13     Q.   Does that mean you felt the police were

14  harassing homeless people there?

15     A.   I -- that one did not -- that was in the back

16  of my mind.  Yes.

17     Q.   It was in the back of your mind?

18     A.   Yes.

19     Q.   Other than your general thoughts about police

20  harassment of the homeless, is there anything that gave

21  you reason to think the police were harassing homeless

22  people that day?

23     A.   No.

24     Q.   Okay.  Did you understand at the time that

25  coming up to police officers in a dark area at nighttime

71

NICHOLAS A. ROBINSON                                    April 2, 2021

1    BY MR. PRITCHARD:

2        Q.  Okay.  But I'm not asking you about your goal.

3        So my question is only did you think that the

4    police officers would come up to you when you shined

5    your flashlight at them.

6            MS. LAHMANI:  Calls for speculation.

7            THE WITNESS:  No, because of the distance.

8    BY MR. PRITCHARD:

9        Q.  Okay.  How far away were you from them when you

10   started flashing your light?

11       A.  I was several, at least anywhere from a

12   hundred -- I would say a hundred to 250, 300 feet.  So I

13   remember, in the video I remember the officers watching

14   it, and I remember saying that the officers took a

15   minute -- or took a minute to finally get up to where

16   they were at.

17       Q.  So your purpose in going up there was to try to

18   get a view of the officers' hands with your flashlight

19   in part.  Correct?

20       A.  Correct.

21       Q.  And your testimony is that you could see that

22   from 200 to 300 foot away?

23           MS. LAHMANI:  Objection.  Misstates the

24   testimony.

25           THE WITNESS:  It's -- the flashlight, the

                                                          82

1    November 29, 2018.  Correct?

2        A.  Correct.

3        Q.  So then why did you shine your flashlight in

4    the direction of police officers that night?

5            MS. LAHMANI:  Objection.  Asked and answered

6    several times.

7            THE WITNESS:  For the safety of the homeless,

8    the population, to be able to see who was coming at me

9    if anybody is coming at me from that distance from where

10   they were.  Again, I wasn't able to see where they were,

11   where they were at.  I know that they were there, but I

12   wasn't able to see them coming towards me until they got

13   to a certain point where there was more light without

14   the aid of the flashlight.

15   BY MR. PRITCHARD:

16       Q.  Okay.  Well, when you shined your flashlight in

17   the direction of the police officers, what did you see

18   them doing at that point?

19       A.  I saw them walking around trying to clear what

20   appeared to be -- clear out the encampment of the tent

21   area of the individual that they had in custody.

22       Q.  Did you see them take that person into custody?

23       A.  I did not.

24       Q.  How did you know they had a person in custody?

25       A.  I did not know at that time.

                                                            85

1    estimated.

2         Q.   Okay.   I think that was overall.   But before

3    November 28th -- before this incident, how many times do

4    you think you had been arrested even if it's an

5    estimate?

6         A.   Before those incidence -- before that incident,

7    twice.   Actually, three times.   Sorry.   Three times.

8         Q.   Okay.   And in other arrests have officers ever

9    touched your arms before placing you under arrest?

10        A.   Yes.

11        Q.   Did they do that in all of the arrests?

12        A.   In one of them.   Yes.   However, in one of them.

13   Yes.   That's correct.

14        Q.   As you were experiencing something that was

15   similar in this case, did that not make you think you

16   were under arrest?

17             MS. LAHMANI:   Objection.   Asked and answered.

18             THE WITNESS:   No.

19   BY MR. PRITCHARD:

20        Q.   Why not?

21        A.   Because the time that I spoke just now I was in

22   handcuffs, and I was being detained.   I was being

23   detained, and eventually they said that I made the

24   decision that I was being -- going to be placed under

25   arrest.   And in this specific incident Dote never

                                                            98

1    mentioned that I was detained or being placed under

2    arrest for 148 until after the takedown occurred.  I was

3    in hand -- takedown occurred where my face hit the

4    ground.  My arm was broken.

5         Q.   And every other time that you've been arrested,

6    is it your testimony that officers have first told you

7    that you're being arrested?

8         A.   There have been times like that.  Yes.

9         Q.   There have been times that were not like that

10   as well.  Right?

11        A.   Correct.

12        Q.   Like in October 2018 right before this

13   incident?

14        A.   Negative.

15        Q.   That officer did not tell you you were under

16   arrest as he was arresting you, did he?

17        A.   He did not tell me I was under arrest at that

18   time.

19        Q.   Instead he touched your arms.  Is that right?

20        A.   He did.

21        Q.   And then put your hands behind your back?

22        A.   He did.

23        Q.   Did the police officers on the night of the

24   incident put your arms behind your back?

25        A.   They -- they lifted -- they grabbed my arms,

                                                              99

NICHOLAS A. ROBINSON                                    April 2, 2021

1      A.  No.  I didn't.

2      Q.  So you did it then but not this time?

3          MS. LAHMANI:  Objection.  Misstates testimony,

4      argumentative.

5   BY MR. PRITCHARD:

6      Q.  Well, I don't think it does.  Why don't we

7      figure that out.

8          Did you not pull your arms away in October

9      2018 -- I think we already did this, but we can do it

10     again.

11         Did you in October of 2018 pull your arms away

12     from a police officer as he was touching your arms?

13     A.  Correct.

14     Q.  Did you not do the same thing in November of

15     2018 a month later during this incident?

16         MS. LAHMANI:  Asked and answered.

17         THE WITNESS:  No.  I didn't.

18  BY MR. PRITCHARD:

19     Q.  Did you move your arms at all as they were

20     trying to put your hands behind your back?

21     A.  No.  I didn't.

22     Q.  Did you feel any police officer pulling your

23     arm behind your back?

24     A.  Yes.

25     Q.  After the police officers had your hands behind

                                                            103

NICHOLAS A. ROBINSON                                    April 2, 2021

1    your back, what happened after that?

2         A.   They put it behind my back, pulled my arms all

3    the way up into the air as high as they could, and with

4    great force threw me to the ground causing the injury

5    that I have.

6         Q.   So you would call what the officers did

7    throwing you to the ground?

8         A.   Yes.

9         Q.   Did they ever release their grip on you?

10        A.   No.

11        Q.   In fact, the officers fell to the ground with

12   you, did they not?

13        A.   Correct.

14        Q.   Which officers were involved in forcing you to

15   the ground?

16        A.   Officer Ryan Dote and Nicholas Petterson.

17        Q.   Was Officer Kulik involved in forcing you to

18   the ground?

19        A.   No.

20        Q.   What, if anything, did you do that was a

21   struggle with the police officers before you were

22   actually on the ground?

23        A.   Repeat the question again.

24        Q.   What, if anything, did you do that was

25   struggling with the police officers before they forced

                                                              104

BELL & MYERS COURT REPORTERS AND LEGAL VIDEOGRAPHERS   408-287-7500

NICHOLAS A. ROBINSON                                    April 2, 2021

1    you to the ground?

2         A.  Nothing.

3         Q.  Can you explain exactly how it is that the

4    police officers forced you to the ground?

5              MS. LAHMANI:  Asked and answered, calls for

6    speculation.

7              THE WITNESS:  They grabbed me, put my hands up

8    in the air as high as they could, and with great

9    bodily -- with great force they (gestures) and with

10   great force on this one slammed me to the ground, and I

11   could hear a crack.

12   BY MR. PRITCHARD:

13        Q.  So now they slammed you to the ground?

14             MS. LAHMANI:  Objection.  Argumentative.

15             THE WITNESS:  Yes.  They slammed me to the

16   ground.  I mean, to me, it's the same answer.

17   BY MR. PRITCHARD:

18        Q.  What part of your body first made contact with

19   the ground?

20        A.  My face.

21        Q.  Were you bleeding from your face at all?

22        A.  No.

23        Q.  Okay.  Once you were on the ground, what

24   happened?  What did the officers do?

25        A.  I remember Ryan Dote on my left side, on the

                                                          105

1      A.   Yes.

2      Q.   Did you tell them that you had been to VMC for

3  treatment?

4      A.   Yes.

5      Q.   And what did the Kaiser doctors tell you about

6  your injuries?

7      A.   That after seeing the orthopedic surgeon, being

8  referred to the orthopedic surgeon, the orthopedic

9  surgeon informed me I suffered a upper mid-shift

10  fracture of the left humerus and nerve damage and that

11  90 -- it was 99.9% of the time with injuries such as

12  mine, you're going to get some type of nerve damage due

13  to the close proximity the bone is to the major nerve.

14      Q.   Did anyone at Kaiser tell you anything

15  different from what VMC staff told you?

16      A.   Other than the diagnosis, no.

17      Q.   Sorry.  What did Kaiser tell you differently

18  about the diagnosis from VMC?

19      A.   I suffered upper mid-shift fracture of the left

20  humerus and that stated that VMC diagnosed it as a

21  spiral fracture.

22      Q.   So they did tell you something, that it was a

23  spiral fracture at VMC.

24      A.   I did now.  I don't recall and I'm going based

25  on what you said, on what your notes obviously --

                                                        121

1    BY MR. PRITCHARD:

2        Q.   Documentation for what purpose?

3             MS. LAHMANI:  Objection.  Calls for

4    speculation, argumentative.

5             THE WITNESS:  Documentation of the injuries for

6    potential future -- yeah.  That's it.

7    BY MR. PRITCHARD:

8        Q.   Potential future what?

9        A.   Again, documentation of injuries.

10       Q.   Right.  So for what purpose do you want to

11   document your injuries?

12            MS. LAHMANI:  Calls for speculation,

13   argumentative.

14            THE WITNESS:  At anytime you -- anytime someone

15   gets injured by the police, you doc -- obviously

16   document your injuries.

17   BY MR. PRITCHARD:

18       Q.   Okay.  Did you ask Mr. Martinez to take these

19   photos?

20       A.   I did.

21       Q.   Sorry?

22       A.   I did.

23       Q.   In some of those photos you have bruising

24   around one of your eyes.  Where did you get that

25   bruising?

                                                    136

1     A.   That was consistent with the takedown, me

2  hitting my face on the ground.

3     Q.   And there was some bruising on one of your

4  arms.  Did you notice that?

5     A.   Yes.

6     Q.   Where did you get that bruising?

7     A.   That was as a result of the swelling and stuff

8  because it was a fractured humerus.  That's where the

9  fracture took place.

10    Q.   Did you post these photos on social media?

11    A.   I do not recall.

12    Q.   Do you have any scar on your arm now?

13    A.   I do.

14    Q.   Have you taken pictures of the way the scar

15 looks recently?

16    A.   I did.  I did.  Actually, I had my fiancé do

17 it.

18    Q.   You did post on social media videos of this

19 incident.  Right?

20    A.   I did.

21    Q.   Where did you get those?

22    A.   I got that from -- I got that from my attorney

23 as part of discovery that I requested.

24    Q.   Okay.  And you posted those in August of 2019

25 online.  Correct?

                                                        137

NICHOLAS A. ROBINSON                                    April 2, 2021

1                    DECLARATION OF WITNESS

2          I, NICHOLAS A. ROBINSON, hereby declare I am

   the deponent in the within matter; that I have read the

3  foregoing deposition and know the contents thereof, and

   I declare that the same is true of my knowledge except

4  as to the matters which are therein stated upon my

   information or belief, and as to those matters, I

5  believe it to be true.

           I declare under the penalties of perjury of the

6  State of California that the foregoing is true and

   correct.

7

           Executed this _____ day of _____,

8  20_____, at _____, _____.

                   (City)                        (State)

9

10                       _____

                         NICHOLAS A. ROBINSON

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                                        151

1            CERTIFICATE OF REPORTER

2        I, SHELLEY M. SAILOR, a Certified Shorthand

3   Reporter, holding a valid and current license issued by

4   the State of California, CSR No. 10254, duly authorized

5   to administer oaths, do hereby certify:

6        That the witness, NICHOLAS A. ROBINSON, in the

7   foregoing deposition was by me duly sworn to testify the

8   truth in the within-entitled cause; that said deposition

9   was taken at the time and place therein cited; that

10  testimony of said witness was reported by me and

11  thereafter transcribed under my direction into

12  typewriting; that the foregoing is a complete and

13  accurate record of said testimony; and that the witness

14  was given an opportunity to read and correct said

15  deposition and to subscribe the same.

16        Should the signature of the witness not be

17  affixed to the deposition, the witness shall not have

18  availed himself of the opportunity to sign or the

19  signature has been waived.

20        I further certify that I am not of counsel nor

21  attorney for any of the parties in the foregoing

22  deposition and caption named nor in any way interested

23  in the outcome of the cause named in said caption.

24  DATED: April 21, 2021

25        SHELLEY M. SAILOR, CSR No. 10254

                                              152

Exhibit "C"



In the Matter Of:

NICHOLAS ROBINSON

vs

CITY OF SAN JOSE, et al.

OFFICER NICHOLAS PETTERSON

April 14, 2021

Case No:  5:19-cv-06768NC

CERTIFIED COPY

NICHOLAS ROBINSON vs CITY OF SAN JOSE, et al.
Officer Nicholas Petterson on 04/14/2021

1                UNITED STATE DISTRICT COURT

2              NORTHERN DISTRICT OF CALIFORNIA

3

4

5

6

7    NICHOLAS ROBINSON,          )
                                 )
              Plaintiff,         )
8                                )
         vs.                     ) Case No. 5:19-cv-06768NC
9                                )
     CITY OF SAN JOSE, RYAN      )
10   DOTE, JAMIE MARIE KULIK,    )
     NICHOLAS PETTERSON and      )
11   DOES 1 through 20,          )
     inclusive,                  )
12                               )
              Defendants. )
13   _____)

14

15

16

17

18        DEPOSITION OF OFFICER NICHOLAS PETTERSON

19             Wednesday, April 14, 2021

20

21

22

23

24   Reported by:
     Annette Shaver              CERTIFIED COPY
25   CSR No. 6169

NICHOLAS ROBINSON vs CITY OF SAN JOSE, et al.
Officer Nicholas Petterson on 04/14/2021

1          Deposition of OFFICER NICHOLAS
   PETTERSON, taken remotely via Zoom meetings on
2  behalf of Plaintiff, beginning at 9:01 a.m., on
   Wednesday, April 14, 2021, before Annette Shaver,
3  Certified Shorthand Reporter No. 6169.

4

5

   APPEARANCES:
6
   For Plaintiff:
7
        LAHMANI LAW, APC
8       BY:  NICOLE LAHMANI, ESQ.
        1539 East Fourth Street
9       Santa Ana, California 92701
        (949) 202-1111
10      nicole@lahmanilaw.com

11              and

12      JOSEPH FARZAM LAW FIRM
        BY:  JOSEPH S. FARZAM, ESQ.
13      Suite 280
        11766 Wilshire Boulevard
14      Los Angeles, California 90025
        (310) 226-6890
15       (Not present)

16

17  For Defendants:

18      CITY OF SAN JOSE
        BY:  MATTHEW PRITCHARD, CITY ATTORNEY
19      200 East Santa Clara Street, #16
        San Jose, California 95113-3131
20      (408) 535-1205
        Matthew.pritchard@sanjoseca.gov
21

22

23

24

25

                                             2

REGAL

NICHOLAS ROBINSON vs CITY OF SAN JOSE, et al.
Officer Nicholas Petterson on 04/14/2021

```
 1   ended up being arrested for his involvement.
 2   BY MS. LAHMANI:
 3       Q.   Now you said that you were on an
 4   investigation that evening, is that right?
 5       A.   Correct.
 6       Q.   What were you investigating?
 7       A.   It was a community policing foot patrol.
 8       MR. PRITCHARD:  Hold on one second.  My
 9   apologies for interrupting the flow.  Objection;
10   misstates testimony, assumes facts not in evidence.
11           And I am sorry, if you could repeat your
12   answer because I didn't hear it.
13       THE WITNESS:  It's called a community policing
14   foot patrol.
15   BY MS. LAHMANI:
16       Q.   And is that a program or is that the name
17   of the investigation?
18       A.   Just a broad term for an investigation.
19       Q.   And what did that investigation entail?
20       MR. PRITCHARD:  Objection; vague, overbroad.
21       THE WITNESS:  It was a trespassing, illegal
22   camping at that location that we were at.
23   BY MS. LAHMANI:
24       Q.   So in other words, it was a general
25   investigation of the homeless encampment in the
```

34

REGAL

NICHOLAS ROBINSON vs CITY OF SAN JOSE, et al.
Officer Nicholas Petterson on 04/14/2021

 1    area?

 2        MR. PRITCHARD:   Objection; vague, misstates

 3    testimony.

 4    BY MS. LAHMANI:

 5        Q.   You can answer the question.

 6        A.   Yes.

 7        Q.   And what does "community policing foot

 8    patrol" mean?

 9        A.   I think it's exactly what it sounds like,

10    it was just officers in the community out of their

11    vehicles.

12        Q.   So does that mean you are kind of walking

13    and patrolling looking for anything suspicious, or

14    were you there because were you called out to be

15    there?

16        A.   We were -- I was there in a supportive

17    manner for the other officer.

18        Q.   And did someone call you to join them

19    there?

20        A.   No.

21        Q.   When you say were you there in a supportive

22    manner for the other officer, which other officer

23    are you referring to?

24        A.   I believe that investigation was Officer

25    Ikeuchi.

                                                        35

NICHOLAS ROBINSON vs CITY OF SAN JOSE, et al.
Officer Nicholas Petterson on 04/14/2021

1      A.   I said I believe you answered the question

2  for me.

3      Q.   The question is did Officer Dote initiate

4  the takedown?

5      MR. PRITCHARD:  Objection; vague, lack of

6  foundation.

7      THE WITNESS:  I can't speak for Officer Dote's

8  actions.

9  BY MS. LAHMANI:

10      Q.   I'm asking you to speak as to what you

11  saw.

12      A.   There was two officers present, I took

13  control of his arm, Officer Dote took control of

14  his other arm, and I can't speak to how he was

15  taken to the ground on behalf of Officer Dote or

16  Mr. Robinson.

17      Q.   Did Officer Dote grab his left arm before

18  you grabbed Nick's right arm?

19      A.   Yes.

20      Q.   How much time passed between the time that

21  Officer Dote grabbed Nick's left arm to the time

22  that you grabbed his right arm?

23      A.   I would estimate it would have been within

24  a couple seconds, really quick so he wouldn't fight.

25      Q.   Is there a reason that the takedown was so

69

1    leave?

2        A.    Based on what I have written here, yes.

3        Q.    Now on this line on the second sentence

4    here it says "The suspect did not respond to

5    commands and stood still on the sidewalk"; do you

6    see that?

7        A.    I do.

8        Q.    And that seems consistent with what you've

9    told me here today, that Nick Robinson never moved

10   from his position, right?

11       A.    Correct.

12       Q.    Now it says "The suspect swung his

13   flashlight in a sweeping motion towards the chest

14   of Officer Dote and appeared to be trying to

15   strike him with the end of the light."

16             Is that still your position, that Nick

17   Robinson was trying to strike Officer Dote with

18   his flashlight?

19       A.    From my perspective, yes.

20       Q.    Now it says "In order to effect the arrest

21   and overcome resistance per 835-APC.  I pulled the

22   suspects's right arm behind his back and applied

23   downward pressure to push him towards the ground."

24             Is that still true and accurate in terms

25   of how were you engaging in the takedown of

                                                          111

NICHOLAS ROBINSON vs CITY OF SAN JOSE, et al.
Officer Nicholas Petterson on 04/14/2021

1    telling someone to turn around and put their hands

2    behind their back?

3        MR. PRITCHARD:  Objection; vague,

4    argumentative.

5        THE WITNESS:  Based on the actions of

6    Mr. Robinson swinging a flashlight at an officer,

7    switching hands of the flashlight, and taking a

8    bladed stance.  And telling him he was under

9    arrest could have provided an even higher level

10   of resistance or initiated an assault by the

11   subject, Mr. Robinson.

12   BY MS. LAHMANI:

13       Q.   Have you ever undergone any training

14   with respect to preventing injuries during a

15   takedown?

16       MR. PRITCHARD:  Objection; vague.

17       THE WITNESS:  I believe all arrest control

18   is taught with the intent of preventing injury.

19   BY MS. LAHMANI:

20       Q.   And is there something specific that you

21   are supposed to do to prevent injury?

22       MR. PRITCHARD:  Objection; vague.

23       THE WITNESS:  Not that I recall, no.

24   BY MS. LAHMANI:

25       Q.   So you don't recall any specific training

NICHOLAS ROBINSON vs CITY OF SAN JOSE, et al.
Officer Nicholas Petterson on 04/14/2021

1    with respect to what to do in order to prevent

2    injury during a takedown?

3        A.    No.

4        Q.    Did you believe that Nick Robinson was

5    armed?

6        A.    He was armed with a flashlight that was

7    large enough to strike us.

8        Q.    Did you believe he was armed with a gun?

9        A.    There is always a possibility someone's

10   armed with a gun.

11       Q.    Did you have any reason to believe that he

12   was?

13       A.    I didn't have a reason to not believe he

14   was.

15       Q.    So do you always assume that someone has

16   a gun unless you have reason to believe that they

17   don't?

18       A.    In this instance I didn't have a reason to

19   believe that he didn't have a gun on him.

20       Q.    So you assumed that he did?

21       A.    No, I'm just telling you, I didn't have a

22   reason to assume he didn't.

23       Q.    But you didn't have any specific reason to

24   believe that he was armed?

25       A.    He was armed with a flashlight that could

99

NICHOLAS ROBINSON vs CITY OF SAN JOSE, et al.
Officer Nicholas Petterson on 04/14/2021

```
 1        I declare under penalty of perjury that

 2   I have read the foregoing transcript of my

 3   deposition testimony, taken on Wednesday, April

 4   14, 2021, via Zoom Internet Meetings, and that,

 5   with the following exceptions which I have

 6   hand-marked on the transcript, the same is a

 7   true record of the testimony given by me at

 8   that deposition:

 9


10


11   Page/Line      Should Read:        Reason for Change:

12   _____   _____   _____

13   _____   _____   _____

14   _____   _____   _____

15   _____   _____   _____

16   _____   _____   _____

17   _____   _____   _____

18   _____   _____   _____

19   _____   _____   _____

20   _____   _____   _____

21   _____   _____   _____

22


23   _____       _____

24   Date                        NICHOLAS PETTERSON

25
```

145

REGAL

NICHOLAS ROBINSON vs CITY OF SAN JOSE, et al.
Officer Nicholas Petterson on 04/14/2021

```
1    COUNTY OF LOS ANGELES    )

2    STATE OF CALIFORNIA      )

3

4         I, Annette Shaver, a Certified Shorthand

5    Reporter licensed in the State of California,

6    License No. 6169, hereby certify that the deponent

7    was by me first duly sworn and the foregoing

8    testimony was reported by me and was thereafter

9    transcribed with Computer-Aided Transcription; that

10   the foregoing is a full, complete, and true record

11   of said proceeding.

12        I further certify that I am not of counsel

13   or attorney for either or any of the parties in

14   the foregoing proceeding and caption named or in

15   any way interested in the outcome of the cause

16   in said caption.  The dismantling, unsealing,

17   or unbinding of the transcript will render the

18   reporter's certificates null and void.

19        In witness thereof, I have hereunto set my

20   hand this day:  26th of April, 2021.

21        __X__ Reading and Signing was requested.

22        _____ Reading and Signing was waived.

23        _____ Reading and Signing was not requested.

24        _____

25        ANNETTE SHAVER, CSR NO. 6169
```

146

REGAL

Exhibit "D"



COURT REPORTING
REGAL
BIG ENOUGH TO DELIVER
SMALL ENOUGH TO CARE

In the Matter Of:

NICHOLAS ROBINSON

vs

CITY OF SAN JOSE, et al.

OFFICER RYAN DOTE

April 13, 2021

Case No:  5:19-cv-06768NC

CERTIFIED ORIGINAL

NICHOLAS ROBINSON vs CITY OF SAN JOSE, et al.
Officer Ryan Dote on 04/13/2021

1              UNITED STATES DISTRICT COURT

2              NORTHERN DISTRICT OF CALIFORNIA

3

4   NICHOLAS ROBINSON,              ) Case No. 5:19-cv-06768NC
                                    )
5              Plaintiff,           )
                                    )
6         vs.                       )
                                    )
7   CITY OF SAN JOSE, RYAN DOTE,    )
    JAMIE MARIE KULIK, NICHOLAS     )
8   PETERSON, and DOES 1 through    )
    20 inclusive,                   )
9                                   )
               Defendants.          )
10  _____)

11

12

13

14      Deposition of OFFICER RYAN DOTE, taken on behalf of

15  the JOSEPH FARZAM LAW FIRM, via videoconference,

16  commencing at 11:04 a.m. and ending at 2:28 p.m.,

17  Tuesday, April 13, 2021, before Ashley R. Chislock,

18  RPR, CSR NO. 14327.

19

20

21

22

23

24

25

                                                              2

NICHOLAS ROBINSON vs CITY OF SAN JOSE, et al.
Officer Ryan Dote on 04/13/2021

1    flashlight into your eyes or was he moving his

2    flashlight?

3            MR. PRITCHARD:  Objection.

4            Vague.  Compound.

5            THE WITNESS:  Both.

6    BY MR. FARZAM:

7        Q    Okay.

8            How long did he continually keep his flashlight

9    shining into your eyes?

10           MR. PRITCHARD:  Objection.

11           Vague.  Assumes facts not in evidence.

12           THE WITNESS:  Several seconds.

13   BY MR. FARZAM:

14       Q    Okay.

15           And did you tell him anything about the

16   flashlight?

17       A    Yes.

18       Q    What did you say?

19       A    To stop shining it in my face.

20       Q    And what was his response?

21       A    He ignored my orders and continued to -- sorry,

22   I'm turning the phone off -- continued to shine it in my

23   eyes.

24       Q    Did it make you angry that he ignored your

25   orders?

42

REGAL

NICHOLAS ROBINSON vs CITY OF SAN JOSE, et al.
Officer Ryan Dote on 04/13/2021

1   shining the flashlight into your eyes?

2        MR. PRITCHARD:  Same objection.

3        THE WITNESS:  Towards the latter part, yes.

4   BY MR. FARZAM:

5   Q    What do you mean, "towards the latter part"?

6   A    We initially ordered him to stop shining the

7   lights in our eyes, he refused to comply, and then when

8   we started approaching him and we got close, only then

9   did he end up complying and stop shining it in our face.

10  Q    Okay.

11       Well, when he stopped shining his flashlight in

12  your eyes, did you have any further concerns about him?

13       MR. PRITCHARD:  Objection.  Vague.

14       THE WITNESS:  Yes.

15  BY MR. FARZAM:

16  Q    What other concerns did you have?

17  A    I had officer safety concerns regarding his

18  demeanor and his trying to apparently blind us with his

19  flashlight.

20  Q    Well, but my question was after -- once he

21  stopped shining the flashlight into your eyes, what other

22  concerns did you have about him?

23  A    He was argumentative.

24  Q    How was he argumentative?

25  A    He displayed pre-assaultive indicators, he was

44

REGAL

NICHOLAS ROBINSON vs CITY OF SAN JOSE, et al.
Officer Ryan Dote on 04/13/2021

1    A    I went to go take Mr. Robinson into custody.

2    Q    And what did you do to take Mr. Robinson into

3 custody?

4    A    I reached for his left elbow and wrist in order

5 to place it behind his back to put handcuffs on him.

6    Q    Did you ask him first -- did you ask him to turn

7 around and put his arms behind him?

8    A    No, I don't believe so.

9    Q    Why didn't you do that?  Why didn't you ask him

10 to put his hands behind him -- behind his back?

11        MR. PRITCHARD:  Objection.

12        Vague.  Argumentative.

13        THE WITNESS:  Because I went to go place him in

14 handcuffs and place him under arrest, and he still had

15 that flashlight in his hands, which was an officer safety

16 concern.

17 BY MR. FARZAM:

18    Q    Part of your training to become a police

19 officer, aren't you told in order to conduct an arrest,

20 you must first ask a subject to turn around and place

21 their hands behind their back?

22    A    Not all the time.  It's not required.

23    Q    Okay.

24        Why was it that in this instance you didn't ask

25 Mr. Robinson to first turn around and place his hands

50

NICHOLAS ROBINSON vs CITY OF SAN JOSE, et al.
Officer Ryan Dote on 04/13/2021

1    Q    Okay.

2         And then what did you do?

3    A    Well, during that, I felt Mr. Robinson's left

4    arm and torso start to tense up and pull away from me, so

5    then we performed a takedown of Mr. Robinson onto the

6    ground.

7    Q    Did you believe -- when you began pulling on

8    Mr. Robinson's left arm, did you believe he was

9    resisting?

10        MR. PRITCHARD:  Objection.

11        Misstates testimony.  Calls for a legal

12   conclusion.

13        THE WITNESS:  I actually did not pull on his

14   arm.  If anything, I pushed it behind his back to get his

15   left arm in that position.  He was actually trying to

16   pull and turn away.

17   BY MR. FARZAM:

18   Q    He was trying it pull and turn away, that's your

19   testimony?

20   A    Yes.

21   Q    And what do you base that on?

22   A    It was based on what I perceived and felt when I

23   was actually grabbing his left arm.

24   Q    Okay.

25        Well, let's talk about takedowns.  Did you

                                                          53

NICHOLAS ROBINSON vs CITY OF SAN JOSE, et al.
Officer Ryan Dote on 04/13/2021

1    BY MR. FARZAM:

2        Q    And in the shooting of February 2015, an

3    individual was killed; correct?

4        A    Yes.

5        Q    You killed him?

6        A    Yes.

7        Q    And why'd you kill him?

8             MR. PRITCHARD:  Objection.

9             Argumentative.  Overbroad.  Vague.  Calls for a

10   narrative.  Calls for a legal conclusion.

11   BY MR. FARZAM:

12       Q    You can answer.

13       A    So the subject who decided to charge us, me and

14   my car partner, with a deadly force, with a knife, failed

15   to comply and listen to our orders to drop the knife and

16   continued charging at us, so that's why ultimately he

17   forced us to use deadly force on him.

18       Q    How many people have you killed, Officer?

19       A    Just one.

20       Q    Okay.

21            Did you shoot that subject, who died in

22   February 2015, in the heart, in the face?  Where'd you

23   shoot him?  What part of his body was the fatal wound

24   inflicted on?

25            MR. PRITCHARD:  Objection.

20

REGAL

NICHOLAS ROBINSON vs CITY OF SAN JOSE, et al.
Officer Ryan Dote on 04/13/2021

1           THE WITNESS:  So you had asked why we did not

2     shoot him in the leg; is that correct?

3     BY MR. FARZAM:

4        Q      Yeah.

5        A      Because throughout our police training on deadly

6     force, we are trained to shoot at center mass of a

7     threat, which is their torso, the main reason being that

8     shooting at a moving object generally is very hard to

9     begin with, shooting at a moving limb is even more

10    difficult, and there's a higher likelihood that the

11    rounds fired by officers will miss and therefore strike

12    unintended people, you know, behind or around the target.

13    So we're trained to shoot at center mass to stop the

14    ongoing deadly threat.

15       Q      How far was the individual with the knife in

16    February 2015 -- how far away was he from you and your

17    partner when you began shooting at him?

18       A      Based off of my recollection, approximately 50

19    to 60 feet away perhaps.

20       Q      Okay.

21              Did you receive any warnings or were you

22    disciplined in any way for the incident in February 2015?

23       A      Sorry, repeat your question again, please.

24       Q      Did you receive any warning from the police

25    department or were you disciplined in any way for the

                                                              22

REGAL

NICHOLAS ROBINSON vs CITY OF SAN JOSE, et al.
Officer Ryan Dote on 04/13/2021

1   and education, to initiate a takedown before attempting

2   to arrest a subject by giving orders and seeking

3   compliance?

4           MR. PRITCHARD:  Objection.

5           Lack of foundation.  Calls for expert opinion.

6   Incomplete hypothetical.

7           THE WITNESS:  Can you repeat your question, sir?

8   BY MR. FARZAM:

9       Q    Based on your training and experience, when is

10  it appropriate to initiate a takedown of a subject before

11  attempting to conduct an arrest by giving orders and

12  seeking compliance?

13          MR. PRITCHARD:  Objection.  Vague.

14          THE WITNESS:  It is justifiable and reasonable

15  when based on the totality of the circumstances, that

16  immediate action is required to take an argumentative or

17  combative -- or I'm sorry -- or actively resisting

18  subject into custody.

19  BY MR. FARZAM:

20      Q    Okay.

21          How many times in the course of your work as a

22  police officer have you taken subjects down -- have you

23  done a takedown?

24      A    Numerous.

25      Q    More than ten?

68

REGAL

1    injured, to your knowledge?

2         MR. PRITCHARD:  Objection.

3         Calls for speculation.  Vague.

4         THE WITNESS:  I don't know.

5    BY MR. FARZAM:

6      Q    Did the cover of takedowns cover beyond the

7    police academy?

8         MR. PRITCHARD:  Objection.

9         Vague.  Unintelligible.

10        MR. FARZAM:  Let me rephrase that.

11   BY MR. FARZAM:

12     Q    Did you get any further training, other than

13   what you learned in the police academy, on the topic of a

14   takedown of a suspect or a subject?

15     A    Yes.

16     Q    Okay.

17        What kind of training did you receive on the

18   subject of a takedown in the police department after your

19   police academy education?

20     A    Various forms, whether it be on-the-job

21   training, informal training put on by supervisors, or our

22   department's use-of-force instructors, as well as

23   mandatory POST -- well, I guess annual training.  It kind

24   of depends on what their training protocol is for that.

25     Q    And in any of those trainings, were you taught

70

NICHOLAS ROBINSON vs CITY OF SAN JOSE, et al.
Officer Ryan Dote on 04/13/2021

1    concluded.)
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

118



NICHOLAS ROBINSON vs CITY OF SAN JOSE, et al.
Officer Ryan Dote on 04/13/2021

1                    REPORTER'S CERTIFICATE

2

3       I, Ashley R. Chislock, a Certified Shorthand

4   Reporter of the State of California, do hereby certify:

5   That the foregoing proceedings were taken before me at

6   the time and place therein set forth, at which time the

7   witness was put under oath by me;

8       That a recording of the proceedings was made by

9   me stenographically which was thereafter transcribed

10  under my direction; that the foregoing transcript is a

11  true record of the testimony given.

12       Further, that if the foregoing pertains to the

13  original transcript of a deposition in a Federal Case,

14  before completion of the proceedings, review of the

15  transcript [X] was [ ] was not requested.

16       I further certify I am neither financially

17  interested in the action nor a relative or employee of

18  any attorney or any party to this action.

19       IN WITNESS WHEREOF, I have this date subscribed

20  my name.

21       Dated this April 23, 2021.

22       *Ashley Chislock*

23       _____
         ASHLEY R. CHISLOCK, RPR, CSR No. 14327

24

25

                                                    120

NICHOLAS ROBINSON vs CITY OF SAN JOSE, et al.
Officer Ryan Dote on 04/13/2021

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24 _____
            (Witness Signature)

25 ///

122

REGAL

Exhibit "E"



# CITY OF SAN JOSÉ, CALIFORNIA

201 W. MISSION STREET
P.O. BOX 270
SAN JOSE, CA  95103-0270
(408) 277- 4212

CHIEF OF POLICE
EDGARDO GARCIA

December 4, 2018



Dear ▇▇▇▇▇▇▇

The San Jose Police Department's Internal Affairs Unit is currently conducting an investigation in which you are a complainant.

This is only a reminder to inform you that the case is currently open and the investigator is continuing the investigation.

If you have a change of address or phone number, please contact the assigned investigator, **Officer Hernandez #3746** at (408) 277-4094.

Sincerely,

EDGARDO GARCIA
Chief of Police

Officer Francisco Hernandez
Internal Affairs Unit

EG:FH

I.A. #I2018-0293

**Internal Affairs Unit**
**I A Case Number: I2018-0293**
**Complainant:** ▓▓▓▓▓▓▓
**Subject: Officers Dote #4006 and** ▓▓▓ ▓▓▓▓
**Investigator: Sgt. Jodi Williams #3571**

## SYNOPSIS:

On November 30, 2018, ▓▓▓▓▓▓▓ contacted the Independent Police Auditor and filed a complaint against known and unknown officers. On the night of November 29, 2018, ▓▓▓▓▓ observed officers in the area of the southbound Hwy 101 on-ramp from Story Rd. ▓▓▓▓▓▓ walked toward the area and illuminated the area and the encampment the officer's had just made an arrest from with his LED flashlight. Officer Dote, along with other officers, confronted ▓▓▓▓▓▓ and told him not to shine his light in their faces. ▓▓▓▓▓ pushed his flashlight at officers and Officer Dote and other officers took ▓▓▓▓▓ to the ground. Officer Dote yelled in ▓▓▓▓▓ 's face. While on the ground, an unknown officer struck ▓▓▓▓ on his left arm with a baton. ▓▓▓▓▓▓ sustained a broken left humerus bone. ▓▓▓▓▓ alleged he was unlawfully detained and subjected to excessive force. He later complained officer's engaged in bias-based policing by listing ▓▓▓▓▓▓▓▓ as his emergency contact thereby not acknowledging their ▓▓▓▓▓. ▓▓▓▓▓ also alleged the Sergeant who responded was trying to add charges. ▓▓▓▓▓ also alleged officers had not booked his flashlight with his property and therefore violated procedure.

## ACTION TAKEN:

| | |
|---|---|
| 11/29/2018 | Date of incident |
| 11/30/2018 | Complaint filed with the IPA |
| 12/04/2018 | Officer Hernandez assigned case |
| 12/04/2018 | Officer Hernandez obtained CAD and GO for event #18-333-0904 |
| 12/04/2018 | Officer Hernandez provided citizen notification to the complainant |
| 12/05/2018 | Officer Hernandez obtained medical release |
| 12/05/2018 | Officer Hernandez faxed medical release to VMC |
| 12/14/2018 | Officer Hernandez re-faxed medical release to VMC |
| 01/02/2019 | Officer Hernandez received the copy of medical records |
| 01/02/2019 | Officer Hernandez mailed (email and postal) copies of medical record to the complainant |
| 01/08/2019 | Officer Hernandez conducted follow up interview of the complainant |
| 01/08/2019 | Officer Hernandez obtained copy of medical records ▓▓▓▓▓▓ from the complainant |
| 01/15/2019 | Officer Hernandez obtained copy of Use of Force Review |
| 01/16/2019 | Officer Hernandez sent officer notifications |
| 02/04/2019 | Formal Case Assigned to Sgt. Williams |
| 06/05/2019 | Returned ▓▓▓▓▓▓ phone call |
| 06/26/2019 | Officer Dote's POA rep requested an interview time |
| 07/16/2019 | Dote Interview conducted |

## STATEMENTS:

Statement of Complainant ▓▓▓▓▓▓▓

The following is a synopsis of the complainant's recorded statement made to the IPA on 11/30/2018. For the full statement refer to the audio file linked in IAPro.

Internal Affairs Case Number: I2018-0293
Complainant: ▇▇▇▇
Subject(s): Officers Dote #4006 and ▇▇▇▇
Investigator:  Sgt. Jodi Williams #3571

▇▇▇▇ lawful order. The light caused Officer Dote to be temporarily blinded and disoriented. "This posed a significant threat to my officer safety because I know that if I am blinded (temporarily or permanently) I can be easily incapacitated and I will not be able to see or perceive any threats. ▇▇▇▇ deliberately shined his bright flashlight in my face at least four (4) separate times. I believed ▇▇▇▇ was purposely trying to disorient and blind me." (sic)

- Officer Dote asked ▇▇▇▇ if he lived in the area and had any business here. ▇▇▇▇ mumbled that he did not. ▇▇▇▇ was told to "move along." ▇▇▇▇ turned around and replied, "Actually, last time I checked no I don't." ▇▇▇▇ displayed the following pre-assaultive indicators:
    - - argumentative and defiant attitude
    - - squaring up his stance and shoulders towards officers
    - - shining the bright flashlight deliberately aiming for officers' eyes
        - flexing and stretching his right hand to get blood flow into his hand/fingers."
- ▇▇▇▇ continued to be argumentative and refused to leave. ▇▇▇▇ deliberately obstructed officers from conducting their investigation. Officer Dote ordered ▇▇▇▇ not to "bother us at our scene, and to leave." ▇▇▇▇ defied the commands and continued to be argumentative. ▇▇▇▇ waved the flashlight around while arguing his point. ▇▇▇▇ pointed and jabbed the butt end of the flashlight directly towards the officer's face and chest.
- Officer Dote ordered ▇▇▇▇ not to point the flashlight at his face. ▇▇▇▇ switched the flashlight to his right hand to prevent the officer from taking the flashlight. Officer Dote noted a "flashlight of that size can be used as an impact weapon which can cause great bodily injury and/or death. I also know that I can be quickly incapacitated if struck in the head, leaving my gun and other weapons vulnerable."
- Officer Dote attempted to take ▇▇▇▇ into custody for PC 148(a)(1). He used his right hand to grab ▇▇▇▇'s left wrist to place it behind his back. Officer Dote placed my left hand in the crook of ▇▇▇▇'s left elbow to bend it to place him in handcuffs.
- Officer Dote felt ▇▇▇▇ attempt to break free. ▇▇▇▇ pulled his left arm away and attempted to spin and turn away. Officer Dote placed a rear wrist lock on ▇▇▇▇'s left wrist and used his left hand to push ▇▇▇▇'s left elbow towards the ground. ▇▇▇▇ held ▇▇▇▇'s right arm.
- While on the ground, Officer Dote maintained pressure on ▇▇▇▇'s left wrist and elbow behind his back. Officer Dote felt ▇▇▇▇ attempted to twist his torso towards him. He ordered ▇▇▇▇ to stop pushing back. Officer Dote placed his knee on ▇▇▇▇'s lower back to gain more control of ▇▇▇▇ upper body. ▇▇▇▇ placed ▇▇▇▇ in handcuffs.
- ▇▇▇▇ complained of pain to his arm. ▇▇▇▇ summoned EMS to the scene. Officer Dote advised Sgt. Yu #2812 of the incident. EMS provided initial medical aid to ▇▇▇▇ ▇▇▇▇ was transported by EMS rig 17 to Valley Medical Center for further medical attention.
- Officer Dote transferred custody of ▇▇▇▇ to Officer Valverde #3987.

▇▇▇▇ noted:
- He was in full uniform working in a marked patrol vehicle. He was equipped with his Department issued body worn camera (BWC). He and Officer Dote were on foot patrol (18-333-0877).

Internal Affairs Case Number: I2018-0293
Complainant: ▬▬▬
Subject(s): Officers Dote #4006 and ▬▬▬
Investigator: Sgt. Jodi Williams #3571

- He was in full uniform working in a marked patrol vehicle. He responded to the area of Hwy 101 and Story Rd to assist Officer Dote.
- ▬▬▬ was handcuffed and provided medical attention by EMS. Officer Valverde removed the handcuff from ▬▬▬ 's left hand to assist ▬▬▬ onto a gurney. ▬▬▬ was transported to VMC for further medical treatment. He followed the ambulance to VMC.
- ▬▬▬ was treated for pain to his left arm. As Sgt. Yu left the ER ▬▬▬ said out loud, "Just wait, I'm going to have all your money and your jobs…This is going to cost the city a lot of money."
- An ▬▬▬ was taken of ▬▬▬ VMC ▬▬▬ determined, based on the ▬▬▬ , ▬▬▬ sustained a midshaft humerus fracture.
- Lt. Pierce arrived on scene, and he advised there was a pending call for Officer Valverde. He responded to his vehicle and saw SJPD case #18-333-0989. The reporting party was ▬▬▬ . Officer Valverde activated his BWC and recorded the conversation. ▬▬▬ stated he and ▬▬▬ were in a car with a female and parked the car. ▬▬▬ exited the vehicle. ▬▬▬ did not walk with ▬▬▬ was worried about ▬▬▬ He contacted Communications and VMC. Officer Valverde provided ▬▬▬ an update of ▬▬▬ 's injury. Officer-Chan #4651 relieved Officer Valverde of his duties.

Officer Chan noted:
- He and Officer Biebel #4255 were in full uniform and driving a marked police vehicle. They responded to VMC to relieve Officer Valverde.
- ▬▬▬ was under the care of ▬▬▬ . ▬▬▬ called the doctor, ▬▬▬ for the injury on ▬▬▬ 's arm. ▬▬▬ released ▬▬▬ to Officer Chan. Officer Chan transported and booked ▬▬▬ into County Jail.
- He provided ▬▬▬ with a case card that was placed in his personal property bag.

Officers Dote and ▬▬▬ completed Use of Force reports.
- Officer Dote noted:
    o Was suspect perceived armed?
        ▪ Yes;
            • Unknown
    o Did suspect resist:
        ▪ Yes, Passive non compliance
    o Type of force used:
        ▪ Other control hold/takedown
    o Location of force used:
        ▪ Rear lower torso/back
        ▪ arms/hands
    o Suspect's erratic behavior:
        ▪ none
    o Suspect injury:
        ▪ Bone fracture
- ▬▬▬ noted:
    o Was suspect perceived armed?
        ▪ No
    o Did suspect resist:

Internal Affairs Case Number:  I2018-0293
Complainant:
Subject(s): Officers Dote #4006 and ▮▮▮▮▮
Investigator:  Sgt. Jodi Williams #3571



- ▮▮▮▮▮▮ talked wide eyed to the officers, and appeared to puff his chest as spoke. ▮▮▮ ▮▮▮ went from having a bladed stance  (left leg and shoulder back and right leg and shoulder forward toward the officers to squared up with the officers)

- ▮▮▮▮▮▮ spoke to Officer Dote and extended the flashlight into Officer Dote's face and chest area. The flashlight was very close to the officer's face. Officer Dote attempted to grab at the flashlight but ▮▮▮▮▮▮ pulled his left arm in and switched the flashlight to his right hand.

- ▮▮▮▮▮▮ assumed a bladed stance with his right leg and shoulder back and his left leg and shoulder toward the officers in what could be called a boxers/fighting stance.

- Officer Dote grabbed at ▮▮▮▮▮▮'s left hand and ▮▮▮▮▮▮ moved closer and grabbed the right arm.

- (01:18) ▮▮▮▮▮▮ was directed to the ground by ▮▮▮▮▮▮ and Officer Dote and a popping sound was heard.

- ▮▮▮▮▮▮ controlled ▮▮▮▮▮▮'s right hand behind the waist. ▮▮▮▮▮▮ pinned ▮▮▮▮▮▮'s right forearm to his lower back. Officer Dote placed ▮▮▮▮▮▮'s left arm and wrist behind his back in a rear wrist lock

- (01:33) ▮▮▮▮▮▮'s right wrist was handcuffed by ▮▮▮▮▮▮ Officer Dote talked to ▮▮▮▮▮▮ with their heads next to each other. ▮▮▮▮▮▮'s right shoulder rose off the ground and moved toward Officer Dote.

- ▮▮▮▮▮▮ yelled out an "ow" as Officer Dote appeared to adjust his position and move his knee up to ▮▮▮▮▮▮'s back. Simultaneously the sound of a ratcheting handcuff was heard along with a pop.

- (01:38) Officer Dote told ▮▮▮▮▮▮ to stop pushing against him. Note: The scene is dark, ▮▮▮▮▮▮'s jacket was black with a black hood and both Officer Dote and ▮▮▮▮▮▮ were wearing black gloves making it difficult to make out their hand placement

- (01:40) ▮▮▮▮▮▮ was face down with his right hand behind his back (and cuffed). Officer Dote was on ▮▮▮▮▮▮'s left side and controlling the left arm. Officer Dote's chest appeared to be close to ▮▮▮▮▮▮'s left shoulder as the officer made the comments noted above (about the light). Note: During this time ▮▮▮▮▮▮ let out a few moans but no sharp cry of pain or sustained cry of pain.

- (01:55) Officer Dote moved away from ▮▮▮▮▮▮ reached for ▮▮▮▮▮▮'s left wrist and completed the handcuffing. ▮▮▮▮▮▮ cried out in pain ("Ow ow ow") as the cuff was applied to his left wrist. ▮▮▮▮▮▮ rolled ▮▮▮▮▮▮ onto his left side, and he cried out in pain.

- (02:24) ▮▮▮▮▮▮ stated he needed to go to the hospital. Officer Dote bent down and asked ▮▮▮▮▮▮ if he was injured.

- (03:00) ▮▮▮▮▮▮ asked ▮▮▮▮▮▮ what hurt and ▮▮▮▮▮▮ replied it was his arm. The officers rolled ▮▮▮▮▮▮ onto his right side. Upon doing so, he cried out in pain.

- (03:20) ▮▮▮▮▮▮ cried out in pain as he was asked for his name.

- (03:30) ▮▮▮▮▮▮ asked ▮▮▮▮▮▮ what hurt and he replied, "My left arm. ("What's wrong with your left arm?") It hurts!"

- (04:05) ▮▮▮▮▮▮ reluctantly identified himself.

- (06:00) ▮▮▮▮▮▮ was helped to a sitting position by Officers ▮▮▮ and ▮▮▮▮▮▮ helped him to his feet and walked ▮▮▮▮▮▮ to a patrol vehicle.

End of recording

Internal Affairs Case Number: I2018-0293
Complainant:
Subject(s): Officers Dote #4006 and ▮▮▮▮
Investigator:  Sgt. Jodi Williams #3571

## FINDINGS:

1. As to the complaint of **ARREST/DETENTION** against Officers Dote #4006 and ▮▮▮▮ ▮▮▮▮ I find the complaint **EXONERATED.**
2. As to the complaint of **FORCE (Takedown, control holds)** against Officers Dote #4006 and ▮▮▮▮ ▮▮▮▮ I find the complaint **EXONERATED.**
3. As to the complaint of **COURTESY** against Officer Dote #4006, I find the complaint **EXONERATED.**

Sgt. Jodi Williams #3571
Office of the Chief of Police
Internal Affairs Unit

Exhibit "F"

1   Joseph S. Farzam, SBN 210817
2   **JOSEPH FARZAM LAW FIRM**
    A Professional Law Corporation
3   11766 Wilshire Blvd., Suite 280
    Los Angeles, California 90025
4   Telephone: (310) 226-6890
    Fax: (310) 226-6891

5

6   Nicole Lahmani, Esq. SBN 278182
    **LAHMANI LAW, APC**
7   1539 E. Fourth Street
    Santa Ana, CA 92701
8   Telephone: (949) 202-1111
    Fax: (855) 700-0529

9   Attorneys for Nicholas Robinson

10

11                  **UNITED STATES DISTRICT COURT**
12                **NORTHERN DISTRICT OF CALIFORNIA**

13

14   NICHOLAS ROBINSON                 )   Case No.: 5:19-cv-06768NC
                                       )
15          Plaintiff,                 )   **DECLARATION OF ROGER**
                                       )   **CLARK IN SUPPORT OF**
16   vs.                               )   **PLAINTIFF'S OPPOSITION TO**
                                       )   **THE MOTION FOR PARTIAL**
17                                     )   **SUMMARY JUDGMENT**
18   CITY OF SAN JOSE, RYAN DOTE,      )
     JAMIE MARIE KULIK, NICHOLAS       )
19   PETTERSON, and DOES 1 through 20  )   DATE:    September 22, 2021
20   inclusive,                        )   TIME:    1:00 p.m.
                                       )   COURTROOM:  5, 4th Floor
21          Defendants.                )   JUDGE:  Hon. Nathanael Cousins
22                                     )
                                       )
23                                     )   Trial:   November 22, 2021

24          I, ROGER CLARK, have personal knowledge of and hereby declare the

25   following:

26          1.     I am the founder of Police Procedures Consultant, Inc., which has been

27   in practice for over 21 years.

28          2.     I served as a Lieutenant for the Los Angeles County Sheriff's

Department for 15 years. As a Lieutenant, I commanded a specialized unit created to investigate, locate, observe, and arrest major (career) criminal offenders.

3.     I also served in the Custody Division of the Los Angeles County Central Jail for 2 years. I served as a Training and Logistics Lieutenant and Watch Commander.

4.     For 6 years and 4 months, I served as a Sergeant for the Los Angeles County Sheriff's Department.

5.     I also served as a Deputy for the Los Angeles County Sheriff's Department for 6 years. Within that capacity, I worked in the Patrol Division of the San Dimas Station, Detective Bureau. As a Deputy, I handled the first response to all crimes requiring investigations. For about 2 years, I performed all duties assigned to Station Patrol including Jailer, Watch Deputy, Patrol, and Traffic.

6.     Attached as **Exhibit A** is a true and correct copy of my report dated on May 28, 2021, that rendered my opinions regarding the November 28, 2018 arrest and use of force inflicted on Mr. Nicholas Robinson by San Jose Police Department Officers Ryan Dote, Jaime Marie Kulik, and Nicholas Petterson.

7.     Pursuant to the requirements of Rule 26, I have reviewed the San Jose Police reports, photographs, video recordings, deposition transcripts. IA reports and other material listed in **Exhibit A** provided to me as of November 28, 2018, regarding this case.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct, and that this declaration was executed on August 20, 2021 in Santee, CA.

Roger Clark

# Roger Clark

## Police Procedures Consultant, Inc.

10207 Molino Road.  Santee, CA 92071
Phone: (208) 351-2458,  Fax: (619) 258-0045
rclark9314@aol.com

May 28, 2021

Joseph S. Farzam, Esq.
Joseph Farzam Law Firm
A Professional Law Corporation
11766 Wilshire Boulevard, Suite 280
Los Angeles, CA 90025

Nicole Lahmani, Esq.
Lahmani Law, APC
1539 East Fourth Street
Santa Ana, CA 92701

**Regarding:    *Nicholas Robinson v. City of San Jose, et al.  Case No.:
5:19-CV-06768NC.***

Dear Counsel:

Thank you for retaining me to analyze and render opinions regarding the November 28,
2018 arrest and use of force inflicted on Mr. Nicholas Robinson (Mr. Robinson) by San
Jose Police Department (SJPD) Officers Ryan Dote (Officer Dote), Jamie Marie Kulik
(Officer Kulik) and Nicholas Petterson (Officer Petterson).  Pursuant to the requirements
of Rule 26, I have reviewed the SJPD reports, photographs, video recordings, deposition
transcripts, IA reports and other material (as listed below) provided to me thus far
regarding this case.  Please be advised that if any additional material is provided, it is
likely that a supplemental report adding to and/or refining my opinions, will be necessary.

It is also necessary to state at the beginning of this report that I do not make credibility
determinations in expressing my opinions.  That is, where there are differences in the
events proffered by SJPD Officer Defendants, and/or others, versus those proffered by
Mr. Robinson and/or other witnesses I do not opine for the trier of fact regarding who are

the more believable witnesses. It is understood that the resolution of any such conflicts are within the purview of a jury to decide.

## Materials Reviewed Thus Far:

1. Pleadings:
   a. 190104_County Claim Form 2012.
   b. 190115_County Claim Form 2012.
   c. 190206_County Claim Form 2012.
   d. 190308_Government Tort Claim.
   e. 190925_Complaint.
   f. 191016_Petition for Bar Admission.
   g. 191018_Complaint Prepared by N. Lahmani Final Revision.
   h. 191021_Conformed Civil Cover Sheet; Conformed Complaint; Conformed Summons (Rejected).
   i. 191210_Stipulation to Extend Time.
   j. 191230_Schedule.
   k. 200107_Answer (City of San Jose); Answer (Jamie Marie Kulick); Answer (Nicholas Petterson); Answer (Ryan Dote).
   l. 200113_Proposed Joint CMC Statement.
   m. 200117_ADR Certification; Conformed Joint Statement of Case; Defendants' Rule 26 Initial Disclosures; Plaintiff Initial Disclosures Rule 26 (a)(1) - (MB)(002); Plaintiff Initial Disclosures Rule 26 (a)(1) - (MB) signed; Plaintiff Initial Disclosures Rule 26 (a)(1) - (MB); Plaintiff Initial Disclosures Rule 26 (a)(1).
   n. 200120_Court Order Setting Trial, Resetting CMC.
   o. 200213_Proposed Protective Order NL Signature; Proposed Protective Order.
   p. 200218_Robinson v. City of San Jose, et al., Protective Order.
   q. 200224_Conformed Stipulation Protective Order.
   r. 200409_Stipulation Regarding ENE NL Signature, Stipulation Regarding ENE.
   s. 200902_Court Order Release Proposed_Criminal Action; Dismissal Criminal Action; Stipulation Dismiss Stay.

t.      200917_Stipulation Dismiss Stay.

u.     201006_Robinson Stipulation Terminate Stay Final; Stipulation Terminate Stay_Final.

v.     201020_Draft Joint CMC Statement.

w.    201021_Robinson JCMS City eds.

x.     201028_Court Order Case Management Scheduling.

x.     201222_Notice of Association of Counsel (Carolin).

y.     210308_Robinson JCMS for March 2021.

z.     210323_Defendants' Amended Initial Disclosures.

aa.   Civil Case Cover Sheet - Federal Signed.

bb.   Civil Case Cover Sheet - Federal

cc.   Summons (PDF and Word Document)

     I.   *Motion for Stay Under Younger Abstention Doctrine:*

        i.   Declaration of Matthew Pritchard.

        ii.   Defendants' Motion for Stay.

        iii.  Proposed Order.

        iv.  Request for Judicial Notice.

2.    Motions:

   a.    200707_Defendants' Reply Motion.

   b.    200707_Defendants' Reply to Plaintiff's Opposition to Defendants' Motion for Stay.

   c.    200722_Order Granting Defendants' Motion to Stay

   d.    2007106_Plaintiff's Opposition for Stay.

3.    Discovery:

   I.   *Defendants' Propounded:*

     a.   200518_Defendants' Production of Documents to Plaintiff.

     b.   200518_City of San Jose Interrogatories to Plaintiff.

     c.   RFA to Plaintiff, Set One.

     d.   RFP to Plaintiff, Set Two.

     e.   Defendant Dote's ROG to Plaintiff, Set One.

   II.  *Defendants' Responses:*

     a.   210331_CJS's Objection to Deposition Notice.

     b.   CSJ Privilege Log.

     c.   CSJ's Response to Plaintiff's RFA, Set One.

d.    CSJ's Response to Plaintiff's ROGS, Set One.
e.    CSJ's Response to Plaintiff's RPD, Set One.
f.    Dote Responses to Plaintiff's ROGS, Set One.
g.    Dote Verification.

III.   *Plaintiff's Propounded:*

a.    210323_ Interrogatories, City of San Jose.
b.    210323_ Interrogatories, Dote.
c.    210323_ Production of Documents.
d.    210323_ Admissions Request, San Jose.
e.    210323_ RFA, San Jose.
f.    210323_ Special ROGS, San Jose.
g.    210323_ Special ROGS, Dote.
h.    POS, Interrogatories, Dote.
i.    POS, Interrogatories, City of San Jose.
j.    POS, Interrogatories.
k.    POS, Production of Documents.
l.    POS, RFA.

IV.   *Plaintiff's Responses:*

a.    Mediation Summary.
b.    Plaintiff's Responses to FROGS.
c.    Plaintiff's Response to RFP.
d.    Verification, Req4Pro.
e.    Verification, RFRogs.
f.    210427_ Responses RFA.
g.    210428_ Exhibit 1.
h.    210428_ Final Binder to Serve.
i.    210428_ Demand for Production.
j.    210428_ Special ROGS.
k.    200611_Plaintiff's Responses to Interrogatories.
l.    200611_Plaintiff's Responses to RPD.
m.    Plaintiff's Responses to FROGS Final.
n.    Plaintiff's Responses to FROGS and RFP, Served Copies.
o.    Plaintiff's Responses to RFP - Final.
p.    Exhibit 1, Videos and Photographs.
q.    Exhibit 2, Medical Records.
r.    Exhibit 31, Social Media.

V.    *Verifications:*
- a.    210427_Blank Verifications.
- b.    Verification, Req4Pro.
- c.    Verification, Req4Pro, Signed.
- d.    Verification, RFRogs.
- e.    Verification, RFRogs, Signed.
- f.    Verification, SpRogs.

4.    Investigation:
- a.    190207_San Jose PR.
- b.    190306_Plaintiff's Driver's License.
- c.    190910_Ryan Dote, 2015 Incident.
- d.    190924_Email NL.
- e.    190217_Email from P_San Jose Officer Safety Bulletin.
- f.    200413_Research Regarding Liability.
- g.    200720_San Jose Police Killings Article.
- h.    201020_San Jose PD Video.
- I.    201022_San Jose PD IA Investigation 2018-0293.
- j.    20104_Email from CL Regarding Video Link.
- k.    Google Maps' Image of Story Road.
- l.    Email Regarding Attorney Misconduct.
- m.    Email Regarding Citizen Complaints.
- n.    Attorney Misconduct Online Complaint.
- o.    Christopher Randall Creech San Jose City Attorney.
- p.    Julia Weilan Van Roo San Jose City Attorney.

5.    Medical Records:
- a.    Elbow Equipment, Bill/Receipt.
- b.    Kaiser, Billing; Encounters, Affidavit Letter.
- c.    Mills-Peninsula Hospital, Bills; Medical Records.
- d.    Valley Medical Center, Hospital Records, Bills.

6.    Trial:
- a.    210317_Order Trial Dates.

7.    Photographs:
- a.    Screenshots of Social Media.
- b.    181221_Pictures.
- c.    190723_Video 1.

      d.     190723_Video 2.
      e.     190909_Body Cam 1.
      f.     190909_Body Cam 2.
      g.     190909_Video 1.
      h.     190909_Video 2.
      i.     190909_Video 3.
      j.     191216_Flyer.
      k.     191216_Flyer with Picture.
      l.     200409_Video Transcribed.
      m.    200917_Dismissal of Criminal Action.
      n.     200917_Request and Order to Release Property, Flashlight.

8.    Deposition Transcripts:
      a.     210428_Certified Condensed, Officer Ryan Dote, April 13, 2021.
      b.     210428_Certified Copy.
      c.     210428_Letter to Witness by Code.
      d.     21828_Certified Condensed, Officer Nicholas Petterson, April 13, 2021 and Exhibits 1-3.
      e.     210503_Certified Condensed, Sergeant Christopher Sciba, PMK, April 16, 2021.
      f.     210503_Certified Copy.
      g.     210503_Letter to Witness by Code.
      h.     Deposition of Mr. Nicholas Robinson, Plaintiff.
      i.     Deposition of Mr. Adan Aguilar, Witness.
      j.     Deposition of Officer Kulik and Exhibits 1-2.
      k.     210323_Notices of Deposition to Plaintiff and Defendants.
      l.     210324_Notice of Deposition to Adan Aguilar.
      m.    210330_Amended Notices of Deposition.
      n.     210407_Amended Notices of Deposition.

9.    Video Recordings:
      a.     San Jose PD Video.
      b.     Perez, BWC.

10.   Mediation:
      a.     200224_Confidentiality Agreement 2018 Revision.
      b.     200224_Letter Setting ENE Date.

      c.      200225_Local Rules ADR Effective May 1, 2018.
      d.      200414_ENE Brief Robinson.
      e.      200416_Confidentiality Agreement.
      f.      200416_Confidentiality Agreement, Signed.
      g.      200416_ENE Recording.

11.      California POST Basic Learning Domains as Follows:
      a.      #1:  "Leadership, Professionalism & Ethics."
      b.      #2:  "Criminal Justice System."
      c.      #3:  "Policing in the Community."
      d.      #5:  "Introduction to Criminal Law."
      e.      #15: "Laws of Arrest."
      f.      #16: "Search and Seizure."
      g.      #18: "Investigative Report Writing."
      h.      #20: "Use of Force."
      i.      #21: "Patrol Techniques."
      j.      #23: "Crimes in Progress."
      k.      #31; "Custody."
      l.      #33: "Arrest Methods/Defensive Tactics."
      m.      #34: "First Aid and CPR."

12.      Temporary Restraining Order.

13.      Internet-based Images of the Scene.

## Apparent Uncontested Facts:

1.      Mr. Robinson stood on a public sidewalk no less than thirty feet from Officers Dote, Kulik and Petterson while he observed their conduct at the scene.

2.      Mr. Robinson complied with the order not to shine his flashlight at the officers.

3.      Mr. Robinson never approached the Officers - they approached him.

4.      Officer Dote initiated the first physical contact with Mr. Robinson.

5.      Officer Dote suddenly grabbed and placed Mr. Robinson in a "rear

wrist-lock" pain compliant hold without any announcement that he (Robertson) was under arrest or being arrested.

6.    Per his testimony and the video recording, Officer Dote never stated at any time his intentions to arrest Mr. Robinson, or provided Mr. Robinson an opportunity to willingly submit to his (Dote's) arrest

7.    After placing Mr. Robinson in the wrist-lock, and without any verbal instruction or warning whatsoever, Officer Dote immediately forced Mr. Robinson face-first into the cement sidewalk.

8.    Mr. Robinson was physically injured as a result of the wrist-lock hold and/or the forced takedown into the cement by Officer Dote.

9.    Once on the ground, Officer Dote placed his knee on Mr. Robinson's back, and continues to stress his arms as he and Officer Petterson were on top of Mr. Robinson.

10.   Mr. Robinson was arrested and booked pursuant to the alleged criminal charges of interfering/delaying.  However, the criminal charges brought against him were dismissed before trial when reviewed by the District Attorney.

11.   Mr. Robinson sustained a broken left arm, facial abrasions and scrapes as a result of the physical force inflicted during his arrest.

12.   None of the involved officers at the scene knew Mr. Petterson by name or any other previous contact(s) he may have had with the SJPD.


**Brief Overview of Events and Commentary:**

In November of 2018, Mr. Robinson resided at 1717 Everglade Avenue in San Jose, California with his fiancé, Adan Aguilar.  Mr. Robinson was not on probation or parole. Mr. Robinson suffers from a social and communication disorder called a Spectrum Disorder and has the official diagnosis of Asperger's Syndrome a form of high-functioning Autism.

While standing on a public sidewalk and in the proximity of a SJPD patrol "warrant investigation", Mr. Robinson was ordered to leave the area despite the fact that he stood on a public sidewalk at least thirty feet from the on-going police activity. When he expressed his understanding of his right to be present and observe the police activity, Mr. Robinson was nonetheless arrested, and subsequently injured by Officers Dote and Petterson. The following pages provide a brief overview of events, commentary and opinions regarding the incident.

## Incident:

On November 28, 2018 at approximately 10:00 p.m. Mr. Robinson drove home from work in Oakland. On the way home, he picked up his fiancé (Adan Aguilar) from his job.

According to Mr. Robinson, he exited the California Highway 101 and traveled west on Story Road. As he exited, he looked to his left and saw police cars parked near a well-known homeless encampment. According to Mr. Robinson, he became suspicious when he did not see any highway patrol personnel at the scene.

Mr. Robinson made a left turn onto Via Ferrari and parked near Iglesia Ni Christo church. Adan remained in the car as Mr. Robinson walked east on Story Road, toward the encampment.

According to Mr. Robinson, he was concerned that vagrants, who had established a camp near the on ramp, were being treated unfairly and unconstitutionally. Therefore, Mr. Robinson brought a flashlight and recording device, so he could document any untoward, unlawful and/or unconstitutional activity.

According to Mr. Robinson, he arrived and observed several San Jose Police Department Officers in the encampment. In order get a better view of the activity, Mr. Robinson, occasionally shone his flashlight on the tents and toward the group of Officers.

Mr. Robinson has testified that he was careful to maintain a safe distance - no less than thirty feet - from the Officers and the encampment. According to Mr. Robinson, who had not engaged the Officers at all, he was approached by Officer Dote.

At this point in the sequence of events, Officer Dote activated his body worn camera (BWC) and was audio recorded as he ordered Mr. Robinson to lower his flashlight. It should be noted here that Officer Dote's BWC recorded that Mr. Robinson complied with the order and lowered his flashlight. However, after Mr. Robinson lowered his flashlight, the Officers immediately shone their lights directly into Mr. Robinson's face. Mr.

Robinson reciprocated and momentarily shone his back in their faces and stated, "You're not going to be doing to my eyes either."

Based on video evidence, Mr. Robinson shone his flashlight toward Officer Dote for less than two seconds, and complied with the order to lower his flashlight within ten seconds - in my opinion, a reasonable amount of time. Additionally, Officer Dote has testified that Mr. Robinson did, in fact, complied with orders to lower the flashlight.

> Q.    From the time you approached Mr. Robinson --from the time you
>        asked Mr. Robinson to stop shining his flashlight in your eyes to the
>        time you took him down, did he, at any point, comply with your
>        order and stop shining the flashlight into your eyes?
> MR. PRITCHARD: Same objection.
> A.    Towards the latter part, yes." (Dote, pages 43-44)

It must be noted that during the encounter, Mr. Robinson stood on a public sidewalk and never approached the Officers. Nonetheless, Officer Dote, followed by Officers Petterson and Kulik approached Mr. Robinson as he stood on the sidewalk. Also, when Officer Dote approached Mr. Robinson he (Dote) stood directly in front of Mr. Robinson – not an action taken by a trained officer in fear of his/her "safety."

> Q.    What other concerns did you have?
> A.    I had officer safety concerns regarding his demeanor and his trying
>        to apparently blind us with his flashlight. (Dote, Page 44)

Next, Mr. Robinson, to avoid any confusion regarding his purpose for standing on the sidewalk, announced why he was there and said, "Okay, last time I checked I have every right to be here to make sure you guys don't violate these peoples' rights." Accordingly, at this point in the sequence of events, there should have been no doubt as to Mr. Robinson's intentions to observe only and was not a credible threat to the on-going police activity.

As Mr. Robinson stood and calmly announced his intention (to document any violations of civil rights) he grasped his flashlight in his left, non-dominant hand, with his index and middle fingers on one side and thumb on the other. Per the video recording, a reasonably trained officer would know that Mr. Robinson's stance, demeanor and the way he handled the flashlight disabused any thought that he was, or might become, violent.

Officer Dote went to great lengths to enumerate the "pre-assaultive indicators" he believed had been exhibited by Mr. Robinson but failed to document the fact that Mr.

Robinson was calm, never assaulted anyone, never approached the officers and in fact was passively non-compliant, at worst.

> Q.    It goes on to ask "Were you assaulted by the suspect?" and you checked "No"; is that still true and accurate?
> A.    Yes.  (Petterson, Page 119.)
>
> Q.    Under the next section, it says "Suspect's erratic behavior as you perceived it at the time of the incident.· Check all that apply," and you checked the box for "None"; do you see that?
> A.    Yes.
> Q.    Is that still true and accurate?
> A.    Yes.
> Q.    Does that mean that your position at that time was that Nick Robinson was not depicting any erratic behavior at the scene, is that right?
> A.    Based on my perception of him, no.  (Petterson, Pages 118-119.)
>
> Q.    Did he bring his right hand up -- his right fist up?
> ME. PRITCHARD: Objection.· Vague.
> A.    I'm sorry, you asked if he brought his right fist up?
> Q.    Yes.
> A.    No, not to my recollection. (Dote, Page 49)

As Mr. Robinson continued to talk to the Officers, and as he held the flashlight in a very passive manner, he pointed the butt of the flashlight as a way to communicate whom he addressed.  After pointing the butt of the flashlight at Officer Dote, Officer Dote immediately reached forward and grabbed Mr. Robinson – without any warning or direction.

> Q.    And what did you do to take Mr. Robinson into custody?
> A.    I reached for his left elbow and wrist in order to place it behind his back to put handcuffs on him.
> Q.    Did you ask him first -- did you ask him to turn around and put his arms behind him?
> A.    No, I don't believe so.
> Q.    Why didn't you do that?· Why didn't you ask him to put his hands behind him -- behind his back?
> ME. PRITCHARD: Objection. Vague. Argumentative.

Page 11 of 32

> A.    Because I went to go place him in handcuffs and place him under
>        arrest, and he still had that flashlight in his hands, which was an
>        officer safety concern.
>
> Q.    Part of your training to become a police officer, aren't you told in
>        order to conduct an arrest, you must first ask a subject to turn around
>        and place their hands behind their back?
>
> A.    Not all the time.  It's not required.  (Dote, Page 50.)

Officer Dote has testified that his primary concern was that Mr. Robinson shone the
"bright" flashlight in his (Officer Dote's) eyes.  Based on video evidence, Mr. Robinson
shone the flashlight for less than two seconds, in totality, toward the Officers.

> Q.    What other concerns did you have?
>
> A.    I had officer safety concerns regarding his demeanor and his trying
>        to apparently blind us with his flashlight.
>
> Q.    Well, but my question was after -- once he stopped shining the
>        flashlight into your eyes, what other concerns did you have about
>        him?
>
> A.    He was argumentative.
>
> Q.    How was he argumentative?
>
> A.    He displayed pre-assaultive indicators, he was raising his voice and
>        refused to comply with our orders,  "Hey, just leave," if he has no
>        business being here."  (Dote, pages 44-45)

After Officer Dote grabbed Mr. Robinson, he forcefully threw Mr. Robinson to the
ground and detained him by using a rear wrist lock and handcuffing him.  Officer Dote
included in his report that he used a wrist lock, threw Mr. Robinson to the ground, placed
his knee on Mr. Robinson's back and continued to twist and turn Mr. Robinson's arms,
while Mr. Robinson was piled upon and prone.  As a result of the physical force, Mr.
Robinson's left arm was broken and he suffered significant blows and abrasions to his
face and body.

**Officer Dote's Report Narrative:**

> "On 11-29-2018, I was dressed in full police uniform with "San Jose
> Police" patches, wearing my department-issued body worn camera (BWC),
> riding a marked police vehicle equipped with red lights/siren , assigned to
> patrol unit 61L2.

"At approximately 2200 hours, I was assisting Officer Ikeuchi #4574 with her warrant investigation (SJPD #18-333-0877) in the area of the HWY 101 SB on-ramp/Story Rd. in San Jose.  At approximately 2200 hours I observed a male subject (later identified as (S) Nicholas, Robinson), standing on the sidewalk area nearby the homeless encampment along the west sound wall.  (S) Nicholas Robinson was dressed in all black clothing and was shining a very bright LED flashlight in my direction.  Ofc. Ikeuchi, Ofc. Petterson and I were currently conducting our warrant investigation with a subject who was in our custody.  I had de-activate by BWC for a personal conversation I was having with another officer on-scene.  Ofc. Ikeuchi and Ofc. Kulik.

"I observed  (S) Nicholas Robinson wandering near the tent, continuously shining the flashlight in our direction.  I was unaware of the suspect's intentions, but it seemed as if he knew the suspect who was in our custody.

"I re-activated my BWC as I walked towards the suspect, activated my flashlight so I could see the suspect more clearly, and announced my presence by saying, "San Jose Police."  The suspect was wearing a black beanie, a thin black jacket, black cargo pants, and black boots.  Based on my training and experience, the suspect was dressed in a manner consistent with a security guard.  I also know that security guards are commonly armed with weapons for their personal protection.  The suspect's pants were baggy and contained numerous pockets.  The suspect's jacket was also baggy and concealed his waistband area.

"The suspect continued standing on the sidewalk, shining his light in my eyes.  Due to the dark hour and the intense brightness of his flashlight, this caused me to become slightly disoriented and I temporarily lost my natural night vision (blind spot in my vision).  I heard Ofc. Petterson order the suspect to put his light down.  The suspect willfully defied Ofc. Petterson's lawful order and deliberately shined his flashlight directly in my eyes . This caused me to be temporarily blinded and disoriented.  Based on my training and experience, this posed a significant threat to my officer safety, because I know that if I am blinded (temporarily or permanently) I can be easily incapacitated and I will not be able to see or perceive any threats.  (S) Nicholas Robinson deliberately shined his bright flashlight in my face at least four (4) separate times.  I believed (S) Nicholas Robinson was purposely trying to disorient and blind me.

Page 13 of 32

"I asked (S) Nicholas Robinson if he lived in the area and had any business here. (S) Nicholas Robinson mumbled that he did not. I gave (S) Nicholas Robinson a lawful order to "move along." The suspect turned around and said, "Actually, last time I checked, no I don't." The suspect displayed the following pre-assaultive indicators:

- argumentative and defiant attitude
- squaring up his stance and shoulders towards officers
- shining the bright flashlight deliberately aiming for officers' eyes
- flexing and stretching his right hand to get blood flow into his hands/fingers.

"The suspect continued to be argumentative and refused to turn around and leave, which inevitably forced myself and other officers on the scene to divert our attention and resources to the suspect, and away from our previous on-going investigation. I again ordered the suspect not to "bother us at our scene, and to leave." The suspect defied our commands and continued to be argumentative. (S) Nicholas Robinson then began waving the flashlight around while arguing his point. The suspect then began pointing and jabbing the butt end of the flashlight directly towards my face and chest. I ordered the suspect not to point the flashlight at my face, and he switched the flashlight to his right hand so that I would not be able to grab it from him. Based on my training and experience, I know the flashlight of that size can be used as an impact weapon which can cause great bodily injury and/or death. I also know that I can be quickly incapacitated if struck in the head, leaving my gun and other weapons vulnerable.

"I attempted to take the suspect into custody for 148 (a) (1) PC. I used my right hand to grab the suspect's left wrist in order to place it behind his back. I placed my left hand in the crook of the suspect's left elbow in order to bend it so I could place him in handcuffs. I felt the suspect attempting to break free by pulling his left arm away and attempting to spin and turn away from my grasp. In order to overcome his resistence, effect his arrest and prevent his escape, I placed a rear wristlock on the suspect's left wrist and used my left hand to push his left elbow towards the ground so that I could gain control over the suspect's torso. Ofc. Petterson had a hold of the suspect's right arm, refer to his supplemental report for further details. While on the ground, I maintained pressure on the suspect's left wrist and elbow behind his back. I felt the suspect attempting to twist his torso

towards me and I ordered him to stop pushing back against me. I placed my knee on the suspect's lower back to also gain more control of his upper body to prevent him from getting up [off] the ground. Ofc. Kulik placed the suspect in handcuffs, refer to her supplemental report for further details.

(S) Nicholas Robinson complained of pain to his right arm. Ofc. Ikeuchi summoned medical attention for the suspect. I immediately notified Sgt. Yu #2812 of the incident and he responded to the scene.

"I transferred custody of the suspect to Ofc. Valverde #3987, refer to his supplemental report for further details.

"For further details regarding this incident, refer to my BWC footage." (Dote Document Narrative, Exhibit 1, Report)


**Standards and Training Regarding Ethical Conduct and Lawful Authority:**

Throughout the nation and in California Law Enforcement Officers assume their duties by oath of allegiance to the Constitution of the United States and the Constitution of the State of California. In California, officers are also required to assume by oath a "Law Enforcement Code of Ethics" which is: "administered to all peace officer trainees during the (POST) basic course and all other persons at time of appointment."

Simply stated, officers are trained in the first days of their attendance at the POST Basic academy that they are required by law and defined professional standards of conduct to protect the constitutional rights of all citizens. This includes the right of all citizens to be free of unlawful detention and/or arrest and to be free of excessive and/or unnecessary force under color of authority (California Penal Code 149 - Assault Under Color of Authority)..

"The criminal justice system gives law enforcement two extraordinary powers:
- the power of arrest
- the power to use deadly force

"The authority to do so does not come from the rule of an authoritarian dictator. Rather it comes from the will and consent of the people who put their trust in law enforcement to use that power with the utmost of care and restraint. This is why it is important to emphasize that peace officers do not

Page 15 of 32

confer "police powers" on themselves.  These powers come to the criminal justice system from the people they serve."  (LD 2, "Introduction to the Criminal Justice System," page 1-4.)

**Training Regarding the Legal Requirement to Announce an Arrest:**

"Information required at time of arrest

"California Penal Code Section 841 requires that any person making an arrest must convey certain information to the individual arrested at the time of the arrest.  The three things that must be explained are:
- intent
- cause
- authority

"Item Description

| | |
|---|---|
| Intent | The arresting person must tell the individual that he or she is being arrested. |
| Cause | The arresting person must state the reason for the arrest (e.g., an outstanding warrant, or the name of the offense). |
| Authority | A non-uniformed officer must show identification. A uniformed officer and/or marked car satisfies this requirement (no ID required). A private person must state his or her authority to make the arrest." (LD 15: Chapter 4 – Arrests, page 4-10.) |

**Peace Officer Standards and Training (POST) Regarding the Use of Force**:

Within the first days of academy training Officers are taught that they are required to follow fundamental rules of prudence, decency, respect and professionalism.  Officers are taught that the overarching objective during any police-citizen contact is to obtain compliance through officer presence combined with the verbal skills  taught during their academy training (Learning Domain 3, "Policing in the Community").

"The development of police-community partnerships requires officers to communicate effectively. Skillful communication is an important officer safety tool. Knowing and applying a variety of communication techniques enhances an officer's ability to successfully communicate with all segments of the community.

**"To perform competently, it is essential that peace officers develop effective communication skills.**

"Although a significant portion of an officer's job is based upon a body of knowledge (penal codes, regulations, case laws, vehicle codes, etc.), it is unrealistic to expect the public to understand all of the language associated with the officer's knowledge. Officers should avoid using "police jargon" when speaking with the public." (LD 3, "Policing in the Community, page 2-10.)

"To use physical force only when the exercise of persuasion, advice and warning is found to be insufficient to obtain public co-operation to an extent necessary to secure observance of law or to restore order; and to use only the minimum degree of physical force which is necessary on any particular occasion for achieving a police objective." (Robert Peel, "Nine Principles of Policing,", 1829.)

Accordingly, officers are trained that any use of physical force should always be considered as a last resort and only absent an obvious reasonable alternative. However, when it becomes necessary for "achieving a police objective" (as cited above) then the subjects' resistance/actions to an arrest coupled with the totality of circumstances will determine the type of force used by peace officers. The following chart illustrates how a subject's resistance/actions can correlate to the force applied by an officer. (Listed as Subject's Actions, Description of Resistance and Possible Force Option):

*Cooperative* - Subject offers no resistance:

- Mere professional appearance
- Nonverbal actions
- Verbal requests and commands

*Passive non-compliance* - Does not respond to verbal commands but also offers no physical form of resistance:

Page 17 of 32

- • Verbal requests and commands.
- • Officers' strength to take physical control, including lifting/carrying.
- • Control holds and techniques to direct movement or immobilize a subject.

*Active resistance* - Physically evasive movements to defeat an officer's attempt at control, including bracing, tensing, running away, or verbally signaling an intention to avoid or prevent being taken into or retained in custody:

- • Control holds and techniques to control the subject and situation
- • Use of personal weapons in self-defense and to gain advantage over the subject
- • Use of devices to secure compliance and ultimately gain control of the situation

*Assaultive* - Aggressive or combative; attempting or threatening to assault the officer or another person:

- • Use of devices and/or techniques to secure compliance and ultimately gain control of the situation
- • Use of personal body weapons in self-defense and to gain advantage over the subject

*Life-threatening* - Any action likely to result in serious injury or possibly the death of the officer or another person

- • Utilizing firearms or any other available weapon or action in defense of self and others

Officers are also trained that they must take into account the *totality of the circumstances* when selecting a reasonable force option and that an officer's force options are limited based on any single factor, and that they must only use the force option appropriate for the situation as conditions may change rapidly. Thus, officers must continually reevaluate the subject's action and must be prepared to transition as needed to the appropriate force options. (LD 20: Chapter 2 – Force Options, pages 2-7.) In my opinion, Mr. Robinson never demonstrated a credible threat as alleged by Officer Dote - either by observed

conduct (simply standing on a sidewalk away from the warrant investigation with a flashlight) or by any verbal threat, or by any physical acts.


**Training and Standards Regarding the "Consequences of Unreasonable Force":**

Officers in California are specifically trained by POST that:

> **"Unreasonable force** occurs when the type, degree and duration of force employed was not necessary or appropriate."
> "Malicious assaults and batteries committed by peace officers constitute unlawful conduct. When the force used is unreasonable, the officer can face criminal and civil liability, and agency disciplinary action."

> "In the Penal Code Section 149, there are a number of statues that regulate the behavior of peace officers.

> > "Every public officer who, under color of authority and without lawful necessity, assaults or beats any person, is punishable by a fine not exceeding ten thousand dollars ($10,000) or by an imprisonment in the State prison or in a county jail not exceeding one year or by both fine and imprisonment."

Additionally, Officers are also specifically trained regarding their obligation to Federal Law regarding officer behavior. It includes:

> > "Peace officers are prohibited from depriving citizens of their rights under the color of the law. If death results, officers may be punished by life imprisonment." (Title 18, Section 242 - Criminal)

> > "Peace officers are prohibited from depriving citizens of their rights under the color of authority." (Title 42, Section 1983 - Civil). (LD 20: Chapter 6 – Consequences of Unreasonable Force.)


**Training and Standards regarding the Duty to Intervene:**

In California Officers are trained by POST that the community expects that its peace

officers will use reasonable force, and both Federal and State law requires other officers present to intervene if reasonable force is exceeded. This intervention may/should include physically restraining the other officer to prevent the inappropriate or unlawful behavior of another. Training includes that officers may face both criminal or civil liability and disciplinary action if they fail to intervene and prevent other officers from violating anyone's constitutional rights if they had reason to know and had an opportunity to act. Additionally, the officer who fails to intervene, for whatever reason, is also held accountable by the United States Code. (LD 20: Chapter 6 – "Consequences of Unreasonable Force".)

**Training Regarding The Right To Lawful Resistance:**

Throughout California, officers are trained while in the academy that although Penal Code Section 834a states that the person being arrested must submit to an arrest, if unlawful or unreasonable force is used to effect the arrest, the person being arrested may lawfully resist to overcome that force. The following lists the applicable penal code sections:

Section 692:   Lawful resistance to the commission of a public offense may be made by the party about to be injured or by other parties.

Section 693:   Resistance sufficient to prevent the offense may be made by the party about to be injured to prevent an offense against his person, or his family or some member thereof. To prevent an illegal attempt by force to take or injure property in his lawful possession.

Section 694:   Any other person, in aid or defense of the person about to be injured, may make resistance sufficient to prevent the offense."

**Additional Opinions Thus Far:**

1.   Throughout the country, Officers are trained regarding the use of their police powers and the methods and means of response when dealing with citizens. Above all, they are required to be ethical and professional in their contacts and to act accordingly –in the best interest of the safety of citizens (as cited above). The defendant officers, and in particular Officer Dote, utterly failed in their respective duties in this regard. This includes their collective uses of

force, detention, and handcuffing of Mr. Robinson. Their actions in this incident can only be viewed as excessive, unnecessary, intrusive, and unconstitutional, and are in violation of policy and law (as trained by POST).

2.    The scope and magnitude of the force applied to Mr. Robinson by the defendant officers (including being thrown to the ground and kneed in the back and torso) was grossly excessive, and violated policy and law, as taught to all officers:

"**Unreasonable force** occurs when the type, degree and duration of force employed was not necessary or appropriate."

"Malicious assaults and batteries committed by peace officers constitute unlawful conduct. When the force used is unreasonable, the officer can face criminal and civil liability, and agency disciplinary action." (Learning Domain #20, page 6-4.)

3.    I see nothing in this set of facts (including the arrest report proffered in this case) to justify Mr. Robinson's detention or arrest.

POST teaches *Reasonable Suspicion* (the police authority to detain) as:

"Enough facts and information to make it reasonable to suspect that criminal activity is occurring, and the person detained is connected to that activity; reasonable suspicion is required to justify a detention."

POST teaches *Probable Cause* (the authority to arrest) as: "A set of facts that would cause a person of ordinary care and prudence to entertain an honest and strong suspicion that the person to be arrested is guilty of a crime."

It is uncontested that the involved officers saw any illegal conduct by Mr. Robinson -accordingly no reasonable probable cause existed to arrest Mr. Robinson.

Page 21 of 32

4.    Based on video evidence, Officers Ikeuchi and Kulik failed in their duty to intervene and prevent the unlawful, unconstitutional, and excessive force exhibited by other Defendants:

**Training Regarding Excessive Force and Duty to Intervene:**

Peace officers are trained that they must recognize the consequences of using unreasonable force, and their legal and ethical responsibilities to intervene if the force being used by another peace officer is inappropriate or unlawful.  They are trained that *Unreasonable force occurs when the type, degree, and duration of force employed was not necessary or appropriate*.  (Emphasis added.)

"Consequences of unreasonable force:

"Malicious assaults and batteries committed by peace officers constitute unlawful conduct.  When the force used is unreasonable, the officer can face criminal and civil liability, and agency disciplinary action.

"In the Penal Code Section 149, there are a number of statues that regulate the behavior of peace officers:

"Section 149:  Every officer who is guilty of willful inhumanity or oppression toward any prisoner under his care is punishable by a fine not exceeding four thousand dollars ($4,000) and by removal from office.

"Section 147:  Every public officer who, under color of authority and without lawful necessity, assaults or beats any person, is punishable by a fine not exceeding ten thousand dollars ($10,000) or by an imprisonment in the State prison or in a county jail not exceeding one year or by both fine and imprisonment."  (Learning Domain #20: "Use of Force, Chapter 6.)

5.    Taking Mr. Robinson's set of facts as true, and as supported by the video evidence (such as it is) then Officer Dote and others submitted

false and deliberately misleading police reports, which violated SJPD policy, POST training and the Law (as taught by POST).

"Any officer who knowingly files a false report will be guilty of a crime. (Penal Code Section 118.1)" (POST Learning Domain #18: "Investigative Report Writing," page 1-4.)

"All reports are to be true, unbiased, and unprejudiced. These are easy words to say, but sometimes hard to live by. It is not always easy to know or find out the truth. Clearly it is the peace officer's moral obligation to seek the truth, lying is wrong. *Truth and public trust cannot be separated.*" (POST Learning Domain #18: "Investigative Report Writing," pages 1-5. Emphasis Added.)

"When writing a report, the minimum requirements to accomplish your job ethically and preserve the integrity of the criminal justice system are:

"Never falsify any portion of your report or modify any aspect of the report away from the factual truth.

*"Objectively document every fact (or piece of evidence) known to you that could prove or disprove the event you are reporting. If you are not sure, include the fact or piece of evidence anyway and qualify it as possible evidence or investigative information.*

"Be clear. A well-written report does not raise questions, it answers them.

"Write your report free of speculation or personal opinions. You are there to gather facts.

"You are responsible for the quality of each report you write. Each report is an opportunity to build or destroy your credibility. Always write precisely what happened to the best of your knowledge. A report determined by a court to be compromised or unethical not only topples your credibility, but your agency's as well – plus it opens the door to challenge every past enforcement action you have performed. Compromising your report is just not worth it and it will raise

questions about your effectiveness as a peace officer and may
ultimately lead to termination of your employment. *It is your
obligation to report incidents just as they occurred; anything else is
unethical*." (POST Learning Domain #1: Chapter 2 -
"Professionalism and Ethics in Policing." Emphasis Added.)

6.      The SJPD appears in this set of facts to have failed to provide the
necessary training and administrative enforcement that would have
prevented the gross departures of professional standards, POST
training, and written policies by the defendant officers that occurred
in this incident. As such, the collective approval of their collective
conduct and their tactics puts the general public at unnecessary
future risk of death and injury from the defendant officers, and other
officers on the department who have been, or are now, similarly
trained and supervised.

**My Qualifications To Review This Case:**

My opinions are based in part on my training, professional experience and education. I
am a twenty seven year veteran of the Los Angeles County Sheriff's Department (LASD).
I was hired on December 1, 1965, and I retired from active service on March 31, 1993.
My career included six years at the rank of Deputy Sheriff, six years as a Sergeant, and
fifteen years as a Lieutenant. I retired holding a California Peace Officer Standards and
Training (POST) Advanced Certificate, and I am a graduate of the POST Command
College (class #5, 1988). The POST Command College was a Masters level two-year
course of study requiring a thesis, in Police Administration, with the diploma awarded by
the California Department of Justice (and not the California University system).

During the course of my service with the department, I had a wide range of duties. Those
duties included an 18 month assignment as a staff jail deputy and two years as an
Administrator/Lieutenant in the same jail facility (Men's Central Jail). I also served on
the department as a patrol officer, field supervisor, jail watch commander and
administrator, station watch commander, and commanding officer of investigative units.
I was a field training officer while assigned as a patrol deputy, and I trained new officers
in POST and department approved patrol procedures, field investigations, apprehension
techniques, and emergency procedures.

I was a Station Detective and, as such, reviewed and assessed cases passed on to me by
the patrol officers. Those cases included possible complaints relating to both

misdemeanor and felony crimes. They frequently required follow up investigations and interviews before the exact nature of the case could be determined. As a field officer and detective, I was trained in interview and interrogation methods and subsequently trained other officers.

Among other assignments as a Sergeant, I supervised field officers and station detectives as they took complaints and conducted preliminary investigations regarding criminal and administrative matters.

As a Sergeant and as a Lieutenant, I served on the training staff of the Los Angeles County Sheriff's Department's Patrol School which taught the POST accepted patrol tactics, and investigation and apprehension methods.

As a Watch Commander and as a Lieutenant, I responded to, investigated, and reported on the use of force and officer-involved shootings. I was also assigned by my Department to sit as a member of Departmental review committees regarding the reasonable or unreasonable use of force and tactics.

As stated above, during my career I was assigned to the Los Angeles County Men's Central Jail (MCJ) for a period of 18 months as a line officer. Upon my subsequent promotion to Lieutenant, I returned to the same facility approximately 10 years later. During that time, I was assigned as a Jail Watch Commander, and as the Facility Training and Logistics Administrator. At the time of my assignment, the MCJ held a daily population in excess of 7,000 inmates, including a hospital, which was serviced by a staff of more than 900 sworn and civilian personnel.

During my assignment as the Administrative Lieutenant of the Department's Reserve Forces Bureau, I worked closely with the State of California Peace Officer Standards and Training in revamping our Reserve Academy to bring it into state compliance. This process gave me an expertise in the POST Basic curriculum. I also supervised the training of cadets at our Reserve Training Academy. They were taught proper investigation, interview, and apprehension procedures. Among other topics, I lectured the Reserve Academy on the POST syllabus: "The Legal and Moral Use of Force and Firearms."

During the 1984 Olympics held in Los Angeles, I was assigned and served as the Department's Intelligence Officer at the Los Angeles Olympics Emergency Operations Center.

During the last five and one half years of my career, I commanded a specialized unit known as the North Regional Surveillance and Apprehension Team (N.O.R.S.A.T.), which was created to investigate, locate, observe and arrest major (career) criminals. I held this position until my retirement from the Department on March 31, 1993.

Criminals investigated and arrested by N.O.R.S.A.T. included suspects involved with homicide, robbery, kidnaping, extortion, burglary, major narcotics violations and police corruption. The majority of our cases were homicide cases, including the murder of police officers. Arrests frequently occurred in dynamic circumstances including crimes in progress.

My unit also conducted major narcotics investigations including undercover narcotics buys, buy busts, and reverse stings. We frequently deployed at the request of investigative units, such as Narcotics, which provided the initial investigative leads for our operations. These narcotics cases usually involved multiple kilogram quantities of drugs and amounts of money ranging from one hundred thousand to more than one million dollars.

Approximately 80% of cases assigned to N.O.R.S.A.T. were active Homicide investigations. In that regard, the unit processed, under my command and supervision, various aspects (depending on the complexity of the cases involved) of approximately 1,000 Homicides ranging from deaths of police officers to serial homicide suspects.

Additionally, the majority of the over 1900 cases for which I have been retained as a consultant (since 1993) have involved injuries or deaths connected with some aspect of force during either apprehension or while in police custody.

During the first three months of my command of N.O.R.S.A.T., the unit had three justifiable shooting incidents. From that time, and over the next five years of my command, N.O.R.S.A.T. established a remarkable record of more than two thousand arrests of career criminals without a single shot fired – either by my officers or by the suspects whom we arrested.

Many of these suspects were armed and considered to be very dangerous. Some were apprehended during the course of their crimes and were very prone to use firearms to escape apprehension. This record of excellence was accomplished through the use of proper tactics, management and supervision of personnel, training in correct apprehension methods, and adherence to the moral and ethical standards endorsed by California POST and my Department. These methods and principles are also embraced by every state

training commission of which I am aware, as well as the national standards established by the U.S. Department of Justice.

As a result of my position and record as the commanding officer of N.O.R.S.A.T., I was assigned to author Field Operations Directive 89-3, "Tactical Operations Involving Detective Personnel." This order remained in force 20 years (until September 30, 2009), and included the basic standards and considerations with which investigative officers must comply in the event of a tactical deployment such as the dynamic entry into a building for the purpose of an arrest and/or seizure of evidence.

Since my retirement, I have testified as an expert on use of force, jail procedures and jail administration, investigations, police procedures, police tactics, investigative procedures, shooting scene reconstruction, and police administration in Arizona State Courts, California State Courts, Washington State Courts and Federal Courts in Arizona, California, Colorado, Florida, Illinois, Indiana, Louisiana, Missouri, Nevada, Ohio, Oregon, Pennsylvania, Texas, Utah, Washington, New Mexico, New York and Wisconsin. I have testified before the Los Angeles Police Department Board of Rights and the Los Angeles County Civil Service Commission. I have testified before the Harris County (Texas) Grand Jury and the Cleveland Grand Jury. I have also submitted written opinions in matters before Alaska, Delaware, Idaho, Montana, North Carolina, New York, Oregon, Kentucky, and Wyoming Federal and State Courts. I was selected (January 20, 2007) to present on the topic of: "Police Experts" at the National Police Accountability Project held at Loyola Law School, Los Angeles, California. I was selected (September 23, 2010) to present on the topic of: "Using POST Modules to Establish Police Officer' Standard of Care" at the National Police Accountability Project, National Lawyers Guild Convention, in New Orleans, Louisiana. I was selected (March 30, 2012) to present to the Kern County Public Defenders in Bakersfield, California, on the topics of "Ethics, Police Investigations, the California POST Curriculum, and the M26 and X26 Taser weapons." On August 7, 2013 I was invited and presented to the Texas Civil Rights Project (TCRP) 2013 Annual Legal Summit in Austin, Texas on the topic: "Ethically Working with Experts from the Prospective of a Police Expert." On October 15, 2015 I was the invited presenter at a Community Forum in Victorville, California on the topics of Police Procedures, Community Policing, Use of Force, and features of the M26, X26 and X2 Taser weapons. I was selected (January 24, 2020) to present on the topic of: "Use of force litigation under California's negligence standard and the impact of AB 392" at the National Police Accountability Project held at Loyola Law, Los Angeles, California. On February 18, 2020, and on March 10, 2021, I lectured (at request) at the University of California - Irvine, School of Law, Civil Rights Litigation Clinic.

I have worked on several projects with the Paso Del Norte (El Paso, Texas) Civil Rights Project and the Texas Civil Rights Project (Austin, Texas). As a result of my expert testimony in *Border Network, et al. v. Otero County, et al.*, Case No. 07-cv-01045 (D.N.M. 2008), a federal court issued a temporary injunction to stop the illegal and widespread immigration raids in Chaparral, New Mexico, implemented pursuant to Operation Stonegarden. The case resulted in the adoption of a model policy for inquiring into a person's immigration status, which has been adopted nationwide and has also been presented to the United States Senate, the Secretary of Homeland Security, and other government officials seeking to reform immigration enforcement.

I have been recognized, and my expert report was quoted by the USDC in *Burns v. City of Redwood City*, 737 F.Supp.2d.1047. I have been recognized, and my expert report was quoted by, the United States Court of Appeals for the Ninth Circuit as an expert in Police Administration and Use of Force in *Blankenhorn v. City of Orange, et al.*, 485 F.3d 463, 485 (9th Cir. 2007). The Ninth Circuit also drew from my expert report in a second published case involving Police Detective Investigations. *Torres, et al. v. City of Los Angeles, et al.*, 540 F.3d 1031, 1042-43 (9th Cir. 2008). The *Torres* case was appealed to the U.S. Supreme Court and returned for trial. I provided the expert opinion in *Chavies Hoskin v. City of Milwaukee, et al.* (E.D. Wis Case No. 13-cv-0920), regarding field strip and cavity searches, hiring, training, discipline and supervision, and which resulted in significant policy changes within the MPD. My opinions supported argument in the Ninth Circuit case: *A. D., a Minor; J. E., a Minor; Sue Casey, Plaintiffs-Appellees, v. State of California Highway Patrol, Defendant, and Stephen Markgraf.*, No. 09-16460, D.C. No. 3:07-cv-05483-SI (9th Circuit, Published Opinion). My opinions supported argument in the Ninth Circuit case: *Chaudhry v. City of Los Angeles*, 751 F.3d 1096, 1102 (9th Cir. 2014). The Ninth Circuit also drew from my expert reports regarding credible threats justifying the use of force, *Hayes v. County of San Diego*, 658 F.3d 867 (9th Cir. 2011), and *Young v. County of Los Angeles*, 655 F.3d 1156 (9th Cir. 2011). The Ninth Circuit also drew from my expert reports regarding Jail Administration and Administrative Responsibilities, *Starr v. Baca*, 652 F.3d 1202 (9th Cir. 2011). The Ninth Circuit also drew from my expert reports regarding an officer's violation of the 14th Amendment if an officer kills a suspect when acting with the purpose to harm, unrelated to a legitimate law enforcement objective, in *AD v. California Highway Patrol*, 712 F. 3d 446 (9th Cir. 2013). The Fifth Circuit drew from my expert report regarding search and seizure, investigations and no-knock requirements in *Bishop et al. v. Arcuri et al.*, 674 F.3d 456 (5th Cir. 2012). The Ninth Circuit also drew from my expert report regarding the use of impact weapons (PepperBall) on civilians in *Nelson v. City of Davis*, 685 F.3d 867 (9th Cir. 2012). I was the expert in the Ninth Circuit opinion regarding the allegations proffered by police officers and their use/display of firearms against civilians

in *Green v. City and County of San Francisco*, 751 F. 3d 1039 (9th Cir. 2014). Most recently, I was the expert in an important Ninth Circuit opinion regarding the allegations proffered by police officers and their use of lethal force against unarmed persons in *Jennifer Cruz, et al., v. City of Anaheim, et al.*, 765 F.3d 1076 (9th Cir. 2014). I was the expert at trial in the Ninth Circuit opinion regarding the order of evidence at trial in *Estate of Manuel Diaz, v. City of Anaheim*, et al., No. 14-55644. My opinion is quoted in the Ninth Circuit opinion regarding the use of lethal force in *A.K.H. a minor, et al, v. City of Tustin, et al.*, No. 14-55184. My opinions supported argument in the Ninth Circuit case: *Estate of Angel Lopez, et al., v. Kristopher Michael Walb*, No. 14-57007 (not for publication) wherein the Ninth Circuit Affirmed the Denial of Summary Judgement by the District Court. My opinions supported argument in the Ninth Circuit case: *Estate of Shakina Ortega, et al., v. City of San Diego, et al.* No. 14-56824 (not for publication) wherein the Ninth Circuit Affirmed the Denial of Summary Judgement by the District Court. My opinions supported argument in the Ninth Circuit case: *Jerry Newmaker, et al., v. City of Fortuna, et al.* No. 14-15098 (for publication). My opinions supported argument in the Ninth Circuit Case: *Tonya E. Shirar, v. Miguel Guerrero, et al.* regarding use of lethal force and "suicide by cop," No. 15-55029 (not for publication). My opinions supported argument in the Ninth Circuit Case *Angel Mendez; Jennifer Lynn Garcia, v County of Los Angeles, et al.*, Nos. 13-56686, and 13-57072 (for publication) and which was settled before the Supreme Court, No. 16-369, regarding the use of lethal force and searches. My opinions supported argument in the Ninth Circuit case: *Chien Van Bui, et al, v City and County of San Francisco, et al*, No. 14-16585 (not for publication), regarding the use of lethal force. My opinions supported argument in the Sixth Circuit opinion, Case No. 16-5322, *Carey Woodcock v. City of Bowling Green, et al,* Originating Case No. 1:13-cv-00124 regarding the use of lethal force. My opinions supported argument in the Ninth Circuit opinion, Case No. No. 14-17388 (for publication), *Johnathan Jones, et al v. Las Vegas Metropolitan Police Department, et al,* Originating Case No. 2:12-cv-01636- regarding the use of lethal force and Taser weapons. My opinions supported argument in the Ninth Circuit opinion, Case No. 16-15606 (for publication), *Christian Longoria, et al v. Pinal County, et al,* Originating Case No. 2:15-cv-00043, PHX SRB, regarding the use of lethal force after a vehicle pursuit. My opinions supported argument in the Ninth Circuit case: *S. B. v. County of San Diego,* 864 F.3rd 1010 (9th Cir. 2017), (for publication) regarding issues of qualified immunity. My opinions supported argument in the Tenth Circuit case: *Russell Tenorio v. Brian Pitzer,* Case No. 2012-CV-01295 (U.S. Supreme Court No. 15-795) regarding issues of qualified immunity and use of deadly force. I participated as a retained expert in the USDC Fifth District case, *Stephen McCollum et al., v. Texas Department of Criminal Justice, et al.,* Case No.3:12-CV-02037 regarding in-custody hyperthermia deaths. My opinions supported argument (and I was cited by name) in the Ninth Circuit opinion, Case No. 17-55116 (for publication), *Susan Mellen, et al v. Marcella Winn, et al,* D.C. Case

No. 2:15-cv-03006, GW AJW, regarding Detective Investigations and Qualified Immunity. My opinions supported argument in the Ninth Circuit Case *Richard Vos; Jenelle Bernacchi, v City of Newport Beach, et al.,* Nos. 16-56791 (for publication) and which was settled by the Supreme Court, No. 16-56791, regarding the use of lethal force and mental illness. My opinions (and quoted by name) supported argument in the Ninth Circuit Case *S.R. Nehad, et al. v. Browder, et al.*, No. 18-55035 (for publication) regarding the use of lethal force and custom and practice. My opinions supported argument in the Ninth Circuit opinion, Case No. 17-55930 (not for publication), *Estate of Kevin Brown, et al. v. Michael Lambert, et al.*, D.C. No. 3:15-cv-01583-DMS-WVG, regarding Detective Investigations and Qualified Immunity. My opinions supported argument in the Ninth Circuit opinion, Case No. 15-56339 (for publication), *Shane Horton, by his Guardian Ad, Litem Yvonne Horton, v. City of Santa Maria; Santa Maria Police Department; Andrew Brice*, D.C. Case No. 2:14-cv-06135- SJO-PJW, and *Jonathan Michael Castro v. County of Los Angeles, et al,* D.C. Case No. CV 10-5425 DSF (JEMx), 833 F.3d 1060 (9th Cir. 2016) (en banc), regarding in-custody suicidal prisoners and qualified immunity. My opinions supported argument in the Ninth Circuit opinion, Case No. 17-56270 (not for publication), *James Soler v. County of San Diego, et al.,* D.C. No. 3:14-cv-02470-MMA-RBB, regarding required verification of persons taken into custody pursuant to a warrant of arrest. My opinions supported argument in the Ninth Circuit opinion, Case No. 18-17404 (for publication) Tan Lam, v. City of Los Banos, et al. D.C. No. 2:15-cv-00531-MCE-KJN, regarding the use of lethal force. My opinions supported argument (and I was cited by name) in the Ninth Circuit opinion, Case No. 19-56035 (for publication), Tiffany Tabares, et al v. City of Huntington Beach, et al, D.C. Case No. 8:18-cv-00821, JLS-JDE, regarding use of force and subjects suffering mental illness. I was retained as consultant regarding the October 15, 2019 Law Enforcement Activity Related Death (including positional asphyxia) of Mr. Angel Zapata-Hernandez by San Diego Metropolitan Transit System (MTS) Code Compliance Officers. My consultations included recommendations and resulted in significant changes in policy and training by the MTS. I was a retained expert in the Temporary Restraining Order restricting the use of kinetic weapons during demonstrations issued April 19, 2021 in Black Lives Matter v. City of Los Angeles, et al, Case No.: CV 20-5027 CBM (Asx).

The California Court of Appeal (Second Appellate District) drew in part from my expert report regarding search warrant service, *Macias v. County of Los Angeles*, 144 Cal. App.4th 313, 50 Cal. Rptr.3d 364 (2006). The California Supreme Court drew in part from my expert opinion regarding police tactics and the use of deadly force, *Hayes et al. v. County of San Diego et al.*, 57 Cal.4th 622 (2013). I was quoted by the California Appellate Court (Second Appellate District, Division Three) in *B.B., a Minor, etc., et al., v. County of Los Angeles, et al., Case No. B264946 Super. Ct. Nos. TC027341, TC027438, BC505918* regarding positional asphyxia issues.

On February 10, 1989, I was personally commended at the Los Angeles County Hall of Administration by United States Attorney General, the Honorable Edwin Meese III, for my work to establish California Penal Code Section 311.11 (forbidding the Possession of Child Pornography).  On February 22, 1993 (at the time of my retirement), Mr. Meese presented a second personal commendation for the success of this critical five-year effort to bring this law into effect.  California Penal Code Section 311.11 is required training for all Law Enforcement Officers in California and taught extensively in the POST Basic Learning Domain #9: "Crimes Against Children,"pages 1-18 to pages 1-21.

On December 7, 2015 I was requested by the Cleveland District Attorney to present my opinions to the Cleveland Grand Jury regarding the November 22, 2014 shooting death of Tamir Rice by City of Cleveland police officers.  In March, 2016 I was requested by the Delaware Attorney General to review and provide my opinions regarding the shooting death of Jeremy McDole.  The AG report was published May 12, 2016.  I provided a written Opinion for New Mexico AG regarding the shooting Death of Teresa Anaya that included requested training opinions.  I have also consulted with, and provided written opinions at the request of the U.S. Attorney (New York), the Santa Clara County District Attorney, and the San Francisco District Attorney.

I have been found competent by both Federal and State Courts to render opinions as to responsibilities as occurred in this case.  A number of my cases have involved law enforcement officers as civil plaintiffs and as criminal defendants.

Since my retirement, I have become an expert in the features and the use of TASER International's products, including the Model M26, Model X26 and Model X2 ECDs.  I own each, along with the download software.  I have reviewed all the TASER training materials and am familiar with the risks and tactics associated with these potentially lethal devices.  I have qualified as an expert on TASER products and testified both in deposition and before juries on their usage.  Two published examples are *Lee v. Nashville*, 596 F. Supp. 2d 1101, 1121-22 (M.D. Tenn. 2009), and *Heston v. City of Salinas*, 2007 U.S. Dist. LEXIS 98433, *25-*26 (E.D. Cal. 2007).  My most recent Federal acceptance/certifications as an expert in the general use and deployment of the TASER weapon (including Taser International product warnings/bulletins sent to every agency using the Taser weapon) occurred in Los Angles, California on November 7, 2017 in *William Mears, et al., v. City of Los Angeles, et al,* USDC Case No.: CV 15-08441 JAK (AJWx) and on February 22, 2018 in *Maria Hernandez; A.J., Jr., et al, v. City of Los Angeles, et al,* USDC Case No. 2:16-c-02689 AB (JEMx), and on May 3, 2018 in Heleine Tchayou, et al. v. City of Los Angeles, et al., Case No. 16-cv-06073-TJH-MRW, and on November 1, 2018 in Alma Rosa Godinez, v. San Diego County, et al. Case No. 3:16-cv-00236 BAS-NLS.  There are many others.

Attached as Exhibit A is a statement listing my law enforcement qualifications and experience; Exhibit B is my fee schedule; Exhibit C is a listing of matters in which I have testified in the last four years as an expert.

I reserve the right to modify my opinions to the extent additional information is provided.

I declare under penalty of perjury that the foregoing is true and correct.  Executed May 28, 2021 at Santee, CA.


Roger A. Clark

**Exhibit "G"**



COURT REPORTING

BIG ENOUGH TO DELIVER
SMALL ENOUGH TO CARE

In the Matter Of:

NICHOLAS ROBINSON

vs

CITY OF SAN JOSE, et al.

OFFICER RYAN DOTE

April 13, 2021

Case No:  5:19-cv-06768NC

CERTIFIED ORIGINAL

NICHOLAS ROBINSON vs CITY OF SAN JOSE, et al.
Officer Ryan Dote on 04/13/2021

1              UNITED STATES DISTRICT COURT

2              NORTHERN DISTRICT OF CALIFORNIA

3

4   NICHOLAS ROBINSON,              )Case No. 5:19-cv-06768NC
                                    )
5              Plaintiff,           )
                                    )
6        vs.                        )
                                    )
7   CITY OF SAN JOSE, RYAN DOTE,    )
    JAMIE MARIE KULIK, NICHOLAS     )
8   PETERSON, and DOES 1 through    )
    20 inclusive,                   )
9                                   )
               Defendants.          )
10  _____)

11

12

13

14       Deposition of OFFICER RYAN DOTE, taken on behalf of

15   the JOSEPH FARZAM LAW FIRM, via videoconference,

16   commencing at 11:04 a.m. and ending at 2:28 p.m.,

17   Tuesday, April 13, 2021, before Ashley R. Chislock,

18   RPR, CSR NO. 14327.

19

20

21

22

23

24

25

2

# FAX COVER SHEET

| TO | lahmanilaw |
|----|----|
| COMPANY | |
| FAX NUMBER | 18557000529 |
| FROM | Ahmad Rafii, D.C |
| DATE | 2019-02-06 23:50:33 GMT |
| RE | Nicholas Robinson– police report |

## COVER MESSAGE

Please see attached. Thank you.

(

EXHIBIT    2
Witness: RYAN DOTE
Date: APRIL 13, 2021
Stenographer: ASHLEY R. CHISLOCK, CSR 14592



**SAN JOSE POLICE DEPT**
DISTRICT ATTORNEY H. DCOPY
DISTRICT ATTORNEY COPY ***FOR OFFICIAL USE ONLY***

GO# SJ 2018-183330904 OPEN          148A1-1 148(A)(1) PC DELAY ARREST

***DISCLAIMER*** San Jose Police Department Report Released to District Attorney and Court. For Official Use Only ***

COURT COPY

COURT COPY

COURT COPY

# Related Image - 12A PRE-E OKING SHEET

Attachment Description:
Reference Number:

PRE-BOOKING INFORMATION SHEET
Santa Clara County

PFN: EFC 903
AGENCY: San Jose P.D.

LAST NAME: ROBERSON   FIRST: Nicholas   MIDDLE: AARON
DATE OF BIRTH: 4/25/1989   PLACE OF BIRTH: Bakers...

SEX: M/H   HAIR: Blk   EYES: Brn   HEIGHT: 5'5"   WEIGHT: 170

RESIDENCE NO. STREET: 1717 Everglade   APT. NO. —   CITY: San Jose   STATE: CA   ZIP CODE: 95122

TELEPHONE: (408) 826-5658

OCCUPATION: Security Guard   UNION: Unknown   EMPLOYER NAME: Inter-Con Security

ARREST DATE: 11/29/10   ARREST TIME: 2273   AGENCY: 0413   OFFICER NAME: Dote

CODE | CIRC | SECTION (DESCRIPTION IF ON-VIEW) | BAIL | F/M/I/C | COURT | WARRANT NO.
--- | --- | --- | --- | --- | --- | ---
FC | 1 | 148.9(1)PC - Resist/Arrest | 1,300 | M | 43130 |

ARRESTING OFFICER   BAIL TOTAL: 1,000

| | | | |
--- | --- | --- | ---
WALLET | | JACKET | COLOR
CHECKBOOK | | SWEATER | COLOR
BELT | BUCKLE | SHIRT/BLOUSE | COLOR
KEYS | KNIFE | PANTS | COLOR
WATCH COLOR | BRAND | DRESS/SKIRT | COLOR
RING | STONE | SHOE | COLOR
CHAINS | STONE | HAT | COLOR
| STONE | PURSE |
| STONE | LIPSTICK |
| STONE | MISC. ITEMS |
LIGHTER | COMB/BRUSH | |
CIGARETTES | | |

3214 REV 12/14



**SAN JOSE POLICE DEPT**
**DISTRICT ATTORNEY H... DCOPY**
**DISTRICT ATTORNEY COPY ***FOR OFFICIAL USE ONLY***
GO# SJ 2018-183330904 OPEN                    148A1-1 148(A)(1) PC DELAY ARREST

**Linkage factors**

Resident status : RESIDENT
Age range : 30-49 YEARS
Access to firearm : No
Victim of :
148A1- 1  148(A)(1) PC DELAY ARREST -  COMPLETED

Victim's Relationship to Offender : VICTIM WAS STRANGER
Person's role : Arrest/Cite #1
Person's name : ROBINSON, NICHOLAS A (DOB: Apr-25-1987)

## 3.  Arrest/Cite #1 - ROBINSON, NICHOLAS AARON

**(Case Specific Information)**

Sex: MALE
Race: CAUCASIAN
Date of birth: Apr-25-1987
Address: 1717 EVERGLADE AV
        Municipality: SAN JOSE , California  95122
        District: C  Beat:  Grid: 96
**Phone Numbers**
        Home:  (323)  667-4231
        Cellular:  (408)  826-5088
**Particulars**

Place of birth: California
Occupation: SEC. GUARD
Employer: INTER-CON SECURITY
Driver's license: D7728584 , California
SSN ████████
Ethnicity: HISPANIC/LATIN/MEXICAN
Language(s) spoken: English
Height: 5'08 Weight: 200 lbs.
Build: Heavy  Complexion: LIGHT BROWN
Eye color: BROWN
Hair color: BROWN
Hair style: Bald, Curly, Short, Receding
Facial hair color: Brown
Facial hair style: Unshaven
Additional remarks: NONE NOTED
**Linkage factors**

Resident status : RESIDENT
Condition : UNKNOWN
Age range : 30-49 YEARS
Access to firearm : No
Armed with : UNARMED



**SAN JOSE POLICE DEPT**
**DISTRICT ATTORNEY H.    DCOPY**
**DISTRICT ATTORNEY COPY ***FOR OFFICIAL USE ONLY***
GO# SJ 2018-183330904 OPEN                    148A1-1 148(A)(1) PC DELAY ARREST

## Related Text Page(s)

Document: SYNOPSIS
Author: 4006 - DOTE,RYAN M
Related date/time: Nov-30-2018 (Fri.) 20

On 11-29-2018 at approximately 2202 hours the crime of obstruct/delay a
peace officer's investigation occurred in the area of the HWY 101
southbound onramp/Story Rd. in San Jose. Fully uniformed police officers
were conducting a separate investigation (SJPD #18-333-0877) when the
suspect began actively and purposely interfering by attempting to blind
officers by shining an extremely bright flashlight in our eyes, causing
major officer safety concerns. Officers approched the suspect calmly,
determined he was uninvolved with our prior investigation, and gave him
lawful orders to leave. The suspect willfully defied our lawful orders and
continued to shine his flashlight in my eyes, began jabbing the flashlight
towards my chest, and obstructed/delayed officers from conducting our
investigation. The suspect continued to willfully defy my lawful orders,
and due to his argumentative nature posed an officer safety concern, which
impeded our investigation. While taking the suspect into custody for
148(a)(1) PC, he physically resisted and was taken to the ground, where he
was placed in handcuffs. The suspect was positively identified, arrested,
transported to Valley Medical Center for further medical attention, and
later booked into Santa Clara County Main Jail.



**SAN JOSE POLICE DEPT**
**DISTRICT ATTORNEY H___ OCOPY**
**DISTRICT ATTORNEY COPY ***FOR OFFICIAL USE ONLY***
GO# SJ 2018-183330904 OPEN                    148A1-1 148(A)(1) PC DELAY ARREST

officer safety because I know that if I am blinded (temporarily or permanently) I can be easily incapacitated and I will not be able to see or perceive any threats. (S) Nicholas Robinson deliberately shined his bright flashlight in my face at least four (4) separate times, I believed (S) Nicholas Robinson was purposely trying to disorient and blind me.

I asked (S) Nicholas Robinson if he lived in the area and had any business here. (S) Nicholas Robinson mumbled that he did not. I gave (S) Nicholas Robinson a lawful order to "move along." The suspect turned around and said "Actually, last time I checked no I don't." The suspect displayed the following pre-assaultive indicators:
- argumentative and defiant attitude
- squaring up his stance and shoulders towards officers
- shining the bright flashlight deliberately aiming for officers' eyes
- flexing and stretching his right hand to get bloodflow into his hand/fingers

The suspect continued to be argumentative and refused to turn around and leave, which inevitably forced myself and other officers on scene to divert our attention and resources to the suspect, and away from our previous on-going investigation. The suspect was deliberately obstructing and preventing officers from conducting our investigation. I again ordered the suspect not to "bother us at our scene, and to leave." The suspect defied my commands and continued to be argumentative. (S) Nicholas Robinson then began waiving the flashlight around while arguing his point. The suspect then began pointing and jabbing the butt end of the flashlight directly towards my face and chest. I ordered the suspect not to point the flashlight at my face, and he switched the flashlight to his right hand so that I would not be able to grab it from him. Based on my training and experience, I know the flashlight of that size can be used as an impact weapon which can cause great bodily injury and/or death. I also know that I can be quickly incapacitated if struck in the head, leaving my gun and other weapons vulnerable.

I attempted to take the suspect into custody for 148(a)(1) PC. I used my right hand to grab the suspect's left wrist in order to place it behind his back. I placed my left hand in the crook of the suspect's left elbow in order to bend it so I could place him in handcuffs. I felt the suspect attempting to break free by pulling his left arm away and attempting to spin and turn away from my grasp. In order to overcome his resistance, effect his arrest and prevent his escape, I placed a rear wrist lock on the suspect's left wrist and used my left hand to push his left elbow towards the ground so that I could gain control over the suspect's torso. Ofc. Petterson had a hold of the suspect's right arm, refer to his supplemental



**SAN JOSE POLICE DEPT**
**DISTRICT ATTORNEY H... )COPY**
**DISTRICT ATTORNEY COPY ***FOR OFFICIAL USE ONLY*****
GO# SJ 2018-183330904 OPEN                    148A1-1 148(A)(1) PC DELAY ARREST

## Related Text Page(s)

Document: **NARRATIVE**
Author: 4651 - CHAN,DAVID
Related date/time: Nov-30-2018 (Fri.) 514

BWC was activated throughout this event.

On 11/30/18, at approximately 0114 hours Ofc. Biebel #4255 and I was working in full uniform and driving a marked police vehicle assigned to patrol as 71L6. We were dispatched to Valley Medical Center (VMC) to relieve 66L2. I arrived at VMC and saw both Lt. Pierce #3380 and Ofc. Valverde #3987 (66L2) with Suspect Nicholas Robinson.

Suspect Robinson was under the care of Dr. ███████████. Dr. ███████ called the orthopedics doctor, Dr. ██████████████ for the injury on Suspect Robinson's arm. Dr. ███████ released Suspect Robinson to me. I transported and booked Suspect Robinson into Santa Clara County Jail.

I provided Suspect Robinson with a case card in his personal property bag.

See Ofc. Valverde's General Offense Report for more details.



**SAN JOSE POLICE DEPT**
**DISTRICT ATTORNEY H...OCOPY**
DISTRICT ATTORNEY COPY ***FOR OFFICIAL USE ONLY***

GO# SJ 2018-183330904 OPEN                    148A1-1 148(A)(1) PC DELAY ARREST

## Related Text Page(s)

Document: SUPPLEMENTAL
Author: 4658 - PETTERSON,NICHOLAS A
Related date/time: Nov-30-2018 (Fri.) 26

On 11/29/2018, I was on patrol in a marked police vehicle (City of San Jose Police crest) equipped with emergency red and blue lights, and a siren. I was in full police uniform (San Jose Police patches on the arms) and was working patrol. I had my department issued body-worn camera on my uniform. Ofc. Lynch #3976 was my partner on patrol and was also in full police uniform.

At approximately 2208 hours, Ofc. Dote #4006 and I were on a community foot patrol investigation (SJPD #18-333-0877) located at the Southbound 101 entrance from Story Rd., in the city of San Jose. I activated my body-worn camera.

An adult male crossed the freeway entrance headed Eastbound before turning around and returning to Southbound sidewalk of Story Rd. The suspect activated a flashlight and began shining the light in the direction of officers and towards the small encampment that was the location of our investigation. Officers had just removed another suspect from the encampment and were in the process of securing the scene and searching the encampment. The suspect approached the area of the encampment which attracted my attention because that area contained many items that could be used as improvised weapons.

I approached the suspect and gave multiple commands for him to lower his flashlight. The suspect aimed his flashlight into the eyes of officers approximately 4 times and refused to comply with orders to lower the light. Based on my training and experience, the flashlight is used as a tool to disorient and to prevent a subject from going on the offense when being approached. By purposely shining a light in the eyes of the officers, the suspect prevented officers from being able to see his movements and the contents of his other hand, and prevented officers from being able to defend themselves because of vision impairment posing an issue of officer safety.

I approached the suspect and again gave him the command to lower his flashlight from my eyes. Ofc. Dote told him to lower his flashlight and to walk away from the area of the investigation. The suspect was holding his flashlight with his left hand in a raised position with his elbow bent. The flashlight was level with the side of his head. The suspect refused to move from the area and again shined his light repeatedly into the eyes of the



**SAN JOSE POLICE DEPT**
**DISTRICT ATTORNEY HARDCOPY**
**DISTRICT ATTORNEY COPY ***FOR OFFICIAL USE ONLY*****

GO# SJ 2018-183330904 OPEN                    148A1-1 148(A)(1) PC DELAY ARREST

## Related Text Page(s)

Document: SUPPLEMENTAL
Author: 3380 - PIERCE, JASON K
Subject: NICOLAS AARON ROBINSON
Related date/time: Nov-30-2018 (Fri.) 100

On 11-29-18 at approximately 2345hrs, I responded to a use of force incident at VMC hospital that required my presence. I spoke to Sgt. Rick Yu #2812 who was on scene. Sgt. Yu advised me of an incident that involved District Lincoln Officers and suspect Nicolas Aaron Robinson.

Sgt. Yu advised me that Officer Dote and other District Lincoln Officers were on a pedestrian stop and suspect Robinson interferred with their stop by flashing his flashlight light into the officers eyes. Party Robinson had nothing to do with the pedestrian stop. Officer Dote warned suspect Robinson numerous times not to flash his light in their eyes. The suspect refused and continued flashing his light towards the officers on scene.

Officer Dote used use physical force to guide the suspect to the ground. The suspect was handcuffed with the assistance of other on scene officers. During the fall to the ground the suspect sustained complaint of pain to his left arm area. Paramedics arrived on scene and transported the suspect to VMC hospital.

At the hospital, the suspect Robinson had xrays taken. The xrays revealed a fractured left humerus bone. Initially the orthopedic surgeon wanted to operate on his arm. After consultation with other doctors it was determined that suspect Robinson can be placed in a shoulder harness and released from the hospital. He was told by the doctors to get schedule an appointment with an orthopedic specialist so they can perform the necessary surgery on his left arm.

This is a category 3 use of force incident (force resulting in a bone fracture). I advised Sgt. Yu to interview the suspect, take photos of the scene, collect evidence, review BWC, complete a use of force report, and canvass the area for witnesses and or other surveillance video.

Sgt. Yu advised me the suspect did not want to talk to him because the suspect had recognized him from a previous case. I went into the emergency room and had a casual conversation with suspect Robinson. My conversation was recorded on BWC.

Suspect Robinson told me that he observed the officer on the on ramp



**SAN JOSE POLICE DEPT**
DISTRICT ATTORNEY H... )COPY
DISTRICT ATTORNEY COPY ***FOR OFFICIAL USE ONLY***

GO# SJ 2018-183330904 OPEN                    148A1-1 148(A)(1) PC DELAY ARREST

## Related Text Page(s)

Document: SUPPLEMENTAL
Author: 2812 - YU, RICK
Related date/time: Nov-30-2018 (Fri.) 115

On 10-25-2018, I was on duty, wearing full uniform, driving a marked police vehicle, assigned to Patrol in the Western Division as one of the Swing Shift Supervisor, working unit 6L10. At approx. 2210 hrs, Ofc. Dote #4006 notified me regarding an use of force incident he was involved in.

Ofc. Dote advised me him and other swing DL units were conducting an investigative stop on the shoulders of the on-ramp S/B Hwy-101 from E/B Story Rd. (Case #18-333-0877) At which time, a male (later identified as (S)Robinson, Nicholas 04-25-1987) who was not related to their stop came into their immediate area and began shining a flash light in the officers' faces. Instead of continuing with their original detention, Ofc. Dote and other officers had to divert their attention to (S)Robinson.

Ofc. Dote subsequently placed (S)Robinson under arrest for obstructing and delaying police duties. In doing so, Ofc. Dote deployed a controlled hold of (S)Robinson's arm and took him down to the ground to gain better control and subsequently handcuffed (S)Robinson. During the arresting procedure, (S)Robinson had complaint of pain to his left torso area. Therefore, Ofc. Dote followed the SJPD department policy and summoned me to the scene.

When I arrived on scene, I activated my department issued BWC (Body Worn Camera). I then made contact with the on scene officers to ensure they were okay and Ofc. Dote briefed me on what occurred. I then saw (S)Robinson unhand-cuffed and being attend to by the paramedics. A short time later, (S)Robinson was seated on a gurney being wheeled by the paramedics toward the back of the ambulance parked to the south of our patrol vehicles.

As far as Ofc. Dote was concern, no other officers used any other type of force to take the suspect into custody (which I later confirmed). After the scene was secured, Ofc. Dote summoned for medical aid for (S)Robinson. Once SJFD and ambulance had arrived and (S)Robinson was receiving professional medical treatment, other officers began to conduct follow up investigation.

NOTE: At this point, this UOF investigation was being conducted as a category-1 (one officer used force and suspect had complaint of pain). I also notified Lt. Cook #3050 of this incident and we both agreed to treat this UOF as category-1 until we receive an update from the medical staff at VMC.



**SAN JOSE POLICE DEPT**
DISTRICT ATTORNEY H  COPY
DISTRICT ATTORNEY COPY ***FOR OFFICIAL USE ONLY***
GO# SJ 2018-183330904 OPEN                    148A1-1 148(A)(I) PC DELAY ARREST

## Related Text Page(s)

Document: SUPPLEMENTAL
Author: 4629 - KULIK, JAIME MARIE
Related date/time: Nov-30-2018 (Fri.) 148

On 11/29/18 at approximately 2145 hours, I was on foot patrol in the area of the southbound 101 onramp and Story Road. I was completing paperwork related to event 18-333-0877 when I noticed a male, later identified as Suspect Nicholas Robinson near the crosswalk at the 101 southbound onramp. Suspect Robinson had a flashlight and was almost struck by a vehicle while he was standing in the crosswalk. Suspect Robinson stayed in the area and was shining his flashlight at us. Ofc. Dote #4006 and Ofc. Petterson #4658 approached Suspect Robinson. Suspect Robinson shined the light at Ofc. Petterson and Ofc. Dote several times.

Suspect Robinson was refusing to leave the area where we were conducting our investigation. Suspect Robinson pointed his flashlight at Ofc. Dote's chest. I assisted officers with handcuffing Suspect Robinson.

I helped Suspect Robinson up and walked him over to Ofc. Petterson's patrol vehicle. I checked the handcuffs for proper fit and double locked them. I conducted a search incident to arrest and I did not locate any contraband on Suspect Robinson. Suspect Robinson was transported to Valley Medical Center by EMS Medic #17.

My body worn camera was activated during this investigation. For further information refer to Ofc. Dote's General Offense Report for further information.



**SAN JOSE POLICE DEPT**
**DISTRICT ATTORNEY [ ]DCOPY**
**DISTRICT ATTORNEY COPY ***FOR OFFICIAL USE ONLY***
GO# SJ 2018-183330904 OPEN                    148A1-1 148(A)(1) PC DELAY ARREST

worried for Suspect-Robinson. [redacted] contacted SJPD-Dispatch and VMC. I was able to update [redacted] on the condition of Suspect-Robinson.

After speaking with [redacted]. SJPD Officer-Chan #4651 relieved me of my duties.

End of Report



**SAN JOSE POLICE DEPT**
DISTRICT ATTORNEY L    DCOPY
DISTRICT ATTORNEY COPY **FOR OFFICIAL USE ONLY***

GO# SJ 2018-183330904 OPEN                                            148A1-1 148(A)(1) PC DELAY ARREST

Age in years:      [31 TO 35                        ]
Gender:            [MALE                      ]
Race:              [HISPANIC                        ]

Primary language spoken by suspect: [ENGLISH                       ]  [   ]Unknown

Did the suspect assault you?              [NO   ]

Suspect arrested and/or in custody?   [In custody              ]

Did you perceive the suspect to be armed?         [YES  ]
If YES, indicate weapon type (check all that apply):
  [  ]Firearm                                     [  ]Other dangerous weapon
  [  ]Knife, blade, or stabbing instrument        [X ]Unknown

Did you confirm the suspect to be armed?           [NO   ]
If YES, confirm weapon type (check all that apply):
  [  ]Firearm
  [  ]Firearm replica
     Firearm types (check all that apply):
       [  ]Handgun        [  ]Rifle
       [  ]Shotgun        [  ]Other firearm
  [  ]Knife, blade, or stabbing instrument
  [  ]Other dangerous weapon

Did suspect resist?  [YES ] If YES, choose highest level of resistance:
                     [PASSIVE NO COMPLIANCE     ]

Did the suspect attempt to disarm you? [NO   ]

Did you use force on this suspect?         [YES  ]

Type of force you used on the suspect (check all that apply):
  [  ]Carotid restraint control hold          [  ]Threat of firearm
  [X ]Other control hold/takedown             [  ]Electronic control device
  [  ]Other physical contact (fists, feet, etc.) [  ]Discharge of firearm (mise)
  [  ]Blunt/impact weapon                     [  ]Discharge of firearm (hit)
  [  ]Chemical spray (e.g. OC/CS)             [  ]Officer vehicle contact
  [  ]Impact projectile                       [  ]K-9 contact
  [  ]Knife, blade, or stabbing instrument    [  ]Other dangerous weapon

Check all items that you deployed/discharged in this use of force incident:



**SAN JOSE POLICE DEPT**
DISTRICT ATTORNEY L___DCOPY
DISTRICT ATTORNEY COPY **\*FOR OFFICIAL USE ONLY\*\***

GO# SJ 2018-183330904 OPEN                148A1-1 148(A)(1) PC DELAY ARREST

On duty:              [YES  ]
Officer type:         [SWORN      ]
Patrol shift:         [SECOND WATCH        ]
Officer dress:        [PATROL UNIFORM      ]
Years of experience:             [12. ]
Assignment (select only one):    [PATROL

Did you use force against a suspect (or multiple suspects)?    [Yes ]
If YES, reason for use of force (check all that apply):
[X ] To effect arrest
[X ] To prevent escape
[X ] To overcome resistance

Were you assaulted by suspect(s)?   [NO  ]

Type of force the suspect used on you (check all that apply):
[  ] Suspect physical contact              [  ] Impact Projectile
[  ] Suspect vehicle contact              [  ] Threat of firearm
[  ] Blunt/impact weapon                   [  ] Discharge of firearm (miss)
[  ] Chemical Spray (e.g. OC/CS)          [  ] Discharge of firearm (hit)
[  ] Electronic control device            [  ] Other dangerous weapon
[  ] Knife, blade, or stabbing instrument  [  ] Animal(

Location(s) on you where suspect(s) used force (check all that apply):
[X ] Not applicable                        [  ] Head
[  ] Neck/throat                           [  ] Front upper torso/chest
[  ] Rear upper torso/back                 [  ] Front lower torso/abdomen
[  ] Rear lower torso/back                 [  ] Front below waist/groin area
[  ] Rear below waist/buttocks             [  ] Arms/hands
[  ] Front legs/feet                       [  ] Rear legs

Were you injured (even if minor)?     [NO  ]

If YES, indicate your injury level (select only one):
[

*Serious Bodily Injury involves a substantial risk of death, unconsciousness,
protracted and obvious disfigurement, or protracted loss or impairment of the
function of a bodily member or organ; wound requiring extensive suturing,
bone fracture, concussion.

What type of injury did you sustain?  (check all that apply):
[  ] Unconsciousness                       [  ] Contusion
[  ] Concussion                            [  ] Bone Fracture
[  ] Internal injury                       [  ] Abrasion/Laceration



**SAN JOSE POLICE DEPT**
**DISTRICT ATTORNEY L___DCOPY**
DISTRICT ATTORNEY COPY***FOR OFFICIAL USE ONLY***
GO# SJ 2018-183330904 OPEN                    148A1-1 148(A)(1) PC DELAY ARREST

## Related Text Page(s)

Document: USE OF FORCE
Author: 4658 - PETTERSON,NICHOLAS A
Subject: USE OF FORCE REPORTING
Related date/time: Nov-30-2018 (Fri.) 12

General Offense Report# [183330904]   SJPD Primary Agency? [YES ]
Did you include the "USEFORCE" offense code on the GO?
[NO, THIS IS A SUPPLEMENTAL REPORT                                    ]

Were multiple police agencies involved in the incident?        [NO   ]
Did you discharge a firearm?                                   [NO   ]
Did you use force on a suspect?                                 [YES  ]
Did this cause serious injury or death to a suspect?           [NO   ]
Did the suspect(s) assault you?                                 [NO   ]
Did this cause serious injury to you?                          [NO   ]
Did this incident cause death to an officer?                  [NO   ]

Check all that apply to this Use of Force incident:
[   ]Multiple incident locations
[   ]Incident occurred on a K-12 campus
[X ]An arrest was made
[   ]Incident resulted in a crime report
[X ]Body Worn Camera RECORDING during incident

Initial contact reason (select only one):
[VEHICLE, MOTORCYCLE, BICYCLE OR PEDESTRIAN STOP              ]

Number of suspects involved  [1 ]
(TO YOUR KNOWLEDGE, the total number of suspects who had force used on
them and/or who assaulted an officer)

Number of officers involved  [2 ]
(TO YOUR KNOWLEDGE, among officers present on the scene, the number who used
force on a suspect and/or were assaulted by a suspect)

SUSPECT INFORMATION
Suspect Name:                    [  ]Unknown, suspect escaped
(Use drop-down menu to select from the list of Entities)
[                                                                    ]

Enter the suspect's name below IF it is not among the Entities listed above
Last Name:    [ROBINSON                                             ]
Given Name(s): [NICHOLAS           ] [                 ] [          ]



**SAN JOSE POLICE DEPT**
DISTRICT ATTORNEY H...DCOPY
DISTRICT ATTORNEY COPY ***FOR OFFICIAL USE ONLY***
GO# SJ 2018-183330904 OPEN                        148A1-1 148(A)(1) PC DELAY ARREST

[  ] TASER probes deployed
[  ] TASER probes deployed (miss)

Location on suspect where you used force (check all that apply):
[  ] Not applicable                    [  ] Head
[  ] Neck/throat                       [  ] Front upper torso/chest
[  ] Rear upper torso/back             [  ] Front lower torso/abdomen
[  ] Rear lower torso/back             [  ] Front below waist/groin area
[  ] Rear below waist/buttocks         [X] Arms/hands
[  ] Front legs/feet                   [  ] Rear legs

Suspect's erratic behavior as you perceived it at the time of the incident
(check all that apply):
[X] None                               [  ] Signs of alcohol impairment
[  ] Signs of mental disability        [  ] Signs of drug impairment
[  ] Signs of physical disability      [  ] Signs of developmental disability

Was suspect injured (even if minor)?     [YES        ]
If YES, indicate suspect's injury level (select only one):
[SERIOUS BODILY INJURY                     ]
*SERIOUS BODILY INJURY involves a substantial risk of death, unconsciousness,
protracted and obvious disfigurement, or protracted loss or impairment of the
function of a bodily member or organ: wound requiring extensive suturing,
bone fracture, concussion.

Suspect injury type (check all that apply):
[  ] Unconsciousness                   [  ] Contusion
[  ] Concussion                        [X] Bone fracture
[  ] Internal injury                   [  ] Abrasion/laceration
[  ] Obvious disfigurement             [  ] Gunshot wound
[  ] Stabbing wound                    [X] Complaint of pain

Medical aid the suspect received - choose highest applicable:
[MEDICAL ASSISTANCE TREATED AT FACILITY AND RELEASED                    ]

Was the suspect's injury caused by a pre-existing condition? [NO        ]

OFFICER INFORMATION
Officer Name:                                        Badge Number:
[PETTERSON,NICHOLAS A                        ]      [4658    ]
Age in years:     [31 TO 35            ]
Gender:           [Male            ]
Race:             [WHITE                        ]
On duty:          [YES        ]



**SAN JOSE POLICE DEPT**
**DISTRICT ATTORNEY L   3DCOPY**
**DISTRICT ATTORNEY COPY ***FOR OFFICIAL USE ONLY*****

GO# SJ 2018-183330904 OPEN                          148A1-1 148(A)(I) PC DELAY ARREST

[    ] Stabbing wound                    [    ] Complaint of pain

Medical aid you received - choose highest applicable:
[NO MEDICAL ASSISTANCE OR REFUSED ASSISTANCE                    ]

Was your injury caused by a pre-existing condition? [NO   ]

Primary officer activity immediately prior to force response (select only one):
[OTHER                                                          ]

Did the use of force result from taking the suspect into custody? [YES  ]



**SAN JOSE POLICE DEPT.**
DISTRICT ATTORNEY E,   DCOPY
DISTRICT ATTORNEY COPY ***FOR OFFICIAL USE ONLY***
GO# SJ 2018-183330904 OPEN                    148A1-1 148(A)(1) PC DELAY ARREST

Suspect weapon photographed?                    [YES ]

Suspect weapon recovered?                    [YES                              ]

Officer injuries photographed?                    [N/A - NO OFFICER INJURIES REPORTED ]

Department member(s) directed to upload Body Worn Camera (BWC) footage in accordance with Duty Manual section L4433 and L4434? [YES ]

TASER downloaded? [NO ] If YES, by whom?
Name
[                                        ]         [        ]
Is this individual a member of the Crime Scene Unit? [        ]

Supervisory Use of Force form completed by:
Name                                        Badge
[YU,RICK                              ]         [2812         ]

**OFFICIAL RECEIPT**
Superior Court of California
County of Santa Clara
191 North First St.
San Jose CA 95113

Receipt No.   H-2019-00877
Transaction Date  02/06/2019
Payor
C1901877

| Description | Amount Paid |
|---|---|
| Miscellaneous Payment | |
| Preparing a copy of any | 17.00 |
| **SUBTOTAL** | **17.00** |
| **PAYMENT TOTAL** | **17.00** |
| Cash Tendered | 20.00 |
| Total Tendered | 20.00 |
| Change | 3.00 |

02/06/2019      Cashier      Audit
01:52 PM      Station 244088      8207217

**OFFICIAL RECEIPT**

SAN JOSE AUTO INJURY CLINIC

(408) 295-5559

1150 S BASCOM AVE H17

SAN JOSE, CA 95128

JUAN INTER-CON SECURITY

(209) 620-1625

NICHOLE LAHMANS
LAHMANS LAW  FAX NUMBER
(855) 700-0529

**Exhibit "H"**



COURT REPORTING

**REGAL**

BIG ENOUGH TO DELIVER
SMALL ENOUGH TO CARE

In the Matter Of:

NICHOLAS ROBINSON

vs

CITY OF SAN JOSE, et al.

JAIME KULIK

April 20, 2021

Case No:  5:19-cv-06768NC

CERTIFIED COPY

1

2                    UNITED STATES DISTRICT COURT

3                  NORTHERN DISTRICT OF CALIFORNIA

4

5

6   NICHOLAS ROBINSON,                    )
                                          )
7             Plaintiff,                  )
                                          )
8   vs.                                   ) Case No.
                                          ) 5:19-cv-06768NC
9   CITY OF SAN JOSE; RYAN DOTE;          )
    JAMIE MARIE KULIK; NICHOLAS           )
10  PETERSON, and DOES 1 through 20,      )
    inclusive,                            )
11                                        )
              Defendants.                 )
12  _____)

13

14

15

16                    DEPOSITION OF:

17                     JAIME KULIK

18             Tuesday, April 20, 2021

19

20

21

22

23  Reported by:

24  Dana Jacobs
    CSR No. 13499

25

CERTIFIED COPY

NICHOLAS ROBINSON vs CITY OF SAN JOSE, et al.
Jaime Kulik on 04/20/2021

1

2                     UNITED STATES DISTRICT COURT

3                   NORTHERN DISTRICT OF CALIFORNIA

4

5

6   NICHOLAS ROBINSON,                    )
                                          )
7              Plaintiff,                 )
                                          )
8   vs.                                   ) Case No.
                                          ) 5:19-cv-06768NC
9   CITY OF SAN JOSE; RYAN DOTE;          )
    JAMIE MARIE KULIK; NICHOLAS           )
10  PETERSON, and DOES 1 through 20,      )
    inclusive,                            )
11                                        )
               Defendants.               )
12  _____)

13                            _

14

15

16

17          The deposition of JAIME KULIK, taken on behalf of

18   the Plaintiff, before Dana Jacobs, Certified Shorthand

19   Reporter 13499, for the State of California, commencing at

20   11:01 a.m., Tuesday, April 20, 2021, remotely via

21   videoconferencing.

22

23

24

25

2

REGAL

NICHOLAS ROBINSON vs CITY OF SAN JOSE, et al.
Jaime Kulik on 04/20/2021

```
 1    APPEARANCES:

 2

 3       For the Plaintiff:

 4           LAHMANI LAW, APC
             By:  Nicole Lahmani
 5               Attorney at Law
             1539 East Fourth Street
 6           Santa Ana, California 92701
             (949) 202-1111
 7           nicole@lahmanilaw.com

 8

 9       For the Defendants:

10           CITY OF SAN JOSE - CITY ATTORNEY'S OFFICE
             By:  Matthew W. Pritchard
11               Attorney at Law
             200 East Santa Clara Street, 16th Floor
12           San Jose, California 95113
             (408) 535-1205
13           matthew.pritchard@sanjoseca.gov

14

15

16

17

18

19

20

21

22

23

24

25
```

3

REGAL

NICHOLAS ROBINSON vs CITY OF SAN JOSE, et al.
Jaime Kulik on 04/20/2021

1    Q    During your training with the police academy, was

2    there education with respect to performing a takedown?

3    A    I'm sorry.  Can you repeat the question?

4    Q    Yeah.  So when you attended the police academy,

5    did they train you on how to perform appropriate

6    takedowns?

7    A    Yes, ma'am.

8    Q    And what did you learn with respect to takedowns?

9    A    I'm not sure.  I know we learned a few different

10   takedowns in the academy.

11   Q    What kinds?

12   A    I can't recall the names of each one.  There are

13   a few different ones.

14   Q    Okay.  So in the academy, they taught you about a

15   few different takedowns, but you don't recall any of

16   those?

17   A    I know them, yeah.

18   Q    Okay.  So what are they?

19   A    I don't know the names of them.  I don't

20   remember.

21   Q    Okay.  Fair enough.  Would you mind describing

22   for me the different types?

23   A    There's one called a leg sweep.  There are a few

24   different ones.  It kind of just depends on the situation

25   that you're presented with.

15

NICHOLAS ROBINSON vs CITY OF SAN JOSE, et al.
Jaime Kulik on 04/20/2021

1    Q     Okay.  So there is a takedown in the form a leg
2  sweep?
3    A     Yes.
4    Q     And what does that mean?
5    A     I mean, it's hard to explain.  I don't know if I
6  can explain it to you.  You kind of have to, like, do it.
7    Q     Do you take someone by the arm?  Do you use your
8  leg?  Can you just kind of walk me through it?
9    A     You could do either.  You could grab onto their
10  shoulder.  You can put your leg behind their leg.  It kind
11  of just depends on the situation and their position and
12  stuff like.
13    Q     Other than a leg sweep, are you familiar with any
14  other type of takedown?
15    A     I mean, there are several, yes.
16    Q     Okay.  What's another type?
17    A     I'm not sure.  I don't know if I could describe
18  it for you.
19    Q     Okay.  So you know that there are several, but
20  the only one that you're familiar with is a leg sweep?
21    A     Well, just the name of it, yes.
22    Q     Okay.  Forgetting about the name, just kind of
23  how it's done, can you describe a different type of
24  takedown?
25    A     I mean, it just kind of depends, like I said, on

16

REGAL

NICHOLAS ROBINSON vs CITY OF SAN JOSE, et al.
Jaime Kulik on 04/20/2021

1    the situation and how you're trying to take the -- whoever

2    into custody, what their actions are.

3        Q    Okay.  And if you have someone who is just

4    standing upright and you need to take him down, how would

5    you approach that?

6            MR. PRITCHARD:  Objection.  Lack of foundation,

7    imprecise or incomplete hypothetical, vague.

8    BY MS. LAHMANI:

9        Q    And by the way, your attorney is going to be

10   making a lot of objections today.  Unless he instructs you

11   not to answer a question, I am entitled to an answer

12   still.

13       A    Okay.  Like I said, it really just depends on the

14   different factors.

15       Q    So as we sit here today, you're not able to

16   actually name any other takedown other than a leg sweep?

17       A    No.

18       Q    And as we sit here today, you're not able to

19   describe how any other takedown is performed other than

20   the very minimal information you provided with regards to

21   a leg sweep?

22       A    Yeah.  Well, every situation's different.

23           MR. PRITCHARD:  Argumentative.

24           Go ahead.

25   BY MS. LAHMANI:

17

REGAL

NICHOLAS ROBINSON vs CITY OF SAN JOSE, et al.
Jaime Kulik on 04/20/2021

1      Q      Is that a no?

2      A      Yes.

3      Q      Yes, that's a no?

4      A      Yeah.   I'm sorry.

5      Q      How long have you been employed with the

6   San Jose PD?

7      A      Approximately three years.

8      Q      And you've not worked for any other police

9   department.  Is that right?

10      A      I have not.

11      Q      Okay.  Now, have you always been in the position

12   as a police officer with the San Jose PD during the course

13   of your employment?

14      A      No, ma'am.

15      Q      What have your positions been?

16      A      I was a community service officer before I was a

17   police officer.

18      Q      Was that your very first position with the

19   San Jose PD?

20      A      Yes, ma'am.

21      Q      And what years were you a community service

22   officer?

23      A      2016 to 2018.

24      Q      What did your duties include as a community

25   service officer?

18

NICHOLAS ROBINSON vs CITY OF SAN JOSE, et al.
Jaime Kulik on 04/20/2021

```
 1   BY MS. LAHMANI:
 2       Q    Based on your training, is there any takedown
 3   that is performed using only the suspect's arms?
 4            MR. PRITCHARD:  Objection.  Vague.
 5            THE WITNESS:  I'm not sure.  I don't know what
 6   your question is.
 7   BY MS. LAHMANI:
 8       Q    Yeah.  Is there any takedown that you've ever
 9   been taught or trained for where you only put a suspect to
10   the ground using his arms?
11            MR. PRITCHARD:  Objection.  Vague.
12            THE WITNESS:  I'm not sure.  I don't know -- I'm
13   not sure.
14   BY MS. LAHMANI:
15       Q    When performing a takedown, is there always the
16   use of legs involved in that process?
17            MR. PRITCHARD:  Objection.  Vague, calls for
18   speculation, calls for expert opinion, incomplete
19   hypothetical.
20            THE WITNESS:  I'm sorry.  Can you repeat the
21   question?
22   BY MS. LAHMANI:
23       Q    Yeah.  When you are taught to take down a
24   suspect, are you supposed to push their legs in order to
25   get them to the floor?
```

70

REGAL

NICHOLAS ROBINSON vs CITY OF SAN JOSE, et al.
Jaime Kulik on 04/20/2021

```
1    STATE OF CALIFORNIA      )
     COUNTY OF ORANGE         )
2

3            I, DANA JACOBS, Certified Shorthand Reporter,

4    License No. 13499, for the State of California, do hereby

5    certify:

6            That, prior to being examined, the witness

7    named in the foregoing deposition JAIME KULIK, was

8    by me duly sworn to testify the truth, the whole truth,

9    and nothing but the truth;

10           That the testimony of the witness, the

11   questions propounded, and all objections and statements

12   made at the time of the examination were recorded

13   stenographically by me and were thereafter transcribed;

14           Further, that if the foregoing pertains to the

15   original transcript of a deposition in a federal case,

16   pursuant to F.R.C.P. 30(e)(2) before completion of the

17   proceedings, review of the transcript  XX_ was ___ was

18   not requested.

19           I further certify that I am not a relative or

20   employee of any attorney of the parties, nor

21   financially interested in the action.

22           I declare under penalty of perjury under the

23   laws of California that the foregoing is true and

24   correct.

25
```

103

REGAL

NICHOLAS ROBINSON vs CITY OF SAN JOSE, et al.
Jaime Kulik on 04/20/2021

1    ERRATA PAGE

2

3        I, _____, make the following
                      (Print Name)
4    changes to my testimony taken in the matter of

5    _____,

6    taken on_____:
                  (Date)
7

8        Page      Line      Change

9        _____     _____     _____

10       _____     _____     _____

11       _____     _____     _____

12       _____     _____     _____

13       _____     _____     _____

14       _____     _____     _____

15       _____     _____     _____

16       _____     _____     _____

17       _____     _____     _____

18       _____     _____     _____

19       _____     _____     _____

20       _____     _____     _____

21       _____     _____     _____

22       _____     _____     _____

23       _____     _____     _____

24       _____     _____     _____

25

104

NICHOLAS ROBINSON vs CITY OF SAN JOSE, et al.
Jaime Kulik on 04/20/2021

```
 1    _____   _____   _____
 2    _____   _____   _____
 3    _____   _____   _____
 4    _____   _____   _____
 5    _____   _____   _____
 6    _____   _____   _____
 7    _____   _____   _____
 8    _____   _____   _____
 9    _____   _____   _____
10    _____   _____   _____
11    _____   _____   _____
12    _____   _____   _____
13    _____   _____   _____
14    _____   _____   _____
15    _____   _____   _____
16    _____   _____   _____
17    _____   _____   _____
18    _____   _____   _____
19    _____   _____   _____
20    _____   _____   _____
21
22
23
24           _____
                   (Witness Signature)
25    ///
```

**105**

REGAL

Exhibit "I"



# Police Force Analysis System℠ Summary Report

## San Jose Police Department

**Use of Force Data from January 1, 2015 to June 30, 2017**

**By:**

**Bob Scales, J.D.**
**Police Strategies LLC**
bob@policestrategies.com
www.policestrategies.com

**January 2018**

## Background – The Lack of Data on Police Use of Force

In response to a recent series of highly publicized police shootings, the public and policy makers are demanding that law enforcement be more accountable and transparent about its use of force, particularly with regards to the impact on communities of color.  But, as made clear in a 2013 survey by the U.S. Department of Justice,[1] there is wide variance in agency approaches to tracking force, a lack of in-depth review of force within many individual police departments, and simply no data allowing for a meaningful evaluation and comparison of use of force practices across the United States.  Understanding police use of force in all its complexity requires a systematic examination of when, where, how, and why force is used in the approximately 800,000 annual force incidents involving nearly 18,000 police agencies throughout the country.

While the FBI has attempted to collect information on justifiable homicides by police officers, this amounts to an extremely small percentage of all police uses of force that occur each year and the data is limited and incomplete.[2]  There are no reliable and comprehensive data sources available that could be used to develop evidence-based best practices for use of force. As a result, there currently exists a plethora of policies, training programs and procedures designed to guide officers on how to appropriately use force.  Since none of these policies or programs have been evaluated for their effectiveness, agencies have no way of knowing whether their existing practices should be maintained, modified or overhauled.  Some organizations such as the Police Executive Research Forum (PERF) have attempted to develop guidelines on how officers should appropriately use force.[3]  Unfortunately with no data or evidence to back up the effectiveness of these new proposals, they are often met with skepticism and resistance by the law enforcement community.[4]  By issuing recommendations for sweeping reforms without

---

[1] "Data on Use of Force by Police Across U.S. Proves Almost Useless," New York Times, August 11, 2015.
[2] "FBI director calls lack of data on police shootings 'ridiculous,' 'embarrassing,'" Washington Post, October 7, 2015.
[3] Guiding Principles on Use of Force, Critical Issues in Policing Series, Police Executive Research Forum, March 2016.
[4] Statement of the International Association of Chiefs of Police and the Fraternal Order of Police on PERF's Proposed Use of Force Standards, February 2016.

providing any data to support those recommendations, the chasm between the public and police may actually widen as we debate how the police should reform themselves.[5]

The lack of evidence-based policies for use of force is quite shocking when you consider that these policies are being used to guide officers in making life and death decisions that could have criminal consequences and expose departments to significant liability.  It is inconceivable that we would allow policies to govern the practice of medicine without ensuring that those policies are backed up by solid scientific research and constant evaluation and assessment.

The Department of Justice (DOJ) has attempted to reform dozens of law enforcement agencies over the last 25 years through a series of consent decrees and collaborative reform projects.  Consent decrees can cost local governments millions of dollars and it can take up to a decade to reach compliance with court ordered mandates.  Unfortunately, one thing that all consent decrees have lacked is a systematic and comprehensive data collection program that would be able to assess the effectiveness of the reforms and the long-term impacts of the decrees.  A few studies by academic researchers have determined that the benefits of consent decrees are mixed at best.[6]

In May 2015 the Obama Administration launched the Police Data Initiative.[7]  This initiative was the result of recommendations from the Task Force on 21st Century Policing and it has two primary goals: (1) Use open data to build transparency and increase community trust, and (2) Provide internal accountability and effective data analysis.  One of the data elements collected by the initiative is police use of force.  This data is currently available on an open data portal managed by the Police Foundation.[8]  Only 24 law enforcement agencies have provided their data on use of force incidents and each of those agencies has a different method for reporting their stats.  Some agencies only include 3 fields of information while others have more than 30 fields.

---

[5] Protocol for reducing police shootings draws backlash from unions, chiefs group, Washington Post, March 31, 2016.
[6] "Do federal consent decrees improve local police departments? This study says they might," Washington Post, May 24, 2017.
[7] "Launching the Police Data Initiative," The White House President Barack Obama, May 18, 2015.
[8] Police Data Initiative Open Data Portal

Some agencies only report on officer involved shootings while others report on all uses of force including the pointing of a firearm. Unfortunately, the use of force data provided to the Police Data Initiative provides very little insight into how officers are using force and where efforts on reform need to be focused.

The State of California recently adopted one of the most comprehensive use of force data collection programs in the country.[9] The URSUS system uses an online reporting tool[10] to collect data from all law enforcement agencies in the state. The California DOJ recently released its first report on use of force data from 2016.[11] The main limitation of URSUS is that it only collects data on use of force incidents that result in serious bodily injury or death of a civilian or officer or the discharge of a firearm. In 2016 there were just 782 incidents that met the URSUS reporting criteria which is less than 2% of the estimated 45,000[12] uses of force that occur in the state each year. Only 25 of the state's 509 law enforcement agencies had more than 5 incidents to report to URSUS in 2016 and more than half the agencies in the state did not have any incidents to report. While the URSUS system is a good first step, the limited amount of data it contains will provide little guidance to departments that want to implement data-driven reforms.

While URSUS captures data on all firearms discharges, most officers will go their entire careers without ever discharging their firearms in the line of duty. By contrast, half of the nation's 800,000 law enforcement officers will use some type of force at least once this year. We need to begin collecting and analyzing data on all use of force incidents so that agencies can craft evidence-based best practices and closely monitor officer behavior in the field.

---

[9] "California Launches Digital Platform to Collect Police Use-of-Force Data," Techwire.net, September 22, 2016.
[10] California Department of Justice URSUS Use of Force Incident Reporting
[11] California DOJ URSUS 2016 Report
[12] This estimate of the total number of use of force incidents in the state was derived from the total number of arrests in 2016 (1,120,759) multiplied by 4% which is the average use of force rate per arrest of the 32 law enforcement agencies in the Police Force Analysis System℠. A use of force incident includes the use of any physical force to overcome resistance and/or the use of any weapon.

## Early Intervention (Early Warning) Systems

Many law enforcement agencies have developed Early Intervention Systems (EIS) to identify potentially problematic behavior among their officers at an early stage so that corrective measures can be taken before a serious incident, complaint or lawsuit occurs. A number of these systems include use of force data as one of the risk components. Typically, some type of trigger will be set based upon the frequency of force (e.g. 3 or more uses of force in a 6-month period) and when an officer meets that trigger, they will be flagged for additional review. The efficacy of EIS systems has been challenged and there is little evidence to demonstrate that they are effective at identifying high risk officers.[13] The Los Angeles Police Department spent millions of dollars developing its TEAMS II system as part of a federal consent decree. Each month the system flags about 190 officers for additional review based in part on the frequency of use of force incidents. In 70% of the flagged cases supervisors did not find any issues with the officer's use of force and only 3% of the flagged officers were ordered to undergo retraining, were reprimanded or had some other action taken.[14] As will be discussed later in this report, measuring the frequency of an officer's use of force is a poor measure of the appropriateness of that force.

## Building the Data Infrastructure to Support Democratic Policing

The core function of the police in a democratic society is to protect life, liberty, and property, and coercion is the fundamental means by which they achieve those democratic goals. While the police perform many complex and important roles within the communities they serve, the single defining characteristic of the police is their capacity to both verbally and physically coerce individuals to do things that they are not otherwise inclined to do, particularly those individuals who are not obeying the rules. To be able to do this efficiently and effectively, the police must be viewed as a legitimate authority by the citizens they serve. This perceived legitimacy is driven by transparency in police decision-making, the presence of sufficient

---

[13] "Early Warning Systems: What's New? What's Working?" CNA, December 2015.
[14] "Report questions LAPD program to flag misconduct," Los Angeles Times, August 25, 2014.

accountability structures, and perhaps most important, fundamental fairness in the distribution of coercive authority.

Democratic policing is thus a process rather than an achievable end in itself, and it can only be demonstrated through constant evaluation in order to ensure that these democratic ideals are being satisfied.   This process of evaluation requires adequate information about coercion.   Recent tragic high-profile events have renewed our focus on an old problem: the fact that we simply do not have sufficient data about police coercion.   The most important task to improve the quality of policing in the United States is to systematically collect and report data on police coercion, and to understand the distribution of coercion across people, places, and time.

- Who is being impacted by police use of coercion and why?
- Are some communities disproportionately impacted by police use of coercive authority?
- How does a suspect's mental health status affect police decision-making?
- Are marginalized populations, such as the homeless, at risk for disproportionate force?
- Does officer knowledge of a subject's potential threat or level of intoxication influence their use of coercive authority?

Police Strategies LLC has partnered with the Center for the Study of Crime and Justice at Seattle University to develop comprehensive information about the intersection of individual and contextual factors that explain situational, temporal, and spatial variation in the distribution of police coercive authority with attention to the ways in which demographic factors such as race/ethnicity, gender, and age, situational/historical/individual characteristics such as mental illness, homelessness, and location impact police-citizen interactions and police coercive control. Data from this system will produce research and support community engagement about the relationship between the intersection of race, age, gender, and status on police coercion.

## Police Strategies LLC

Police Strategies LLC is a Washington State based company that was formed in February 2015. The company was built by law enforcement professionals, attorneys and academics with the primary goal of helping police departments use their own incident reports to make data-driven decisions and develop evidence-based best practices. The company's three partners are all former employees of the Seattle Police Department and were directly involved with the Department of Justice's pattern or practice investigation of the department in 2011 as well as the federal consent decree that followed. They wanted to take the lessons learned from that experience and provide other police departments with the tools they need to monitor use of force incidents, identify high risk behavior and evaluate the outcomes of any reforms that are implemented. The company has a partnership with the Center for the Study of Crime and Justice at Seattle University to assist in the analysis of the data.

## Police Force Analysis System℠

In the summer of 2015, Police Strategies LLC launched the Police Force Analysis System℠ (PFAS). PFAS combines peer-reviewed research with state-of-the-art analytical tools to produce a powerful data visualization system that can be used by law enforcement, policy makers, academics, and the public.[15] The core of PFAS builds upon the research work of Professor Geoff Alpert and his Force Factor method. Force Factor analysis formed the basis of Professor Alpert's 2004 book "Understanding Police Use of Force – Officers, Suspects and Reciprocity"[16] and has been the subject of several scholarly articles.[17]

PFAS is a relational database that contains 150 fields of information extracted from law enforcement agencies' existing incident reports and officer narratives. The data is analyzed using legal algorithms that were developed from the evaluation criteria outlined in the United States

---

[15] Capitola Police creates online database to track use of force stats, Santa Cruz Sentinel, August 2016.
[16] Understanding Police Use of Force – Officers, Suspects, and Reciprocity, Cambridge Studies in Criminology, 2004.
[17] See, e.g., Reliability of the Force Factor Method in Police Use-of-Force Research, Police Quarterly, December 2015.

Supreme Court case of *Graham v. Connor*, 490 U.S. 386 (1989). The Court adopted an objective reasonableness standard which evaluates each case based upon the information that the officer was aware of at the time the force was used and then comparing the officer's actions to what a reasonable officer would have done when faced with the same situation. PFAS uses Force Justification Analysis to determine the risk that a use of force incident would be found to be unnecessary and Force Factor Analysis to evaluate the risk that the force would be found to be excessive.



PFAS examines relevant temporal data from immediately before, during and after an application of force.



PFAS uses powerful data visualization software to display the information on dynamic dashboards.  These dashboards can be used by police management to identify trends and patterns in use of force practices and detect high risk behavior of individual officers.  The system can also be used to spot officers who consistently use force appropriately and effectively.  Since the system can find both high risk and low risk incidents, PFAS can be used both as an Early Intervention System to correct problematic behavior as well as a training tool that highlights existing best practices.

PFAS contains several years of historical data for each agency and is designed to be updated on a regular basis.  This allows the department to immediately identify trends and patterns as well as measure the impacts and outcomes of any changes that are made to policies, training, equipment or practices.  For example, if a department provides crisis intervention and de-escalation training to its officers, the system will be able to evaluate whether that training has had any impact on officer behavior.

PFAS currently has use of force data from 32 law enforcement agencies in five states involving more than 5,000 incidents and 2,500 officers who used force a total of 13,000 times.  PFAS is the largest database of its kind in the nation.  Although the incident reports from each of these agencies uses a different format, all the data extracted and entered into the system has been standardized which allows us to make interagency comparisons.  The Police Force Analysis Network℠ allows agencies to compare their use of force practices with other agencies in the system.

The Police Force Analysis System℠ provides comprehensive information about police use of coercive authority, and permits the study of the intersection of individual and contextual factors that explain situational, temporal, and spatial variation in the distribution of police coercive authority.  PFAS supports meaningful community engagement about police coercion by providing comprehensive and relevant data to address and inform community concern regarding police-citizen interactions.

## Key Findings from the Police Force Analysis System℠

Under our partnership with the Center for the Study of Crime and Justice at Seattle University, we are continuously analyzing the use of force data from all the agencies in PFAS to identify trends, patterns, correlations and outcomes.  Here are some of our initial key findings:

## 1.  Uses of Force are Linked to Arrests

Almost all use of force incidents are associated with an attempt by an officer to bring an individual into custody.  If a suspect resists a lawful arrest or detention, then it is usually necessary for the officer to use some type of force to gain control of the suspect.  To reduce the need to use force, many agencies have sent some or all their officers through crisis intervention and de-escalation training.  These courses help officers identify individuals with mental health issues and provides them with the verbal and interpersonal skills needed to help de-escalate and gain control of problematic situations without having to use force.  While there are no comprehensive studies that have linked de-escalation training with a reduction in use of force incidents, it is likely that these programs do provide officers with valuable skills that they can use to resolve conflicts.

While many people view any use of force by police as a negative outcome regardless of how or why the force was used, our data shows that officers cannot do their jobs effectively without using some amount of force in appropriate circumstances.  No matter how much de-escalation training an officer receives, there will always be a certain percentage of arrestees who will resist or flee regardless what the officer says or does.  PFAS data shows that on average 4% of all arrests involve in a use of force.

Some departments have seen dramatic declines in uses of force when consent decrees are imposed or when departments come under intense public scrutiny or when body cameras have implemented.  However, these declines in uses of force are almost always associated with a corresponding decline in arrests as officers become less proactive and they are more reluctant to engage in situations involving minor crimes, infractions or suspicious circumstances.

There is a strong correlation between the total number of uses of force a department has and the total number of arrests their officers make. Similarly, the more proactive and productive an officer is, the more arrests they will make and the more uses of force they will have. Rather than simply measuring the frequency of force, a better metric to assess risk is the use of force rate compared to arrests. For example, an officer who makes 10 arrests and uses force against 4 of those suspects (40% use of force rate) is a much higher risk than an officer who makes 300 arrests and uses force against 12 suspects (4% use of force rate).

When an agency begins to analyze its use of force incidents, the focus should be on the use of force rate per arrest, the necessity of the force used (i.e. whether the force was justified) and the proportionality of force to resistance (i.e. whether the force was excessive). Unfortunately, most departments and most Early Intervention Systems simply look at the frequency of force and work from the assumption that more force is bad, and less force is good. This type of simplistic analysis tends to penalize more productive and proactive officers and could lead to public safety problems if officers are encouraged to disengage and make fewer arrests.

## 2. Officers that use force more frequently, tend to use force more appropriately

PFAS examines not only the frequency of force that an officer uses, but also the risk that an individual force incident would be found to be unnecessary and/or excessive under the *Graham v. Connor* legal standard. We have found that officers who rarely use force tend to have higher risk scores than officers who frequently use force. This is probably because an officer who has more experience using force in the field will learn how to use force more appropriately than an officer who has only used force during training exercises.

This finding has significant implications for existing Early Intervention Systems which rely solely on the frequency of force to identify potentially problematic behavior. These systems flag officers with the highest number of force incidents as high risk. Our findings suggest that the opposite is true and that it is the officers who rarely use force who represent the greatest risk to the department. This may explain why most EIS systems have a very high false positive rate. (See the LAPD TEAMS II discussion above).

### 3. Less experienced younger officers are more likely to find themselves in situations where use of force is required

On average about half the officers in any given police department will use force at least once each year.  Most of the officers who use force will be assigned to patrol and these officers tend to be the youngest and least experienced officers in the department.  As we saw in the previous finding, the less experienced the officer, the more likely it is that the officer will engage in high risk use of force behavior.  This has implications for officer deployment and training.  As a risk management strategy, it may be prudent to partner more experienced officers with less experienced ones until they have had enough practice in using force in the field.  From a training perspective it would be advisable to focus in-service use of force training on younger and less experienced officers and have each of their use of force incidents thoroughly reviewed and discussed with their supervisors.

### 4. Members of the public tend to be more concerned about the fact that force was used at all rather than the level of force that was used

Some of the agencies we are working with have provided us with data on complaints about uses of force and this data has been incorporated into PFAS.  An analysis of that data has shown that when individuals complain about an officer using excessive force against them, it is more common for these incidents to have a low Justification Score rather than a high Force Factor score.  Therefore, it appears as if the motivation for the complaint is not about the level of force that was used, but rather the fact that force was used at all.  Complaints about use of force are most common when low levels of force are used against individuals who are engaged in minor crimes or infractions or when they are incorrectly suspected of criminal behavior.  When these individuals fail to cooperate, the officer can usually gain control with a minimal amount of force and no injury.  However, the suspects in these types of situations tend to view any force used against them as unwarranted, and therefore any amount of force used is likely to generate a complaint.  In situations where a suspect was engaged in serious criminal behavior, threatened the officer, actively resisted

and/or tried to flee, suspects are less likely to complain even if the officer used a very high level of force and the suspect sustained an injury.

This finding is consistent with a recent study from the John F. Finn Institute for Public Safety:

> "In our recently published study of policing, Mirage of Police Reform, we found that citizens' assessments of procedural justice are shaped much less by how officers use their enforcement powers—such as using physical force or conducting searches— than whether they use them…[I]ndividual officers' decisions about whether to use their coercive authority matter far more to public perceptions of police legitimacy than how they use it."[18]

---

[18] "Building Trust in Police: What Really Works?" The Crime Report, Center of Media Crime and Justice at John Jay College, July 18, 2017.

## Data Collection from the San Jose Police Department

Police Strategies LLC began working with the San Jose Police Department (SJPD) in May 2017. Our first task was to code the Department's use of force reports from 2015 and 2016 and enter the data into the Police Force Analysis System℠.

SJPD provided two types of reports for coding: (1) General Offense Hardcopy (GO) reports and (2) Force Response Reports. These reports were received as Adobe Acrobat files. In addition, SJPD provided electronic data on some of the incident details (date, time, address, etc.) and suspect details (age, race, gender). There were 727 incident reports from 2015 and 617 from 2016. Some of these incidents involved more than one suspect that had force used against them.

Police Strategies LLC began coding the cases in July 2017. There were five coders that reviewed the reports and entered the data into PFAS. Each coder has successfully completed a three-month training course and has passed a series of exams to ensure that their coding is consistent and meets the standards required for the system. In addition, each coder's work is spot checked to ensure accuracy and consistency. Data entry was completed in early September 2017 and then the information was then processed through the system's legal algorithms. Finally, the interactive dashboards were built for SJPD. All the data entered into the system was geocoded and SJPD was able to provide shape files for the department's divisions, districts, beats and grids. This enabled us to prepare several customized dashboards that present the use of force data geographically.

The Department has also contracted for quarterly updates of PFAS using 2017 data. In February 2017 SJPD stopped using the hand-written Force Response Reports and officers began entering the data into a new electronic database. SJPD sent us the records from that electronic database for entry into the system. The first six months of reports from 2017 have been entered into the system and the dashboards have been updated. Reports from the third quarter of 2017 are currently being coded and the updated dashboards will be ready by January 2018. Moving forward, the dashboards will be updated every quarter within 6 weeks of receiving the reports from the preceding quarter.

## San Jose Police Department Force Response Report from 2007

The last use of force report created by SJPD used data from 2007 and used about 20 data fields taken from the Force Response Reports.  While not all this data is directly comparable with the data contained in PFAS, we were able to make direct comparisons with the data taken from the Force Response Reports from 2015 and 2016.  The following is a comparison of the data contained in the San Jose Police Department's 2007 Force Response Report and the Department's use of force data from 2015 and 2016 contained in the Police Force Analysis System℠.

### 1.  Arrests and Uses of Force

From 2007 to 2016 the number of annual arrests made by SJPD fell by 58% from 35,998 arrests to 15,229 arrests.  At the same time the number of uses of force fell by 45% from 1,156 in 2007 to 639 in 2016.  In 2007 the use of force rate (uses of force per 100 arrests) was 3.2% and by 2016 it had risen to 4.2%.  This modest increase in the use of force rate is related to the lower number of arrests. When the department makes fewer arrests, officers will focus on more serious incidents particularly those involving violent crimes and weapons offenses. Suspects involved in these types of crimes tend to be less compliant generating a higher use of force rate. Therefore, the increase in the department's use of force rate is a product of an increasing percentage of violent crimes in overall arrests (19.8% in 2015 to 23.3% in 2016).



## 2. Location of Force Incidents

Over the last 10 years there has been a dramatic shift in the location of force incidents within the City of San Jose. The City is divided into 17 police districts and the proportion of all uses of force each year were examined for each district. In 2007 Edward District alone had 20% of all the force incidents in the City. By 2016 that percentage had fallen to 12%. By contrast Lincoln District had 9% of the City's uses of force in 2007 and that grew to 13% by 2016. Over the last 10 years the percentage of the City's uses of force has increased by over 50% in Adam and Charles Districts while falling by more than 40% in Yellow and Edward Districts. All the districts had double digit percentage changes except for David, King, Mary and Victor Districts which remained relatively unchanged. These dramatic shifts in the locations of use of force incidents may be a result of deployment and staffing changes or varying crime patterns or a combination of multiple factors.



Uses of Force by District

| | Edward | Lincoln | Charles | X-ray | Sam | Mary | King | Paul | Frank | Victor | Yellow | William | Robert | Adam | Nora | Tom | David |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ☐2007 | 19.8% | 9.3% | 6.6% | 7.1% | 7.0% | 7.3% | 6.0% | 5.2% | 6.1% | 4.6% | 5.3% | 3.5% | 3.2% | 3.0% | 2.5% | 3.4% | 0.1% |
| ☐2015 | 11.9% | 12.0% | 11.2% | 7.6% | 8.4% | 6.9% | 6.2% | 5.4% | 3.6% | 4.6% | 4.3% | 4.5% | 3.9% | 3.4% | 3.8% | 2.3% | 0.1% |
| ☐2016 | 11.6% | 12.8% | 10.2% | 8.8% | 7.8% | 6.7% | 5.9% | 6.7% | 3.9% | 4.2% | 3.0% | 4.2% | 4.1% | 4.7% | 3.0% | 2.3% | 0.0% |



## 3. Entertainment Zone

It appears that most of the decline in force incidents with the following characteristics is due to a dramatic decline in force incidents in the Entertainment Zone:

- Friday and Sunday
- 12am to 4am
- On Views
- Alcohol related calls and assaults on citizens
- Edward District

In 2015 and 2016 there were 144 uses of force in the Entertainment Zone. These incidents had characteristics that were different from incidents that occurred in other areas of the city:

- On Views were more common in the Entertainment Zone – 42% vs. 28% for the rest of the city
- Violent crimes were more common in the Entertainment Zone – 40% vs. 32% for the rest of the city
- Disturbances and suspicious circumstances were more common in the Entertainment Zone – 22% vs. 15% for the rest of the city
- 99% of incidents occurred outside (street or park) or inside a business or club vs. 71% in other areas of the city
- Between 1am and 2am was the most common hour for force incidents to occur in the Entertainment Zone (between 10pm and 11pm was the peak time in other areas of the city)
- Half the use of force incidents in the Entertainment Zone occurred on Saturday and Sunday vs. 35% in other areas of the city



## 4. Day of the Week

Over the last 10 years the proportion of weekly incidents has increased from Mondays to Thursdays while it has declined on Fridays and Sundays. Saturdays have remained steady.



| | Mon | Tue | Wed | Thu | Fri | Sat | Sun |
|---|---|---|---|---|---|---|---|
| 2007 | 11% | 12% | 10% | 11% | 17% | 20% | 20% |
| 2015 | 13% | 9% | 10% | 13% | 16% | 19% | 19% |
| 2016 | 12% | 14% | 13% | 14% | 14% | 20% | 14% |

## 5. Time of Day

Between 2007 and 2016 the most significant change in the time that force incidents occur was from 12am to 4am. In 2007 nearly one-third of all force incidents occurred during this time but by 2016 this was down to 14% of all incidents.



| | 12am-4am | 4am-8am | 8am-12pm | 12pm-4pm | 4pm-8pm | 8pm-12am |
|---|---|---|---|---|---|---|
| 2007 | 32% | 5% | 7% | 11% | 20% | 25% |
| 2015 | 21% | 7% | 10% | 11% | 23% | 29% |
| 2016 | 14% | 7% | 13% | 13% | 24% | 29% |

## 6. Source of Call

Over the last 10 years use of force incidents resulting from dispatched calls have become more common while On Views have declined.  In 2007 force incidents from Dispatched calls and officer initiated stops were nearly equal at 45% each.  By 2016 Dispatched calls made up 57% of all force incidents while officer initiated stops were only 33% of force incidents.



### Source of Call

| | Dispatch | On View | Self Initiated | Flag Down | Emergency Assist | Other |
|---|---|---|---|---|---|---|
| 2007 | 46% | 33% | 12% | 4% | 3% | 2% |
| 2015 | 53% | 24% | 12% | 3% | 3% | 5% |
| 2016 | 57% | 18% | 15% | 4% | 3% | 3% |

### 7. Incident Type

The following types of incidents have become more commonly associated with force incidents over the last 10 years:

- Domestic Violence
- Pedestrian Contacts
- Crime in Progress
- Suspicious Persons

Incidents where the suspect is under the influence of alcohol or the suspect has assaulted a citizen are less likely to be associated with a use of force in 2016 compared to 2007.



## Incident Type

| | Domestic Violence | Pedestrian Contact | Foot Pursuit | Alcohol Influence | Crime in Progress | Assault on Citizen | Suspicious Persons | Vehicle Pullover | Assault on Officer | Mental Illness | Drug Influence | Suicidal Person |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2007 | 8.2% | 4.3% | 5.9% | 10.1% | 4.6% | 8.0% | 4.1% | 5.6% | 3.2% | 2.4% | 2.0% | 1.1% |
| 2015 | 8.4% | 8.3% | 7.9% | 5.3% | 8.0% | 5.6% | 4.5% | 3.6% | 3.3% | 3.1% | 3.1% | 1.2% |
| 2016 | 10.0% | 7.8% | 6.6% | 4.9% | 7.5% | 5.5% | 6.3% | 4.5% | 2.7% | 2.4% | 1.4% | 0.9% |

## 8. Number of Suspects

In 2007 officers reported that 34% of force incidents involved multiple suspects. By 2015 that percentage had dropped by nearly two-thirds with only 13% of incidents having more than one suspect involved.



| | Single | Multiple |
|---|---|---|
| 2007 | 66% | 34% |
| 2015 | 87% | 13% |
| 2016 | 86% | 14% |

## 9. Gender of Suspects

The gender of suspects involved in force incidents has not changed significantly over the last 10 years with roughly one in eight incidents involving a female suspect.



| | Male | Female |
|---|---|---|
| 2007 | 87.3% | 12.7% |
| 2015 | 86.0% | 14.0% |
| 2016 | 86.4% | 13.6% |

## 10. Age of Suspects

The proportion of suspects under age 25 that were involved in force incidents has decreased from 44% in 2007 to 29% in 2016. This has caused the average age of all suspects to rise from 28.6 years to 32.6 years.



### Age of Suspect

| | 10-14 | 15-19 | 20-24 | 25-29 | 30-34 | 35-39 | 40-44 | 45-49 | 50-54 | 55-59 | 60-64 | 65-69 | 70+ |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2007 | 1.8% | 16.0% | 26.3% | 17.3% | 11.4% | 9.3% | 7.3% | 5.6% | 3.1% | 1.1% | 0.3% | 0.3% | 0.3% |
| 2015 | 0.8% | 12.6% | 18.4% | 15.9% | 16.1% | 11.0% | 6.9% | 7.7% | 6.8% | 2.7% | 0.7% | 0.0% | 0.4% |
| 2016 | 0.3% | 11.1% | 17.1% | 19.9% | 13.5% | 13.3% | 6.1% | 5.8% | 6.6% | 4.7% | 0.3% | 0.5% | 0.6% |



### Average Age of Suspects

| | 2007 | 2015 | 2016 |
|---|---|---|---|
| Average Age | 28.6 | 32.0 | 32.6 |

## 11. Suspects Under the Influence or Mental Health Issue

Since 2007 the percentage of suspects who are under the influence or experiencing mental health issues has declined steadily. Suspects with mental health issues dropped by nearly 50% from 2007 to 2016.



**Signs of Chemical Influence or Mental Health**

|       | Chemical Influence | Mental Health | None  |
|-------|--------------------|---------------|-------|
| 2007  | 66.7%              | 13.9%         | 19.4% |
| 2015  | 62.5%              | 8.5%          | 29.0% |
| 2016  | 54.8%              | 6.7%          | 38.5% |

## 12. Assaults on Officers

From 2007 to 2016 fewer officers reported being assaulted by the suspect during a use of force incident.



**Percentage of Officers Reporting Being Assaulted During a Force Incident**

| | 2007 | 2015 | 2016 |
|---|---|---|---|
| Assaulted | 20.2% | 16.3% | 13.5% |

## 13. Officer Assignment

Over the last decade, fewer officers assigned to specialty units were using force and most of the force used by the department shifted to patrol officers.  By 2016, 85% of all the force incidents in the department were initiated by officers assigned to patrol.



**Officer Assignment**

% OF ALL INCIDENTS

| | Patrol | Special Operations | Entertainment Zone | Other | Secondary Employment | BOI |
|---|---|---|---|---|---|---|
| 2007 | 70.9% | 11.9% | 12.7% | 1.6% | 2.3% | 0.5% |
| 2015 | 79.0% | 12.6% | 1.8% | 3.6% | 1.8% | 1.2% |
| 2016 | 84.6% | 8.8% | 1.0% | 2.6% | 1.8% | 1.1% |

## Analysis of Use of Force Frequency by Officer Characteristics

As of June 2017, the San Jose Police Department had 915 sworn officers on its roster.[19] From January 1, 2015 to June 30, 2017 about two-thirds of the officers in the department (613 officers) used force at least once.  On average each of these officers used force 4.9 times.  During this same period there were 62 officers who are no longer with the department and these officers used force 148 times.

The Use of Force Disparity Index is the percentage of all use of force incidents involving a group of officers divided by the percentage of all officers in the department that are associated with that same group. A score above 1 indicates that uses of force are over represented in the group. A score of less than 1 indicates that uses of force are underrepresented in the group. For example, San Jose PD has 180 sergeants making up 16.3% of all the officers in the department. These sergeants used force 191 times which is 6.1% of all the uses of force used by all the officers in the department. The Disparity Index for sergeants is 0.37 (6.1%/16.3%) which means that sergeants are underrepresented in uses of force (i.e. sergeants are 63% less likely to use force than you would expect based upon the number of sergeants in the department). By contrast, officers with less than 5 years of experience are overrepresented in uses of force. These officers make up 20% of the department but they are involved in 40% of all uses of force so they are twice as likely to use force as you would expect based upon their numbers in the department and they have a Disparity Index of 2.

The following graphs examine how frequently officers with different characteristics use force.[20]

---

[19] All the use of force analyses involving officer characteristics includes both active and inactive officers except for the analysis related to the officer's current assignment which only includes active officers.

## Officer Gender

There are 111 female officers in the San Jose Police Department representing 10% of all the sworn officers. Between January 1, 2015 and June 30, 2017, female officers used force 216 times which was 6.9% of all the force used during the period. Female officers were 31% less likely to use force than would be expected based upon their percentage of the police force.

Over the last two and a half years, 54% of female officers used force at least once compared to 61% of male officers. On average, female officers who used force were involved in 3.6 incidents compared to 4.8 incidents for male officers.



| | Male | Female |
|---|---|---|
| Officers = 1,114 | 90.0% | 10.0% |
| Uses of Force = 3,130 | 93.1% | 6.9% |



| | Male | Female |
|---|---|---|
| % of Officers Using Force | 61% | 54% |
| Average UOF per Officer | 4.8 | 3.6 |



| | Male | Female |
|---|---|---|
| Disparity Index | 1.03 | 0.69 |

© 2018 Police Strategies LLC

## Officer Race

The amount of uses of force by White, Hispanic, and Asian officers are proportionate to their share of all officers in the department. Black officers are 46% less likely to use force and Native American officers are 61% more likely to use force than would be expected based upon their percentage of the police force.

About 60% of White, Hispanic, Asian, and Native American officers in the department used force at least once during the last two and a half years while 49% of Black officers used force. On average each White, Hispanic and Asian officer using force used force about 5 times while Black officers used force 3 times and Native American officers used force 7 times.



**Officer Race**

| | White | Hispanic | Asian | Black | Nat Amer |
|---|---|---|---|---|---|
| Officers = 1,114 | 53.3% | 24.9% | 16.2% | 4.3% | 1.2% |
| Uses of Force = 3,130 | 52.6% | 25.3% | 17.8% | 2.3% | 2.0% |



**Percentage of Officers Using Force and Average Number of Uses of Force per Officer**

| | White | Hispanic | Asian | Black | Nat Amer |
|---|---|---|---|---|---|
| % of Officers Using Force | 60% | 59% | 62% | 49% | 62% |
| Average UOF per Officer | 4.6 | 4.9 | 5.0 | 3.1 | 7.4 |



**Disparity Index = % of All Uses of Force / % of All Officers**

| | White | Hispanic | Asian | Black | Nat Amer |
|---|---|---|---|---|---|
| Disparity Index | 0.99 | 1.02 | 1.10 | 0.54 | 1.61 |

## Officer Age

Officers under 40 years of age have a greater percentage of all uses of force than would be expected based upon the number of officers in the department. Younger officers are 80% more likely to use force than would be expected based upon their proportion of the department.

The younger the officer, the more likely he/she is to use force. About 82% of officers under 30 used force at least once in the last two and half years while only 42% of officers over 50 used force. Those officers who used force and were under 40 years on average used force about 6 times while older officers used force only about 3 times.



| Officer Age | 22-29 | 30-39 | 40-49 | 50+ |
|---|---|---|---|---|
| Officers = 1,114 | 10.8% | 22.1% | 41.4% | 25.7% |
| Uses of Force = 3,130 | 19.3% | 39.5% | 30.7% | 10.6% |



| | 22-29 | 30-39 | 40-49 | 50+ |
|---|---|---|---|---|
| % of Officers Using Force | 82% | 76% | 57% | 42% |
| Average UOF per Officer | 6.1 | 6.6 | 3.7 | 2.8 |



| | 22-29 | 30-39 | 40-49 | 50+ |
|---|---|---|---|---|
| Disparity Index | 1.8 | 1.8 | 0.7 | 0.4 |

## Officer Years of Experience

Officers with less than five years of experience have a greater percentage of all uses of force than would be expected based upon the number of officers in the department. The least experienced officers in the department are more than twice as likely to use force than would be expected based upon their proportion of the department. The less experienced the officer, the more likely he/she is to use force.

About 82% of officers with less than 5 years' experience used force at least once in the last two and half years while only 38% of officers with 25 or more years' experience used force. On average those officers who used force and had less than 5 years' experience used force on average 7 times, while officers using force with more than 25 years' experience used force only 2.5 times.



**Officer Years of Experience**

| | <5 | 5-9 | 10-14 | 15-19 | 20-24 | 25+ |
|---|---|---|---|---|---|---|
| ■ Officers = 1,114 | 20.3% | 4.9% | 14.4% | 21.6% | 23.9% | 14.9% |
| ■ Uses of Force = 3,130 | 41.9% | 5.2% | 18.7% | 19.2% | 10.0% | 5.0% |



**Percentage of Officers Using Force and Average Number of Uses of Force per Officer**

| | <5 | 5-9 | 10-14 | 15-19 | 20-24 | 25+ |
|---|---|---|---|---|---|---|
| ■ % of Officers Using Force | 82% | 63% | 74% | 60% | 46% | 38% |
| ● Average UOF per Officer | 7.1 | 4.7 | 4.9 | 4.2 | 2.6 | 2.5 |



**Disparity Index = % of All Uses of Force / % of All Officers**

| | <5 | 5-9 | 10-14 | 15-19 | 20-24 | 25+ |
|---|---|---|---|---|---|---|
| ■ Disparity Index | 2.1 | 1.0 | 1.3 | 0.9 | 0.4 | 0.3 |

## Officer Rank

Officers are 20% more likely to use force than would be expected based upon their proportion of all sworn personnel in the department. Sergeants, lieutenants, captains and chiefs are all much less likely to use force than would be expected based upon their numbers in the department.

About 67% of officers in the department used force at least once in the last two and half years. On average each of those officers used force about 5 times. About 44% of sergeants in the department used force at least once in the last two and half years. On average each of those sergeants used force about 2 times. Less than 20% of lieutenants, captains and chiefs used force and on average they used force less than 2 times each.



| | Officer | Sergeant | Lieutenant | Captain | Chief |
|---|---|---|---|---|---|
| Officers = 1,114 | 78.0% | 16.3% | 3.7% | 1.0% | 0.9% |
| Uses of Force = 3,130 | 93.5% | 6.1% | 0.4% | 0.1% | 0.0% |



| | Officer | Sergeant | Lieutenant | Captain | Chief |
|---|---|---|---|---|---|
| Disparity Index | 1.20 | 0.37 | 0.10 | 0.06 | 0.04 |



| | Officer | Sergeant | Lieutenant | Captain | Chief |
|---|---|---|---|---|---|
| % of Officers Using Force | 67% | 44% | 15% | 18% | 10% |
| Average UOF per Officer | 5.1 | 2.4 | 1.8 | 1.0 | 1.0 |

## Analysis of Use of Force Rates by Type of Crime

Most uses of force are associated with a custodial arrest. In 2015 and 2016, SJPD made a total of 34,408 arrests and force was used 1,380 times. This produced an average use of force rate per arrest of 4%. When the type of crime involved is taken into consideration, we see a large range of use of force rates.

Arrests are concentrated around four main crimes: warrants (22% of all arrests), violent crimes (19% of all arrests), drug crimes (15% of all arrests), and property crimes (13% of all arrests). By contrast, uses of force are primarily focused around violent crimes (39% of all uses of force) and every other type of crime is involved in less than 10% of all force incidents.



**Arrests by Crime as a Percentage of All 34,406 Arrests**
**Uses of Force by Crime as a Percentage of All 1,380 Uses of Force**
**2015 and 2016**

| | Probation | Disorderly | Trespass | Weapon | Violent | Other | Liquor | Property | Drugs | Sex | Warrant | Traffic |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Arrests % | 0.6% | 0.5% | 1.1% | 2.5% | 18.9% | 10.0% | 3.7% | 13.3% | 15.5% | 2.4% | 21.5% | 10.1% |
| UOF % | 2.5% | 1.8% | 3.8% | 5.4% | 39.3% | 15.4% | 3.3% | 8.9% | 8.8% | 0.9% | 6.7% | 3.0% |



**Use of Force Rate per Arrest by Type of Crime Charged**
**2015 and 2016**

| | Probation | Disorderly | Trespass | Weapon | Violent | Other | Liquor | Property | Drugs | Sex | Warrant | Traffic |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| UOF Rate | 16.5% | 16.0% | 13.9% | 8.7% | 8.4% | 6.2% | 3.6% | 2.7% | 2.3% | 1.6% | 1.2% | 1.2% |

© 2018 Police Strategies LLC

Suspects who are engaged in disorderly conduct or trespassing are more than five times more likely to have force used against them during an arrest than suspects who are involved in property crimes, drug crimes, non-violent sex crimes and traffic offenses. This suggests that suspects who are disorderly or trespassing are more likely to resist arrest than suspects engaged in other types of crimes. Individuals committing disorderly conduct are probably in an agitated state and are less likely to comply with an officer's orders. Individuals who are trespassing will usually be ordered to leave the area and if they refuse then force will need to be used.

While the crimes of disorderly conduct and trespassing have high use of force rates, the offenses make up less than 2% of all arrests made by the department each year. Arrests for violent crimes generate a much higher number of uses of force. Use of force rates for violent crimes and weapons offenses are just over 8% which is more than double the force rates of most other crimes. Individuals committing violent crimes may have more aggression and anger and therefore will be less amenable to officer commands.

Suspects who were in violation of their probation had the highest use of force rate of all the types of crimes (16.5%). An individual who is in violation of the conditions of his or her probation is probably acutely aware that any contact with the police could have serious consequences. Therefore, these types of individuals are the most likely to resist officers. By contrast individuals with warrants had a very low use of force rate of 1.2%. This may be because many individuals with outstanding warrants may not even know that a warrant had been issued for their arrest. Therefore, they may be less cautious when encountering the police.

## Analysis of Use of Force by Suspect Characteristics

Whenever the issue of police use of force is discussed or debated, one of the fundamental questions is whether police officers treat individuals differently based upon their personal characteristics (e.g. age, race, gender, etc.). We used the Pearson correlation to evaluate the linear relationship between individual suspect characteristics and high-risk use of force behavior (e.g. low Justification Score, high Force Factor score and high injury rate). A strong correlation between a suspect characteristic and a high-risk behavior may indicate that officers are taking that suspect characteristic into consideration when making use of force decisions or actions. The following suspect characteristics were measured:

1. Gender
2. Age
3. Race
4. Height
5. Weight
6. Officer believed suspect was under the influence of drugs or alcohol
7. Officer believed suspect had a mental health issue
8. Residence (San Jose, Another City, or Homeless)

The following suspect behaviors were also examined in relation to high Force Factor scores and high injury rates:[21]

9. The seriousness level of the suspected crime
10. Whether the suspect fled from the officer
11. Whether the officer believed the suspect was armed

---

[21] Comparisons were not made with Justification Scores because each of these elements is a component of the Justification Score.

| Suspect Characteristic | Lower Justification Score (Higher Risk of Unnecessary Force) | Higher Force Factor Score (Higher Risk of Excessive Force) | Higher Injury Rate |
|---|---|---|---|
| Age | Older Suspect*** | Older Suspect** | ns |
| Gender | ns | Male Suspect*** | Male Suspect*** |
| Weight | ns | Heavier Suspect*** | ns |
| Drugs/Alcohol | ns | Not Under the Influence*** | ns |
| Mental Health | ns | No Mental Health Issue*** | ns |
| Race | ns | ns | ns |
| Height | ns | ns | ns |
| Residence | ns | ns | ns |
| Flight | | Suspect Fled*** | Suspect Fled*** |
| Armed | | Armed Suspect** | Armed Suspect*** |
| Crime | | More Serious Crime** | More Serious Crime** |

| |
|---|
| *** p < .001 - Correlation is Significant at the 0.1% Level |
| ** p < .01 - Correlation is Significant at the 1% Level |
| ns = Not Significant |

A statistically significant correlation found in this table could be caused by two principal factors or a combination of the two factors:

1. The suspect characteristic is associated with a certain type of suspect behavior (e.g. older suspects are more likely to threaten the officer than younger suspects or heavier suspects present a higher level of resistance than lighter suspects), or

2. The officer treats the suspect differently based upon the suspect's characteristic (e.g. the officer is more reluctant to use force against a juvenile suspect or a female suspect than an older suspect or male suspect).

The Justification Scores are based upon all the relevant legal factors (outlined in *Graham v. Connor*) that go into an officer's decision to use force. A low Justification Score means that an officer decided to use force when the suspect was involved in a lower level crime, the suspect did not present a significant threat, the suspect did not flee from the officer, and there was very little resistance. An incident with a lower Justification Score is at greater risk of being found to be unnecessary, but it does not necessarily mean that the force used was unlawful. The only

characteristic that had a statistically significant correlation with a low Justification Score was the age of the suspect. Officers are more likely to use force with a lower Justification Score against an older suspect than a younger suspect. Juveniles tend to have the highest Justification Scores which may be due to an officer's reluctance to use force against a minor unless it is absolutely warranted.

The Force Factor Scores are based upon the proportionality of the level of force used to the level of resistance presented. An incident with a higher Force Factor score is at greater risk of being found to be excessive, but it does not necessarily mean that the force used was unlawful. The Force Factor Score controls for the level of resistance presented. Therefore, a statistically significant correlation is more likely to be caused by the officer behaving differently based upon the suspect's characteristic. There were several suspect characteristics that had a statistically significant correlation with a higher Force Factor Score. Officers are likely to use a higher level of force against males, older suspects, and heavier suspects. Officers may feel the need to use a higher level of force to control these types of suspects and/or they may be more reluctant to use higher levels of force against females, younger suspects and lighter suspects. Officers are more likely to use higher levels of force against individuals who are <u>not</u> under the influence of alcohol or drugs and do not present some type of mental health issue. This means that when officers are faced with a resistant suspect who is obviously under the influence and/or has an observable mental health issue, the officer is going to try and control the suspect with a lower level of force. This may be due to the officer's perception that these types of individuals are more vulnerable and present less of a threat to the officer's safety.

When a suspect is involved in a more serious crime, or when a suspect flees, or when a suspect is armed, an officer is more likely to use a higher level of force than when a suspect does not present any of these conditions. Similarly, these suspect behaviors are also associated with a higher injury rate for the suspect. Only one other characteristic was associated with a higher suspect injury rate. Male suspects are more likely to be injured than female suspects.

There were three suspect characteristics examined that did not have any correlation with Force Justification, Force Factor or Force Injury Rates: the suspect's race, the suspect's height

and the suspect's residence.  This finding suggests that an officer's decision to use force and the level of force that an officer chooses to use are not influenced by the suspect's race or height or whether the suspect is homeless or a resident of another city.  This finding also suggests that suspect behavior in use of force incidents does not vary by the race of the suspect.  Additional correlations were conducted between suspect race and other behaviors and the only statistically significant correlation was between Hispanic suspects and flight.  Hispanic suspects were more likely to flee from the police than White suspects.

## Racial Disparity Analysis

While census data of the residential population is sometimes used as a benchmark for disparity analysis, it does not provide an adequate measure to assess the possible impacts of racial bias by police officers.  There are many factors that could affect the racial disparity between uses of force and the population that have nothing to do with officer bias such as crime rates, compliance rates, possession of weapons, poverty rates, deployment strategies, etc.  When the racial composition of suspects involved in use of force incidents is compared to the demographics of the population there are some disparities present.   Hispanic and Black suspects are overrepresented in the use of force numbers when compared to their percentage of the population, while White and Asian suspects are underrepresented.

A better benchmark for measuring demographic disparities in police uses of force is arrest data.  Almost every use of force incident is associated with an arrest.  All things being equal, we would expect to see the same proportion of suspect characteristics for those who are arrested as those who have force used against them.  If there is racial bias present, we would expect to see racial disparities between uses of force and arrests.  When we calculate the Racial Disparity Index using arrests as the denominator rather than population, any racial disparities with uses of force are virtually eliminated.  This means that when suspects are arrested by SJPD officers, they are no more or less likely to have force used against them based upon their race or ethnicity.

The Use of Force Disparity Index is the percentage of all use of force incidents involving each racial group of suspects compared to their proportion of all arrests.  A score above 1 indicates that uses of force are over represented in the racial group.  A score of less than 1 indicates that uses of force are underrepresented in the racial group.  As an example, Hispanic suspects make up 56.2% of all arrests and they are involved in 60.1% of all uses of force.  The Racial Disparity Index for Hispanic suspects is 1.07 (60.1% ÷ 56.2%) which means that Hispanic suspects are 7% more likely to be involved in a use of force incident than you would expect based upon their proportion of the arrestees. Hispanic and Black suspects are slightly overrepresented in uses of force when compared to arrests.   White and Asian/Other suspects are slightly underrepresented in use of force incidents compared to arrests.



| | Hispanic | White | Black | Other |
|---|---|---|---|---|
| Arrests | 56.2% | 20.3% | 12.2% | 11.3% |
| Uses of Force | 60.1% | 16.6% | 12.7% | 10.6% |



| | Hispanic | White | Black | Other |
|---|---|---|---|---|
| Disparity Index | 1.07 | 0.82 | 1.04 | 0.93 |

Use of force rates (uses of forcer per 100 arrests) also had minor variations by race. For White suspects, 3.29% of all their arrests resulted in a use of force, while Hispanic suspects had a use of force rate of 4.29%. Black suspects and Asian/Other suspects had use of force rates between Hispanics and Whites. The use of force rates for all races were separated by less than one percentage point.



| | Hispanic | White | Black | Other |
|---|---|---|---|---|
| UOF Rate | 4.29% | 3.29% | 4.17% | 3.51% |

## Trends in the Race of Suspects Involved in Uses of Force

Over the last decade the race of the majority of suspects involved in force incidents has been Hispanic. In the first nine months of 2017 about one in five suspects was White and one in six was Black. Asian suspects have consistently made up less than 10% of all suspects. White and Black suspects make up a higher percentage of non-resident suspects than suspects who are residents of San Jose. Nearly half of non-residents suspects were either White or Black compared to 33% of suspects who were residents of San Jose.



### Race of Suspect

|       | Hispanic | White | Black | Asian | Other |
|-------|----------|-------|-------|-------|-------|
| 2007  | 54.0%    | 19.2% | 14.8% | 5.7%  | 6.3%  |
| 2015  | 62.5%    | 16.1% | 11.3% | 8.2%  | 1.9%  |
| 2016  | 57.4%    | 17.2% | 14.2% | 8.0%  | 3.1%  |
| 2017  | 53.8%    | 21.7% | 16.1% | 7.4%  | 1.1%  |



### Race of Suspect – San Jose Resident

| | Hispanic | White | Black | Asian | Other |
|---|---|---|---|---|---|
| 2007 | 58.6% | 19.9% | 10.9% | 4.9% | 5.6% |
| 2015 | 66.5% | 15.0% | 8.4% | 8.0% | 2.1% |
| 2016 | 62.9% | 14.5% | 11.7% | 8.2% | 2.6% |
| 2017 | 57.4% | 18.9% | 14.2% | 8.5% | 0.9% |



### Race of Suspect – Non-Resident

| | Hispanic | White | Black | Asian | Other |
|---|---|---|---|---|---|
| 2007 | 41.9% | 17.4% | 24.8% | 7.8% | 8.1% |
| 2015 | 52.8% | 18.5% | 18.5% | 8.8% | 1.4% |
| 2016 | 43.3% | 24.2% | 20.8% | 7.3% | 4.5% |
| 2017 | 45.7% | 28.6% | 20.0% | 5.0% | 0.7% |

# Interagency Comparative Analysis Using the
# Police Force Analysis Network℠

As a contributor of data to the Police Force Analysis System℠, San Jose PD also has access to data from other agencies in the system through the Police Force Analysis Network℠ (PFAN). PFAN currently has use of force data from 32 law enforcement agencies in five states involving more than 5,000 incidents with 2,500 officers who used force 13,000 times. This is the largest database of its kind in the nation. Although the incident reports from each of these agencies uses a different format, all the data extracted and entered into the system has been standardized which allows us to make meaningful interagency comparisons. The Police Force Analysis Network℠ allows agencies to compare their use of force practices with other agencies in the system.

## 1. Force Tactics Comparisons

PFAN contains data on all the force tactics and weapons that officers use.  The system allows department wide usage rates to be compared across agencies.  The following table lists the usage rates for weapons and physical tactics by SJPD officers and then compares that with the averages from other agencies.  SJPD officers use impact weapons and projectile weapons more frequently than officers from other agencies in the system.  For physical tactics San Jose PD officers use their weight, strikes and pushing more frequently than officers from other agencies and SJPD officers are less likely to end up wrestling with suspects.

| Weapon | Percentage of Incidents Used | Interagency Comparison |
|---|---|---|
| Electronic Control Device | 17% | Average |
| Impact Weapon | 17% | Above Average |
| Projectile Weapon | 4.6% | Above Average |
| Canine Bite | 4.2% | Average |
| Pepper Spray | 4.2% | Average |

| Physical Tactic | Percentage of Incidents Used | Interagency Comparison |
|---|---|---|
| Takedown | 57% | Average |
| Used Weight | 40% | Above Average |
| Strike | 32% | Above Average |
| Push | 21% | Above Average |
| Pain Compliance | 16% | Average |
| Wrestle | 10% | Below Average |
| Hair Hold | 2.5% | Average |
| Lateral Neck Restraint | 0.7% | Average |

## 2. Risk Factor Comparisons

PFAN provides a comprehensive comparative risk analysis of relevant factors involved in use of force incidents.  The primary risk areas are:

1. Frequency of Force – The more uses of force an agency has the greater the risk of injuries, complaints and lawsuits resulting from these incidents.

2. Force Justification and Force Factor – Force incidents with low Force Justification Scores are at higher risk of being found to be unnecessary while incidents with high Force Factor scores are at higher risk of being found to be excessive.

3. Injury Rates – Higher injury rates pose risks to the health and safety of officers and suspects and are more likely to result in complaints and lawsuits.

For each of the risk factors examined, SJPD is within one standard deviation of the mean for all the agencies in the system.  This means that the department is generally within the expected norm for all its use of force practices.  There are some areas where SJPD is above or below the average for the other the agencies.  This indicates a higher/lower risk than average.  Of all the areas examined, the highest risk for the department is related to the injury rates for both suspects and officers.  SJPD has a suspect injury rate of 44% compared to an interagency average of 30% and an officer injury rate of 19% compared to 13% for other agencies.

SJPD is doing better than average in some risk areas.  SJPD's use of force rate per 1,000 population is half of the interagency rate and SJPD officers are less likely to be involved in high Force Factor incidents.  Perhaps most importantly, only 0.7% of SJPD incidents involve both a low Justification Score and a high Force Factor Score which is half of the interagency average.  These Low Justification/High Force Factor incidents create the highest level of risk for an agency.

| Risk Factors<br>Force Frequency | San Jose PD | Interagency Average | Standard Deviation |
|---|---|---|---|
| Annual Number of Uses of Force per 1,000 Population | 0.6 | 1.2 | Within 1 SD |
| Annual Number of Uses of Force per 100 Arrests | 4.2 | 4.1 | Within 1 SD |
| Percentage of All Officers in the Department Using Force Each Year | 50% | 49% | Within 1 SD |
| Average Number of Uses of Force per Officer | 2.6 | 2.1 | Within 1 SD |

| Risk Factors<br>Force Justification and Force Factor | San Jose PD | Interagency Average | Standard Deviation |
|---|---|---|---|
| Percentage of All Force Incidents with a Low Justification Score | 16% | 17% | Within 1 SD |
| Percentage of All Force Incidents with a High Force Factor Score | 6% | 8% | Within 1 SD |
| Percentage of All Force Incidents with Both a Low Justification Score and a High Force Factor Score | 2.6% | 2.6% | Within 1 SD |
| Percentage of Officers with Multiple Low Justification Incidents | 6.0% | 6.0% | Within 1 SD |
| Percentage of Officers with Multiple High Force Factor Incidents | 0.7% | 1.3% | Within 1 SD |

| Risk Factors<br>Injury Rates | San Jose PD | Interagency Average | Standard Deviation |
|---|---|---|---|
| Suspect Injury Rate | 44% | 30% | Within 1 SD |
| Officer Injury Rate | 19% | 13% | Within 1 SD |

### 3. Suspect Injury Rate Comparisons

SJPD is above average for all types of suspect injuries except for loss of consciousness. For fractures, SJPD is more than one standard deviation above the mean for all the agencies which indicates that the department is an outlier in this area.

Using PFAS we can conduct a more detailed analysis of the 43 force incidents that resulted in a suspect fracture. More than two-thirds of the suspect fracture incidents are associated with a physical strike and/or the use of an impact weapon. Incidents that involve a suspect fracture have a long duration with half the cases taking 5 or 6 force sequences to bring the suspect under control. A high number of force sequences suggests that the officers

are in a protracted struggle with the suspects.  As a result, the officer injury rate for this type of incident is 40% which is more than twice the department average.  Four out of five of these incidents involve two or more officers using force and the use of both physical force and a weapon.

Although impact weapons were used in a majority of suspect fracture cases, a fracture injury is still a rare occurrence.  Impact weapons were used 283 times in the last two and half years and only 10% of those incidents resulted in a suspect fracture.

| Suspect Injury Rates | San Jose PD | Interagency Average | Standard Deviation |
|---|---|---|---|
| Scrapes and Bruises | 20.1% | 13.7% | Within 1 SD |
| Cuts | 14.9% | 10.7% | Within 1 SD |
| Canine Bites | 3.7% | 2.7% | Within 1 SD |
| Fracture (includes broken teeth) | 2.6% | 0.5% | Above 1 SD |
| Pepper Spray | 2.5% | 1.5% | Within 1 SD |
| Unconsciousness | 0.2% | 1.2% | Within 1 SD |



**Force Tactics Used that Resulted in a Suspect Fracture**

Strike 77%
Impact Weapon 67%
Takedown 53%
Used Weight 51%
Wrestle 23%
Electronic Control Device 23%
Push 21%
Pain Compliance 19%
Canine 5%
Pepper Spray 2%
Hair Hold 2%

© 2018 Police Strategies LLC

4. **Other Force Characteristics**

For most of the criteria measured by the Force Analysis Network℠, San Jose PD is within the average range of the other agencies.  The following table lists those force characteristics which are significantly different in San Jose compared with the other agencies.  These are simply descriptive measures and are not necessarily associated with increased risk.

| Characteristics of Force Incidents that are **More Common** in San Jose than Other Jurisdictions | Characteristics of Force Incidents that are **Less Common** in San Jose than Other Jurisdictions |
|---|---|
| Officer used force after an On-View event | Officer used force after a dispatched call |
| Three or more officers were present when force was used | Only one officer was present when force was used |
| Three or more officers used force | Only one officer used force |
| The reason for the contact was a violent crime or a traffic offense | The reason for the contact was a welfare check or a warrant arrest |
| The most serious crime referred was a violent crime or a drug crime | There was no charge referred for prosecution |
| Suspect is homeless | Suspect was a resident of another city |
| Suspect presented a higher level of resistance | Suspect presented a lower level of resistance |
| Suspect was non-White | Suspect was White |
| Suspect was not suicidal | Suspect was suicidal |

# Sample Dashboards from the Police Force Analysis System℠







© 2018 Police Strategies LLC

48

**Exhibit "J"**



# Police Force Analysis System℠
# Third Summary Report

## San Jose Police Department

**Use of Force Data from January 1, 2015 to December 31, 2018**

**By:**

**Bob Scales, J.D.**
**Police Strategies LLC**
bob@policestrategies.com
www.policestrategies.com

**March 2020**

## Background

In January 2018 we produced the first Summary Report using data from the San Jose Police Department's Police Force Analysis System℠. That report included data from January 1, 2015 to June 30, 2017. Our second report included data from July 1, 2017 to June 30, 2018. This report adds data from July 1, 2018 to December 31, 2018. Police Strategies will continue to update the system on a regular basis.

## Police Strategies LLC

Police Strategies LLC is a Washington State based company that was formed in February 2015. The company was built by law enforcement professionals, attorneys and academics with the primary goal of helping police departments use their own incident reports to make data-driven decisions and develop evidence-based best practices. The company's three partners are all former employees of the Seattle Police Department and were directly involved with the Department of Justice's pattern or practice investigation of the department in 2011 as well as the federal consent decree that followed. They wanted to take the lessons learned from that experience and provide other police departments with the tools they need to monitor use of force incidents, identify high risk behavior and evaluate the outcomes of any reforms that are implemented. The company has a partnership with the Center for the Study of Crime and Justice at Seattle University to assist in the analysis of the data.

## Police Force Analysis System℠

In the summer of 2015, Police Strategies LLC launched the Police Force Analysis System℠ (PFAS). PFAS combines peer-reviewed research with state-of-the-art analytical tools to produce a powerful data visualization system that can be used by law enforcement, policy makers, academics, and the public.[1] The core of PFAS builds upon the research work of Professor Geoff

---

[1] Capitola Police creates online database to track use of force stats, Santa Cruz Sentinel, August 2016.

Alpert and his Force Factor method.  Force Factor analysis formed the basis of Professor Alpert's 2004 book "Understanding Police Use of Force – Officers, Subjects and Reciprocity"[2] and has been the subject of several scholarly articles.[3]

PFAS is a relational database that contains 150 fields of information extracted from law enforcement agencies' existing incident reports and officer narratives.  The data is analyzed using legal algorithms that were developed from the evaluation criteria outlined in the United States Supreme Court case of *Graham v. Connor*, 490 U.S. 386 (1989).  The Court adopted an objective reasonableness standard which evaluates each case based upon the information that the officer was aware of at the time the force was used and then comparing the officer's actions to what a reasonable officer would have done when faced with the same situation.  PFAS uses Force Justification Analysis to determine the risk that a use of force incident would be found to be unnecessary and Force Factor Analysis to evaluate the risk that the force would be found to be excessive.



---

 SJPD puts use-of-force data online in pioneering move, San Jose Mercury, January 2018

[2] Understanding Police Use of Force – Officers, Subjects, and Reciprocity, Cambridge Studies in Criminology, 2004.

[3] See, e.g., Reliability of the Force Factor Method in Police Use-of-Force Research, Police Quarterly, December 2015.

PFAS examines relevant temporal data from immediately before, during and after an application of force.



PFAS uses powerful data visualization software to display the information on dynamic dashboards. These dashboards can be used by police management to identify trends and patterns in use of force practices and detect high risk behavior of individual officers. The system can also be used to spot officers who consistently use force appropriately and effectively. Since the system can find both high risk and low risk incidents, PFAS can be used both as an Early Intervention System to correct problematic behavior as well as a training tool that highlights existing best practices.

PFAS contains several years of historical data for each agency and is designed to be updated on a regular basis. This allows the department to immediately identify trends and patterns as well as measure the impacts and outcomes of any changes that are made to policies, training, equipment or practices. For example, if a department provides crisis intervention and de-escalation training to its officers, the system will be able to evaluate whether that training has had any impact on officer behavior.

PFAS currently has use of force data from 56 law enforcement agencies in seven states involving more than 8,000 incidents and 3,000 officers who used force a total of 15,000 times. PFAS is the largest database of its kind in the nation. Although the incident reports from each of these agencies uses a different format, all the data extracted and entered into the system has been standardized which allows us to make interagency comparisons. The Police Force Analysis

Network℠ allows agencies to compare their use of force practices with other agencies in the system.

The Police Force Analysis System℠ provides comprehensive information about police use of coercive authority and permits the study of the intersection of individual and contextual factors that explain situational, temporal, and spatial variation in the distribution of police coercive authority. PFAS supports meaningful community engagement about police coercion by providing comprehensive and relevant data to address and inform community concern regarding police-citizen interactions.

## Data Collection from the San Jose Police Department

SJPD provided two types of reports for coding: (1) General Offense (GO) reports and (2) electronic Force Response Reports. These reports were received as Adobe Acrobat files and Excel spreadsheets. In addition, SJPD provided electronic data on some of the incident details (date, time, address, etc.) and subject details (age, race, gender).

In February 2019 Police Strategies LLC received SJPD use of force reports from the last six months of 2018. Data entry was completed in April 2019 and then the information was processed through the system's legal algorithms. Finally, the interactive dashboards were updated. All the data entered into the system was geocoded and SJPD was able to provide shape files for the department's divisions, districts, beats and grids. This enabled us to prepare several customized dashboards that present the use of force data geographically.

The Department has contracted for ongoing updates of PFAS. The next Summary Report will be produced in mid-2019.

# <u>Summary of San Jose PD's Police Force Analysis System℠</u>

## 1) Date, Time and Location of Use of Force Incidents

Uses of force do not have a distinct seasonality with an average of 56 incidents per month. The use of force is more common in the month of May with an average of 64 incidents and less common in December and January with 50 and 48 incidents respectively. Over the last four years monthly uses of force peaked in July 2018 at 72 and was lowest in February 2017 at 34. Force occurred most often on Saturdays (121 incidents/year) and were lowest on Tuesdays and Wednesdays (79 incidents/year). Each day use of force was most common between the hours of 4pm and 2am peaking between 10pm and midnight.

Streets are the most common location for uses of force to occur (55%) followed by businesses (14%). Twenty-three percent of incidents happened inside or outside of a residence. Less than 8% of use of force incidents occurred at parks, schools, nightclubs or other locations.

Nearly two-thirds of use of force incidents arose from a dispatched call for service while 27% were the result of an officer-initiated stop.

The most common call type for force incidents was for a violent crime (33%) followed by a traffic stop or infraction (17%) and property crimes (17%).



## Use of Force Incident Locations



## Use of Force Heat Map



## 2) Force Frequency

Over the last four years 904 San Jose PD officers have used force 4,975 times in 2,670 separate incidents.  On average there are 668 use of force incidents each year.

Two officers used force 41 times each over the four-year period and they were involved in 3.1% of all the force incidents.  Eight officers used force between 30 and 34 times.  Altogether these 10 officers made up 1.1% of the officers who used force but accounted for 6.8% of all uses of force.  There were 354 officers who only used force once or twice during the last four years.

On average about 50% of the officers in the department use force in any given year.  These officers use force  2.5 times annually.  The top 10% of officers who use force are responsible for 27% of the total uses of force by the department.

For every 10,000 residents in San Jose, the department uses force 6.2 times.  About 4% of all arrests results in a use of force.

## 3) Force Justification

The Force Justification Score is based upon the four Graham Factors: (1) seriousness of the crime being investigated; (2) the level of threat to the officer or others; (3) the level of resistance; and (4) whether the subject fled from the officer.  Low Justification Scores are indicative of incidents where subjects were not committing serious crimes, did not pose a significant threat to the officer or others, did not present a high level of resistance and did not flee.

Over the last four years, 16% of San Jose's use of force incidents had low Force Justification scores (<6).  The average justification score was 9.4 on a scale of 0 to 20 which is above average for other departments.  For each of the four Graham factors, San Jose scored highest in the resistance level and the crime level categories and lowest in the threat level category.  This indicates that when San Jose officers use force, they are facing more serious crimes and higher levels of resistance, but subjects are less likely to present an immediate threat to the officers or others.

Eight percent of incidents received the highest justification score of 20. Most of these cases involved assaults on the officers before the officer made the decision to use force.

In the last four years 442 officers were involved in at least one incident with a low Force Justification score and 188 of these officers were involved in more than one low Force Justification incident. One officer was involved in 11 incidents and another officer was involved in 9 incidents.

Low Force Justification incidents were more likely to have the following characteristics than cases with higher Force Justification scores:

- Subject was female (23%)
- The most serious charge referred for prosecution was a drug crime (29%)

Average Force Justification Scores were lower for women than men. Native American subjects had higher Force Justification scores than other racial groups. Average Force Justification scores declined with the subjects' age. Older subjects had lower Force Justification scores than younger subjects.

Officers were much less likely to use weapons during a low Force Justification incident and were less likely to use physical strikes as well.

## 4) Force Factor

The Force Factor Score is based upon the proportionality of force to resistance and scores range from -6 to +6. A negative score means that the subject's resistance level was higher than the officers' force level. A medium Force Factor Score is between 0 and +2. This is the range where most officers can gain control of a subject by using force that is at least proportional to the level of resistance or slightly above. A Force Factor of +3 or above is considered a high score. This does not mean that the force was excessive, but these incidents do present a higher risk to the department.

Over the last four years 7% of incidents had a high Force Factor score (+3 or above). There were 59 incidents that had a +4 Force Factor and no incidents had a score of +5 or +6. There were 167 officers who were involved in at least one high Force Factor incident and 45

of those officers were involved in multiple incidents over the four-year period.  One K-9 officer was involved in 10 high Force Factor incidents.  Canine bites often result in a high Force Factor score because the subject is usually hiding from officers (Level 2 passive resistance) when they are bitten by the by the K-9 (Level 6 less lethal weapon force).  Another officer had 7 high Force Factor incidents.  This officer was involved in 26 force incidents and relied mostly on the use of weapons - OC (58%), impact weapons (12%) and projectile weapons (12%).  The routine use of weapons will result in higher than average Force Factor scores.

The most common Force Factor Score was +1 (42%) followed by 0 (26%).  These numbers indicate that most officers in the department behave very consistently when faced with a given level of resistance and they tend to use the minimal amount of force necessary to gain compliance.

Most of the high Force Factor incidents involved the use of a weapon (82%).  ECDs and projectile weapons were used in half of the high Force Factor incidents followed by canines (14%) and OC (12%).

When high levels of force are used against lower levels of resistance the subjects are controlled much faster with lower injury rates for officers but higher injury rates for subjects.

| | Force Factor | | |
| --- | --- | --- | --- |
| | Low (-1 to -2) | Medium (0 to +2) | High (+3 to +4) |
| Subject brought under control within 1 or 2 Force Sequences | 23% | 27% | 63% |
| Subject Injury Rate | 53% | 57% | 71% |
| Officer Injury Rate | 19% | 21% | 4% |
| Weapon Used by Officer | 25% | 34% | 82% |

## 5) Force Tactics

Of the 2,670 use of force incidents that occurred over the last four years, 64% involved physical force only, 12% involved only the use of a weapon(s) by officers and 24% involved both physical force and the use of a weapon.

Of the physical tactics that were used, grabbing/pulling/holding was the most common (77%) followed by takedowns (59%).



ECDs (16%) and impact weapons (15%) were the most common weapons used by officers. Firearm incidents were not included in the database.



In the last four years, 305 officers deployed their ECDs 529 times. Most deployments involved the use of the probe 77% and drive-stun mode was used 12% of the time. In 12% of deployments both probe and drive stun were used. The ECD was fully effective 54% of the time and in 31% of deployments it had no effect. There were two officers who deployed their ECDs 7 times during the four-year period and three officers who deployed the weapon 6 times.

Over the last four years officers have used 4,975 physical force tactics and weapons.  The four-year trends for physical force show that the use of strikes has been declining while officers are wrestling with subjects and using their body weight to hold subjects down more often.



The use of ECDs remained steady until 2018 when it dropped to 3.5% of all force tactics used.  The use of impact weapons had declined steadily over the last four years from 5.8% to 2.9%.  Similarly, the use of projectile weapons and OC has fallen to only 0.4%.  The use of canines remained relatively stable from year to year.



## 6) Subjects

The subject demographic groups that are most commonly found in the Department's use of force incidents have the following characteristics:

| Race | Gender | Age | Residence | Number of Subjects | Percentage of Force Incidents |
|------|--------|-----|-----------|--------------------|-------------------------------|
| Hispanic | Male | 18-29 | San Jose | 494 | 18.6% |
| Hispanic | Male | 30-49 | San Jose | 366 | 13.7% |
| Hispanic | Male | 30-49 | Transient | 103 | 3.9% |
| White | Male | 30-49 | San Jose | 99 | 3.7% |
| All Other Demographic Groups | | | | 1,608 | 60.2% |





The following table shows how the subjects from San Jose PD compare with subjects from the other 55 agencies in the Police Force Analysis Network℠.

| Subject Characteristic | Percentage of Incidents* | Interagency Average | Interagency Comparison |
|---|---|---|---|
| Female | 16% | 17% | Average |
| Non-White | 81% | 31% | High |
| Juvenile | 7% | 6% | Average |
| Over Age 50 | 11% | 9% | Average |
| Transient | 17% | 6% | High |
| Resident of Another Jurisdiction | 12% | 29% | Below Average |
| Under the Influence of Alcohol or Drugs | 57% | 46% | Above Average |
| Mental Health Issue | 25% | 17% | Above Average |
| Suicidal | 3% | 8% | Below Average |
| *For comparative purposes, missing data is excluded from the percentages. | | | |

One in four subjects fled from the officer, while 12% possessed some type of weapon. Thirty-two subjects were armed with a firearm and four of them pointed their weapon at officers.

Most subjects engaged in some type of physical resistance (86%) while 102 subjects used a weapon against the officer.  Four percent of subjects were only passively resisting when force was used against them.

## 7) Disparity Analysis

While census data of the residential population is sometimes used as a benchmark for a disparity analysis, it does not provide an adequate measure to assess the possible impacts of bias by police officers. There are many factors that could affect the demographic disparities between uses of force and the population that have nothing to do with officer bias such as crime rates, compliance rates, possession of weapons, poverty rates, deployment strategies, etc.

A better benchmark for measuring demographic disparities in police uses of force is arrest data.[4] Almost every use of force incident is associated with an arrest. All things being equal, we would expect to see the same proportion of subject characteristics for those who are arrested as those who have force used against them. If there is a demographic disparity observed between the use of force data and the arrest data, this disparity could be caused by differential subject behavior (i.e. one subject group is more or less likely to resist arrest than other groups) or differential officer behavior (i.e. officers are more or less prone to use force against one subject group than other groups) or a combination of differential behavior from both subjects and officers.

Arrest data from the San Jose Police Department from 2017 and 2018 was examined and compared to the use of force data collected by the Police Force Analysis System. Arrest data was broken down by gender, race and age and the use of force data was organized into the same categories as the arrest data.[5] We also gathered population demographic data from the US Census Bureau and other sources.

---

[4] A recent report from the University of Texas at San Antonio and the University of Cincinnati used this methodology to examine racial disparities between uses of force and arrests using data from the from the Tulsa Police Department.
https://bloximages.newyork1.vip.townnews.com/tulsaworld.com/content/tncms/assets/v3/editorial/6/48/64860d34-4fe8-5c06-bc0f-92e7a85acab3/5e60500e75e7e.pdf.pdf
[5] The arrest data provided by the Department was broken down into only four racial/ethnic groups (Hispanic, Black, White and Other). Based on the more detailed racial breakdown of use of force data, we would predict that the "Other" group is comprised most of Asian arrestees and would also include Native Americans, Pacific Islanders and other racial categories.

In 2018 the estimated total population of the City of San Jose was 1,045,000. During the two-year period from 2018 to 2019 the Department made 32,741 arrests and used force against 1,290 subjects. The annual arrest rate per thousand population was 16 and the use of force rate per 100 arrests was 3.9%. The following tables provide the gender, race and age composition of the estimated population of San Jose in 2018 and the demographic composition of all arrestees and subjects who had force used against them in 2017 and 2018:

| Gender | Population | Arrests | Uses of Force |
|---|---|---|---|
| Male | 50.3% | 77.5% | 82.2% |
| Female | 49.7% | 22.5% | 17.8% |

| Race | Population | Arrests | Uses of Force |
|---|---|---|---|
| Other | 42.0% | 10.4% | 9.4% |
| Hispanic | 31.2% | 55.3% | 54.9% |
| White | 23.6% | 20.8% | 21.4% |
| Black | 3.2% | 13.5% | 14.3% |

| Age | Population | Arrests | Uses of Force |
|---|---|---|---|
| <18 | 26.4% | 7.5% | 8.4% |
| 18-24 | 9.9% | 17.9% | 21.4% |
| 25-29 | 9.0% | 15.4% | 16.5% |
| 30-39 | 17.7% | 27.3% | 28.5% |
| 40-49 | 14.9% | 17.3% | 14.3% |
| 50-59 | 10.6% | 11.5% | 8.7% |
| 60+ | 11.5% | 3.2% | 2.2% |

A Disparity Index was calculated for both arrests and uses of force.  The Arrest Disparity Index is the percentage of arrests of a demographic subgroup compared to that group's percentage in the overall population.  The Use of Force Disparity Index is the percentage of uses of force of a demographic subgroup compared to that group's proportion of overall arrests.  A disparity index of 1 means that there is no disparity between the two variables.  A disparity index of less than 1 means that the group appears less frequently than would be expected while a disparity index greater than once means that the group appears more frequently than expected.

When we examine arrests by gender, we find that males are 54% more likely to be arrested than we would expect based on their percentage of the population while females are 55% less likely to be arrested.  When arrests by race are examined, we find that Whites and Other races are underrepresented in the arrests while Hispanics and Blacks are overrepresented.  We also find disparities by age.  Adults between the ages of 18 and 39 are more than 50% more likely to be arrested than their population numbers would suggest while juvenile and adults over 60 are over 70% less likely to be arrested.  The arrest disparities observed for gender and age are supported by criminal behavior research – males are more likely to commit crimes than females and the peak age range for criminal behavior is between 18 and 24.

When we compare uses of force and arrests, we see much less disparity.  Males are only 6% more likely to have force used against them than we would expect based on their arrest numbers, and females are 21% less likely.  Juvenile arrestees are much more likely to have force used against them than arrestees over 40 and the 18 to 24 age group has the highest disparity.  While there were large arrest disparities by race, there is virtually no racial disparity when uses of force are compared  to arrests.

Based on the available data, we cannot reach any definitive conclusions as to the cause of observed demographic disparities.  However, the lack of any significant racial disparities between uses of force and arrests suggests that resistive behavior is similar across racial groups and officers do not treat subjects differently based solely on the subject's race.

**Disparity Index**

**Arrest and Use of Force Data from 2017-2018**

| Gender | Arrests / Population | Uses of Force / Arrests |
|---|---|---|
| Male | 1.54 | 1.06 |
| Female | 0.45 | 0.79 |
| | | |
| **Race** | | |
| Other | 0.25 | 0.90 |
| Hispanic | 1.77 | 0.99 |
| White | 0.88 | 1.03 |
| Black | 4.17 | 1.06 |
| | | |
| **Age** | | |
| <18 | 0.28 | 1.12 |
| 18-24 | 1.80 | 1.20 |
| 25-29 | 1.71 | 1.07 |
| 30-39 | 1.54 | 1.05 |
| 40-49 | 1.16 | 0.82 |
| 50-59 | 1.09 | 0.75 |
| 60+ | 0.27 | 0.69 |

## 8) Injuries

In the last four years  there were 407 officers who were injured a total of 696 times. Fourteen officers were injured between 5 and 9 times.  Most officer injuries involved a minor scrape (46%) or a cut (27%), but 12 officers suffered a fracture.  Officers received more than half of their injuries on their hands or arms.

Fourteen percent of force applications by officers resulted in an injury to the officer who used force.  Officers were more likely to get injured when they used a lateral neck restraint (56% injured) or wrestled with a subject (28% injured) and were least likely to get injured when they used a canine (3% injured) or OC (11% injured).

Of the officers who were injured, 12% were treated by EMTs and 18% were treated at a hospital.

Over the last four years 1,536 subjects that had force used against them were injured (58% of all incidents).  Of the subjects who were injured, most of the injuries were minor: complain only (17%), ECD probe (9%), scrape (35%) or cut (24%).  Ninety-three subjects were bitten by a canine,  52 subjects suffered a fracture or broken tooth and 7 subjects lost consciousness.  Subjects received about half of their injuries on their head and 37% of injuries were on the hands or arms.

Subjects were most likely to receive an injury during a canine application (100% injured) or the use of an ECD (82% injured), OC (81% injured), or an impact weapon (77% injured).  Of all the physical force techniques used the following were most likely to injure the subject: lateral neck restraint (88% Injured), strikes (75% injured) and wrestling with the subject (74% injured).

Of the all the subjects who were injured, 14% were treated by EMTs only and 61% were treated at a hospital.

## 9) Trends

Over the period from 2015 to 2018 the following force trends were observed:

- The annual number of use of force incidents dropped by 14% from 2015 to 2016 and then remained stable for the next two years.
- The average Force Factor and Force Justification Scores remained very stable over the four-year period and were in the average range of other agencies.
- In 2018 the average number of Force Sequences rose to 4.2 which is in the high range.  This means that it is taking longer for officers to control subjects which could lead to greater risk of injury for officers and subjects.
- The rate of active resistance by subjects fell by 17% over the last four years and the subject's use of deadly force against the officer fell from 3.4% to 0.3%.
- Officers are moving away from less lethal weapons and are using more physical force to control subjects.  Incidents involving a less lethal weapon fell from 40% to 31%.
- The average annual number of force incidents per officer has fallen steadily from 2.9 to 2.3.
- More incidents occurred on the street in 2018 (60%) than prior years (53%)
- The subject's use of deadly force fell from 3.4% to 0.3%
- Incidents where the subject attempted to flee increase from 10% to 17%, but subjects fleeing on foot or by vehicle fell from 29% to 27%.
- In 2018, subjects that had mental health issues (29%) or were suicidal (5%) were at the highest rate during the last 4 years.

| Subject/Incident Characteristic | 2015 | 2018 | Change |
|---|---|---|---|
| Subject Possessed a Knife | 4% | 9% | +125% |
| Juvenile Subject | 5% | 10% | +100% |
| Subject was Possibly Armed | 18% | 33% | +83% |
| Subject was Suicidal | 3% | 5% | +67% |
| White Subject | 16% | 22% | +38% |
| Subject had Mental Health Issue | 22% | 29% | +32% |
| Female Subject | 14% | 17% | +21% |
| Force Occurred on the Street | 53% | 60% | +13% |
| Hispanic Subject | 64% | 54% | -16% |
| Subject Assaulted Officer During Force | 40% | 31% | -23% |
| Original Call was for Traffic, Liquor or Infraction | 21% | 16% | -24% |

## 10)   Force Tactics Trends

Between January 2015 and December 2018 there were 904 officers who used force a total of 4,975 times.  In general, officers are moving away from less lethal weapons and higher levels of force and are resolving more incidents with lower levels of physical force.  In 2015 57% of all tactics used involved low levels of physical force but by 2018 low level force had increased to 68%.  Between 2015 and 2018 the use of less lethal weapons fell from 40% of all incidents to 31%.  As a percentage of all force tactics used, physical strikes have been declining, while using weight to hold down a subject and wrestling have been increasing. The use of takedowns has remained constant.  From 2015 to 2018 the use of impact weapons has been cut in half from 5.8% to 2.9% and the use of projectile weapons has fallen from 1.4% to 0.4%.  In 2018 the use of Electronic Control Devices fell from about 4.5% to 3.5%.  Canine use has remained steady at under 1% while the OC rate was cut in half in 2018 to 0.4%





## 11)   Geographic Analysis

In 2015 Foothill, Western and Central Divisions each had about 200 incidents involving a use of force while the Southern Division only had 130 incidents.  In 2016 the total number of use of force incidents decreased by 102 but the geographic distribution remained similar with Southern having the fewest incidents (120) and the other three Divisions with about 170 incidents each.  In 2017 the total number incidents decreased by only 10 but the geographic distribution changed dramatically.  The Western Division had 204 incidents while the other three Divisions had about 140 incidents each.   In 2018 the geographic pattern of force changed again.  For the first time in the last four years, the number of incidents in the Southern Division (167 incidents) exceeded both the Foothill Division (162 incidents) and the Central Division (141 incidents).

The number of use of force incidents in the Southern Division had been climbing steadily since the first quarter of 2017 but dropped dramatically in the fourth quarter of 2018.  Central and Foothill Divisions fell from their highs in 2015 and 2016 and have maintained a lower level in 2017 and 2018.  Western has consistently had the highest annual number of force incidents over the last four years.

Since 2015 Lincoln District has consistently had the highest number of force incidents and now comprises about 15% of all uses of force in the City.  Charles and Edward Districts have the next highest numbers of force incidents, but their numbers have been declining since 2015.   From 2016 to 2018 use of force incidents in Yellow and Tom Districts more than doubled.  In 2017 X-Ray District had the second highest number of use of force incidents but it fell to 5th place in 2018.

Uses of force that result from an officer-initiated stop (onview) have consistently been lower in the Southern Division compared to the other three Divisions.  Central Division has the

highest percentage of uses of force resulting from an onview 34% while 75% of uses of force in the Southern Division come from dispatched calls.

By 2018 the subject flight rates and average subject threat levels were similar across all four Divisions. Lincoln and Frank Districts had the highest average subject threat levels while Robert and Tom Districts had the lowest. Subjects in King and Victor Districts were the most likely to flee from officers (37%).

Southern Division officers have consistently spent more time interacting with subjects before using force, and this may be due to the fact that a higher percentage of their force incidents come from dispatched calls that they are investigating rather than officer onviews.

In 2018 the average Justification Scores were similar among the four Divisions, but Western Division had a higher average Force Factor Score than the other Divisions. The average Force Factor Score has been increasing in Western Division since 2016.

Officers were more likely to be injured in the Central Division while Western and Foothill Divisions had higher subject injury rates.

ECD use has been declining in all Divisions except for Southern where it increased to 20% of all force incidents in 2018. Impact weapon use has fallen in all Divisions with the greatest decline in Central (9% of force incidents in 2018). Takedowns are used most often in Foothill and Central Divisions (68% of force incidents), while strikes have been declining in all Divisions and are lowest in Southern Division (19% of force incidents).

Over the last four years the percentage of female subjects has increased in Western, Foothill and Central Divisions and by 2018 18% of all uses of force involved a female subject. The average age of subject has remained steady except in Foothill Division where it has increased

from 29 in 2015 to 33 in 2018. Subjects with mental health problems have increased in all Divisions and by 2018 were highest in Central and Southern Divisions (33% of force incidents).

The percentage of Hispanic subjects has fallen over the last four years in Foothill and Central Divisions and has increased in Southern Division. The number of White subjects has increased in Southern and Western Divisions, while other racial groups have remained relatively consistent from year to year. The number of Asian subjects in Foothill Division increased from 10 to 25 between 2017 and 2018. Hispanics made up the largest portion of subjects in every District except for Yellow and Tom where White subjects were most common.

## 12)   Long-Term Use of Force Trends

The last use of force report created by SJPD used data from 2007 and presented about 20 data fields taken from the Force Response Reports.  While not all this data is directly comparable with the data contained in PFAS, we were able to make direct comparisons with the data taken from the Force Response Reports in recent years.  The following is a comparison of the data contained in the San Jose Police Department's 2007 Force Response Report and the Department's use of force data from 2015, 2016 and 2017 contained in the Police Force Analysis System℠.

### a) Arrests and Uses of Force

From 2007 to 2018 the number of annual arrests made by SJPD fell by 50% from 35,998 arrests to 17,906 arrests.  At the same time the number of uses of force fell by 43% from 1,156 in 2007 to 662 in 2018. In 2007 the use of force rate (uses of force per 100 arrests) was 3.2%. The rate rose to 4.2% in 2016 before falling back to 3.7% by 2018. Between 2015 and 2018 the use of force rate has remained stable at an average of 3.9%. When the department makes fewer arrests, officers will focus on more serious incidents particularly those involving violent crimes and weapons offenses.  Subjects involved in these types of crimes tend to be less compliant generating a higher use of force rate.  Therefore, some of the increase in the

department's use of force rate since 2007 is a product of an increasing percentage of violent crimes in overall arrests (17.5% in 2015 to 21.5% in 2017).

## b) Calls for Service and Uses of Force



From 2007 to 2018 the number of annual calls for service to SJPD fell by 23% from 436,624 calls to 338,124 calls. At the same time the number of uses of force fell by 43% from 1,156 in 2007 to 662 in 2018. In 2007 the use of force rate (uses of force per 100 calls for service) was 0.265% and by 2018 it had fallen to 0.196%.



### c) Day of the Week

Over the last 11 years the proportion of use of force incidents occurring on the weekends has declined from 40% to 30%. Most of this decline has shifted to the Mondays to Thursday time period.



| | Mon | Tue | Wed | Thu | Fri | Sat | Sun |
|---|---|---|---|---|---|---|---|
| ▪ 2007 | 11% | 12% | 10% | 11% | 17% | 20% | 20% |
| ▪ 2015 | 19% | 9% | 10% | 13% | 16% | 19% | 19% |
| ▪ 2016 | 12% | 14% | 13% | 14% | 14% | 20% | 14% |
| ▪ 2017 | 14% | 10% | 13% | 15% | 17% | 16% | 14% |
| ▪ 2018 | 14% | 14% | 12% | 15% | 15% | 17% | 13% |

### d) Time of Day

Between 2007 and 2018 the most significant change in the time of day that force incidents occur was from 12am to 4am. In 2007 nearly one-third of all force incidents occurred during this time period, but by 2018 this was down to 13% of all incidents. During this same period use of force was becoming more and more common during the day between the hours of 8am and 8pm.



| | 12am-4am | 4am-8am | 8am-12pm | 12pm-4pm | 4pm-8pm | 8pm-12am |
|---|---|---|---|---|---|---|
| ▪ 2007 | 32% | 5% | 7% | 11% | 20% | 25% |
| ▪ 2015 | 21% | 7% | 10% | 11% | 23% | 29% |
| ▪ 2016 | 14% | 7% | 13% | 13% | 24% | 29% |
| ▪ 2017 | 18% | 5% | 11% | 14% | 27% | 25% |
| ▪ 2018 | 13% | 7% | 14% | 15% | 24% | 27% |

### e) Gender of Subjects

The gender of subjects involved in force incidents has changed in the last two years. The percentage of female subjects has increased from 12.7% to 17.4% in 2018.



| | Male | Female |
|---|---|---|
| 2007 | 87.3% | 12.7% |
| 2015 | 86.0% | 14.0% |
| 2016 | 86.4% | 13.6% |
| 2017 | 81.7% | 18.3% |
| 2018 | 82.6% | 17.4% |

### f) Age of Subjects

The proportion of subjects under age 20 that were involved in force incidents has decreased from 17.8% in 2007 to 13.3% in 2018. Subjects over 60 has risen from 0.8% to 2.4%. For the last four years the average age of all subjects has remained steady at around 32 years.



| | 10-14 | 15-19 | 20-24 | 25-29 | 30-34 | 35-39 | 40-44 | 45-49 | 50-54 | 55-59 | 60+ |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 2007 | 1.8% | 16.0% | 26.3% | 17.3% | 11.4% | 9.3% | 7.3% | 5.6% | 3.1% | 1.1% | 0.8% |
| 2015 | 0.8% | 12.6% | 18.4% | 15.9% | 16.1% | 11.0% | 6.9% | 7.7% | 6.8% | 2.7% | 1.1% |
| 2016 | 0.3% | 11.1% | 17.1% | 19.9% | 13.5% | 13.3% | 6.1% | 5.8% | 6.6% | 4.7% | 1.4% |
| 2017 | 1.3% | 12.6% | 14.0% | 17.3% | 15.1% | 13.7% | 7.6% | 8.4% | 4.9% | 3.2% | 1.9% |
| 2018 | 1.8% | 11.5% | 18.4% | 15.7% | 16.5% | 11.8% | 7.1% | 5.4% | 4.5% | 4.8% | 2.4% |

# Interagency Comparative Analysis Using the
# Police Force Analysis Network℠

As a contributor of data to the Police Force Analysis System℠, San Jose PD also has access to data from other agencies in the system through the Police Force Analysis Network℠ (PFAN). PFAN currently has use of force data from 56 law enforcement agencies in seven states with more than 8,000 incidents involving 3,000 officers who used force 15,000 times.  This is the largest database of its kind in the nation.  Although the incident reports from each of these agencies uses a different format, all the data extracted and entered into the system has been standardized which allows us to make meaningful interagency comparisons.  The Police Force Analysis Network℠ allows agencies to compare their use of force practices with other agencies in the system.

San Jose PD now has four years of historical data in the system.  For purposes of the interagency comparisons we used average annualized numbers from the last three years.

This report is deigned to alert the Department of potentially high-risk areas that may need improvement as well as areas where the Department is performing with low levels of risk.  A high-risk score does not necessarily mean that there is a problem that needs to be addressed and for that reason this report does not recommend any specific corrective actions.  Instead the annual use of force reports and comparative dashboards will allow the Department to focus more attention on higher risk areas and determine whether any adjustments to policies, procedures or training are warranted.  Similarly, a low risk score does not mean that there are no issues that need to be addressed.  Departments are encouraged to continue to conduct individual force reviews and use the dashboard systems to supplement and enhance those reviews to identify issues that might not otherwise be uncovered.  The system will also help to highlight those areas where the Department is performing well and will help to maintain those performance levels.

1. **Risk Factor Comparisons**

PFAN provides a comprehensive comparative risk analysis of relevant factors involved in use of force incidents.  The primary risk areas are:

1.  Frequency of Force – The more uses of force an agency has the greater the risk of injuries, complaints and lawsuits resulting from these incidents.
2.  Force Justification and Force Factor – Force incidents with low Force Justification Scores are at higher risk of being found to be unnecessary while incidents with high Force Factor scores are at higher risk of being found to be excessive.
3.  Speed of Force and Force Sequences – The faster an officer decides to use force, the higher the risk that the force may be unnecessary.  The more force sequences it takes an officer to control a subject, the higher the risk that both the officer and the subject will be injured.
4.  Injury Rates – Higher injury rates pose risks to the health and safety of officers and subjects and are more likely to result in complaints and lawsuits.

The following risk rankings are based upon a comparison with the 56 agencies currently in the Police Force Analysis Network℠.  Lower Risk scores are more than one standard deviation below the mean.  Higher Risk scores are more than one standard deviation above the mean.  Medium Risk scores are within one standard deviation of the mean.

⬤ Higher Risk

◎ Medium Risk

⬤ Lower Risk

| Risk Level | Risk Type | Metric | Value | Interagency Comparison |
|---|---|---|---|---|
| ◯ | Force Frequency | Uses of force per 1,000 population | 0.62 | Below Average |
| ◯ | Force Frequency | Uses of force per 100 arrests | 3.9 | Average |
| ◯ | Force Frequency | Percentage of officers in the department using force annually | 50% | Above Average |
| ◯ | Force Concentration | Average annual uses of force per officer using force | 2.5 | Above Average |
| ◯ | Force Concentration | Percentage of force incidents involving the top 10% of officers | 27% | Below Average |
| ◯ | Graham v Connor | Percentage of incidents with low Justification Scores | 16% | Below Average |
| ◯ | Graham v Connor | Percentage of incidents with high Force Factor Scores | 7.1% | Above Average |
| ◯ | Graham v Connor | Percentage of incidents with both low Justification and high Force Factor scores | 2.5% | Above Average |
| ◯ | Force Duration | Percentage of incidents with 5 or 6 Force Sequences | 29% | Above Average |
| ◯ | Force Duration | Percentage of incidents where the Speed of Force was immediate | 45% | Average |
| ◯ | Injury | Subject total injury rate | 58% | Above Average |
| ◯ | Injury | Subject serious injury rate | 6% | Average |
| ◯ | Injury | Subject medical treatment rate | 44% | Above Average |
| ◯ | Injury | Officer injury rate | 20% | Above Average |

San Jose PD was within one standard deviation of the mean for every risk metric and did not have any areas of higher risk compared with other agencies.  While the Department has above average risk in 8 of the 14 metrics it is not a statistical outlier among the 56 agencies.

## 2.  Force Tactics Comparisons

PFAN contains data on all the force tactics and weapons that officers use.  The system allows department wide usage rates to be compared across agencies.  The following table lists the usage rates for weapons and physical tactics by San Jose PD officers and then compares these rates with the averages from other agencies.  San Jose PD officers use impact weapons and projectile weapons more frequently than officers from other agencies in the system.  For physical tactics San Jose PD officers use strikes and pushing more frequently than officers from other agencies.

| Weapon | Percentage of Incidents Used | Interagency Average | Interagency Comparison |
|---|---|---|---|
| Electronic Control Device | 16% | 26% | Below Average |
| Impact Weapon | 15% | 2.7% | High |
| Projectile Weapon | 4.3% | 0.7% | High |
| Canine Bite | 3.9% | 3.7% | Average |
| Pepper Spray | 3.7% | 2.7% | Average |

| Physical Tactic | Percentage of Incidents Used | Interagency Average | Interagency Comparison |
|---|---|---|---|
| Grab/Hold/Pull | 77% | 72% | Average |
| Takedown | 59% | 55% | Average |
| Used Weight | 43% | 26% | Above Average |
| Strike | 29% | 14% | High |
| Push | 23% | 12% | High |
| Pain Compliance | 19% | 22% | Average |
| Wrestle | 14% | 19% | Average |
| Hair Hold | 2.7% | 3.6% | Average |
| Lateral Neck Restraint | 0.6% | 2.7% | Below Average |

| All Force Tactics Used | Percentage of Incidents Used | Interagency Average | Interagency Comparison |
|---|---|---|---|
| Only Physical Tactics Used | 64% | 64% | Average |
| Both Physical Tactics and Weapons Used | 24% | 26% | Average |
| Only Weapons Used | 12% | 10% | Average |

### 3. Subject Injury Rate Comparisons

SJPD is above average for all types of subject injuries except for canine bites and loss of consciousness. Compared to other jurisdictions, subjects from San Jose are three times more likely to complain of an injury or pain after a force incident when no visible injury is present. While San Jose PD's fracture rate has declined in recent years, it is still higher than the average for other agencies.

| Minor Injury | Subjects Injured | Interagency Average | Interagency Comparison |
|---|---|---|---|
| Complaint Only | 10% | 3% | High |
| ECD Probe | 5% | 11% | Below Average |
| Bruise or Scrape | 20% | 13% | Above Average |
| Cut or Bleeding | 14% | 12% | Average |
| Chemical | 2.8% | 1.4% | Average |

| Serious Injury | Subjects Injured | Interagency Average | Interagency Comparison |
|---|---|---|---|
| Canine Bite | 3.5% | 3.1% | Average |
| Unconscious | 0.26% | 0.75% | Below Average |
| Fracture (including teeth) | 2.0% | 0.78% | Above Average |

4. **Other Force Characteristics**

For most of the criteria measured by the Force Analysis Network℠, San Jose PD is within the average range of the other agencies.  The following table lists those force characteristics which are significantly different in San Jose compared with the other jurisdictions.  These are simply descriptive measures and are not necessarily associated with increased risk.

| Characteristics of Force Incidents that are **More Common** in San Jose than Other Jurisdictions | Characteristics of Force Incidents that are **Less Common** in San Jose than Other Jurisdictions |
|---|---|
| Three or more officers were present when force was used | Only one officer was present when force was used |
| Three or more officers used force against the same subject | Only one officer used force |
| The reason for the contact was a violent crime or a traffic stop | The reason for the contact was a welfare check or a warrant |
| The most serious crime referred was a violent crime or a drug crime | No crime was referred for prosecution |
| The force incident took 5 or 6 sequences before the subject was under control | The force incident took 3 or 4 sequences before the subject was under control |
| Subject was under the influence of alcohol or drugs and/or had mental health issues | Subject was suicidal |
| Subject was a resident of San Jose or a transient | Subject was a not a resident of the jurisdiction |
| Subject was non-white | Subject was white |
| Subject made a threatening movement | Subject made a verbal threat to the officer |
| Subject was armed with an improvised weapon | Subject was armed with a firearm |

## PROOF OF SERVICE

### Case No. 5:19-cv-06768NC
### Case Name. Robinson v. City of San Jose

I, HILDA AKBARIAN, declare that I am a resident of or employed in the County of Los Angeles, California. I am over the age of 18 years and not a party to the entitled case. The name and address of my residence or business is JOSEPH FARZAM LAW FIRM 11766 Wilshire Blvd., Suite 280, Los Angeles, California 90025.

On August 20, 2021, I served the foregoing document described as:

**DECLARATION OF JOSEPH S. FARZAM IN SUPPORT OF PLAINTIFF'S OPPOSITION TO THE MTOIIN FOR PRETRIAL SUMMARY JUDGMENT**

_____      by placing the document(s) listed above in a sealed envelope, addressed as set forth below, and placing the envelope for collection and mailing in the place designated for such in our offices, following ordinary business practices.

_____      by transmitting via facsimile the document(s) listed above to the fax number(s) set forth below on this date before 5:00PM.

__X__         by transmitting via electronic mail the document(s) listed above to the electronic mailing address set forth below on this date before 5:00PM.

_____      by causing a true copy thereof to be personally delivered to the person(s) at the address(es) set forth below.

on the parties listed below by placing a true copy thereof enclosed in a sealed envelope for collection and mailing in the United States Postal Service following ordinary business practices at Los Angeles, California addressed as follows:

### SEE ATTACHED SERVICE LIST

I am readily familiar with the ordinary practice of the business of collecting, processing and depositing correspondence in the United States Postal Service and that the correspondence will be deposited the same day with postage thereon fully prepaid.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on August 20, 2021 in Los Angeles, California.

HILDA AKBARIAN

<u>**SERVICE LIST**</u>

**Case No. 5:19-cv-06768NC**
**Case Name. Robinson v. City of San Jose**

Nora Frimann, Esq.
Ardell Johnson, Esq.
Mathew Pritchard, Esq.
Office of the City Attorney
200 East Santa Clara Street, 16th Floor
San Jose, CA 95113-1904
Tel: (408) 535-1900
Email: <u>cao.main@sanjoseca.gov</u>

Attorney for Defendants